**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CLOVER TECHNOLOGIES GROUP, LLC, *et al.*,[1] | ) | Case No. 19-12680 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DISCLOSURE STATEMENT FOR THE JOINT PREPACKAGED CHAPTER 11 PLAN OF
REORGANIZATION OF CLOVER TECHNOLOGIES GROUP, LLC AND ITS DEBTOR AFFILIATES**

Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Matthew C. Fagen (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone: (302) 426-1189
Facsimile:  (302) 426-9193

-and-

Morton R. Branzburg (*pro hac vice* pending)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone: (215) 569-3007
Facsimile:  (215) 568-6603

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Dated:  December 17, 2019

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Clover Technologies Group, LLC (9236); 4L Holdings Corporation (0292); 4L Technologies Inc. (5035); Clover Ithaca Properties, LLC (9236); Refurb Holdings, LLC (1230); Clover Wireless, LLC (0313); and Valu Tech Outsourcing, LLC (3563).  The location of the Debtors' service address in these chapter 11 cases is: 5850 Granite Parkway, Suite 720, Plano, Texas 75024.

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT**
DISCLOSURE STATEMENT, DATED DECEMBER 13, 2019

**SOLICITATION OF VOTES TO ACCEPT OR REJECT**
**THE DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION**

**YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE AS OF THE VOTING RECORD DATE, YOU HELD A CLAIM AGAINST OR INTEREST IN THE DEBTORS IN ONE OF THE FOLLOWING CLASSES AND THEREFORE YOU ARE ENTITLED TO VOTE ON THE PLAN:**

| VOTING CLASSES | NAME OF CLASS UNDER THE PLAN |
|---|---|
| **CLASS 3** | **Term Loan Secured Claims** |
| **CLASS 7** | **Existing Equity Interests** |

| DELIVERY OF BALLOTS |
|---|
| 1.      Ballots must be actually received by the Solicitation Agent before the Voting Deadline (<u>11:59 p.m., prevailing Eastern Time, on January 15, 2020</u>). |
| 2.      Ballots may be returned by the following methods:  (a) in the enclosed pre-paid, pre-addressed return envelope; (b) via first class mail, overnight courier, or hand delivery to the address set forth below; or (c) via electronic submission through the Solicitation Agent's online voting portal at https://cases.stretto.com/Clover. |
| <div align="center">CLOVER TECHNOLOGIES GROUP BALLOT PROCESSING<br>C/O STRETTO<br>8269 E. 23RD AVE, STE. 275<br>DENVER, CO 80238</div> |
| If you have any questions on the procedures for voting on the Plan, please contact the Solicitation Agent by emailing teamclover@stretto.com and referencing "Clover Technologies Group" in the subject line, or by calling (855) 923-0996 (domestic toll free) or (949) 341-7245 (international toll), and asking for the solicitation group. |

## RECOMMENDATION BY THE DEBTORS

EACH OF THE DEBTORS STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS OR INTERESTS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT NO LATER THAN <u>JANUARY 15, 2020 AT 11:59 P.M. (PREVAILING EASTERN TIME)</u> PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND ON THE BALLOTS.  THE BOARD OF DIRECTORS, GENERAL PARTNER, MEMBER, OR MANAGER, AS APPLICABLE FOR EACH OF THE DEBTORS HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERIES TO CLAIM AND INTEREST HOLDERS.  AT THIS TIME, EACH DEBTOR BELIEVES THAT THE PLAN AND RELATED TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES.

PLEASE NOTE THAT THE DESCRIPTION OF THE PLAN PROVIDED THROUGHOUT THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY PROVIDED FOR CONVENIENCE PURPOSES.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES CONTAINED IN THIS DISCLOSURE STATEMENT AND THE PLAN.

A COPY OF THE PLAN TO WHICH THIS DISCLOSURE STATEMENT RELATES IS ATTACHED HERETO AS <u>EXHIBIT A</u>.

READERS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE OR TO MAKE ANY REPRESENTATION IN CONNECTION WITH THE PLAN AND THIS DISCLOSURE STATEMENT.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR THE PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL IN THIS DISCLOSURE STATEMENT.

ANY DISCUSSION OF FEDERAL, STATE, LOCAL, OR NON-U.S. TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO THE READER OR A HOLDER OF A CLAIM OR INTEREST. READERS AND ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

**Neither this Disclosure Statement nor the Plan has been filed with the United States Securities and Exchange Commission (the "SEC") or any state authority. The Plan has not been approved or disapproved by the SEC or any state securities commission, and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan. Any representation to the contrary is a criminal offense.**

**This Disclosure Statement has been prepared pursuant to sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rule 3016(b). The Securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under applicable state securities law (collectively, the "Blue Sky Laws"). The prepetition solicitation of votes on the Plan is being made in reliance on the exemption from the registration requirements of the Securities Act provided by section 4(a)(2) of the Securities Act (the "Solicitation"). The Debtors intend to rely on section 1145 of the Bankruptcy Code to exempt the offer, issuance, and distribution of Securities of the Reorganized Debtors in connection with the Solicitation and the Plan from registration under the Securities Act and the Blue Sky Laws. Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities.**

**This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Readers are cautioned that any forward-looking statements in this Disclosure Statement are based on assumptions that are believed to be reasonable, but are subject to a wide range of risks, including risks associated with the following: (a) future financial results and liquidity, including the ability to finance operations in the ordinary course of business; (b) the relationships with and payment terms provided by trade creditors; (c) additional post-restructuring financing requirements; (d) future dispositions and acquisitions; (e) the effect of competitive products, services, or procuring by competitors; (f) changes to the costs of commodities and raw materials; (g) the proposed restructuring and costs associated therewith; (h) the effect of conditions in the local, national, and global economy on the Debtors; (i) the ability to obtain relief from the bankruptcy court to facilitate the smooth operation of the Debtors' businesses under chapter 11; (j) the confirmation and consummation of the Plan; (k) the terms and conditions of the Exit Facility, the Take-Back Term Loan Facility, the New Common Stock, and the New Warrants to be entered into, or issued, as the case may be, pursuant to the Plan; (l) the consummation of the Imaging Sale by the Debtors and the Teleplan Acquisition; and (m) each of the other risks identified in this Disclosure Statement. Due to these uncertainties, readers cannot be assured that any forward-looking statements will prove to be correct. The Debtors are under no obligation to (and expressly disclaim any obligation to) update or alter any forward-looking statements whether as a result of new information, future events, or otherwise, unless instructed to do so by the Bankruptcy Court.**

**THIS DISCLOSURE STATEMENT AND THE PLAN CONTAIN MATERIAL NON-PUBLIC INFORMATION CONCERNING THE DEBTORS, THEIR SUBSIDIARIES, AND THEIR RESPECTIVE DEBT AND OTHER SECURITIES. EACH RECIPIENT HEREBY ACKNOWLEDGES THAT IT IS AWARE THAT THE FEDERAL SECURITIES LAWS OF THE UNITED STATES PROHIBIT ANY PERSON WHO IS IN POSSESSION OF MATERIAL NON-PUBLIC INFORMATION ABOUT A COMPANY FROM PURCHASING OR SELLING ANY SECURITIES OF SUCH COMPANY OR FROM COMMUNICATING THE INFORMATION TO ANY OTHER PERSON UNDER CIRCUMSTANCES IN WHICH IT IS REASONABLY FORESEEABLE THAT SUCH PERSON IS LIKELY TO PURCHASE OR SELL ANY SUCH SECURITIES.**

**You are cautioned that all forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The liquidation analysis, financial projections, and other projections and forward-looking information contained herein and attached hereto are only estimates, and the timing and amount of actual distributions to Holders of Allowed Claims and Interests, among other things, may be affected by many factors that cannot be predicted. Any analyses, estimates, or recovery projections may or may not turn out to be accurate.**

**TABLE OF CONTENTS**

Page

I.    Executive Summary. .................................................................................................................1
      A.    Purpose of this Disclosure Statement and the Plan ...........................................................1
      B.    Overview of the Transactions Contemplated by the Plan ..................................................1
      C.    Summary of Treatment of Claims and Interests and Description of Recoveries under the
            Plan ...............................................................................................................................2
      D.    Voting on the Plan................................................................................................................3
      E.    Confirmation and Consummation of the Plan .....................................................................4
            1.    Combined Hearing. ..................................................................................................5
            2.    Effect of Confirmation and Consummation of the Plan...........................................5
      F.    Additional Plan-Related Documents ...................................................................................5

II.   The Debtors' Business Operations and Capital Structure....................................................6
      A.    The Debtors' Corporate History...........................................................................................6
      B.    The Debtors' Wireless Business Operations. .......................................................................7
            1.    Remanufacturing.......................................................................................................7
            2.    Buyback and Resale. ................................................................................................7
            3.    Clover's Workforce. .................................................................................................8
      C.    Clover's Corporate Structure. .............................................................................................8
      D.    Debtors' Capital Structure...................................................................................................8

III.  Events Leading to These Chapter 11 Cases. ..........................................................................9
      A.    Market and Industry Challenges..........................................................................................9
      B.    Lender Discussions. .............................................................................................................9
      C.    Imaging Sale. .....................................................................................................................10
      D.    Teleplan Acquisition..........................................................................................................11
      E.    Appointment of Disinterested Directors ...........................................................................11

IV.   The Debtors' Proposed Restructuring: Key Components. .................................................11
      A.    The Restructuring Support Agreement and the Plan..........................................................11
      B.    The Debtors' Need for Liquidity and the Cash Collateral Order.......................................12
      C.    The Debtors' Proposed Disclosure Statement and Solicitation Process............................13
      D.    Employee and Equity Considerations in the Plan ..............................................................13
      E.    The Debtors' First Day Motions and Certain Related Relief ............................................14
      F.    Use of Cash Collateral. ......................................................................................................14
      G.    Other Requested First-Day Relief and Retention Applications.........................................14

V.    Summary of the Plan...............................................................................................................15
      A.    Treatment of Unclassified Claims......................................................................................15
            1.    Administrative Claims.............................................................................................15
            2.    Professional Fee Claims..........................................................................................15
            3.    Priority Tax Claims.................................................................................................16
      B.    Classification of Claims and Interests................................................................................17
      C.    Treatment of Classes of Claims and Interests ...................................................................17
            1.    Class 1 — Other Secured Claims............................................................................17
            2.    Class 2 — Other Priority Claims ............................................................................18
            3.    Class 3 — Term Loan Secured Claims ...................................................................18
            4.    Class 4 — General Unsecured Claims ....................................................................19
            5.    Class 5 — Intercompany Claims .............................................................................19
            6.    Class 6 — Intercompany Interests ..........................................................................19
            7.    Class 7 — Existing Equity Interests .......................................................................19
      D.    Means for Implementation of the Plan...............................................................................20
            1.    General Settlement of Claims and Interests. ..........................................................20

|     | 2.  | Restructuring Transactions. | 20 |
|     | 3.  | Sources of Consideration for Plan Distributions | 20 |
|     | 4.  | New Shareholders Agreement. | 22 |
|     | 5.  | Exemption from Registration Requirements | 22 |
|     | 6.  | Corporate Existence | 23 |
|     | 7.  | Corporate Action | 23 |
|     | 8.  | Vesting of Assets in the Reorganized Debtors. | 23 |
|     | 9.  | Cancellation of Notes, Instruments, Certificates, and Other Documents | 23 |
|     | 10. | Effectuating Documents; Further Transactions | 24 |
|     | 11. | Exemption from Certain Taxes and Fees. | 24 |
|     | 12. | New Organizational Documents. | 25 |
|     | 13. | Directors and Officers. | 25 |
|     | 14. | Management Incentive Plan. | 25 |
|     | 15. | Preservation of Causes of Action. | 25 |
|     | 16. | Release of Avoidance Actions. | 26 |
| E.  | Treatment of Executory Contracts and Unexpired Leases. | | 26 |
|     | 1.  | Assumption of Executory Contracts and Unexpired Leases. | 26 |
|     | 2.  | Claims Based on Rejection of Executory Contracts or Unexpired Leases. | 27 |
|     | 3.  | Cure of Defaults and Objections to Cure and Assumption. | 27 |
|     | 4.  | Insurance Policies. | 28 |
|     | 5.  | Indemnification Obligations. | 28 |
|     | 6.  | Director, Officer, Manager, and Employee Liability Insurance. | 28 |
|     | 7.  | Employee and Retiree Benefits. | 28 |
|     | 8.  | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 28 |
|     | 9.  | Reservation of Rights. | 29 |
|     | 10. | Nonoccurrence of Effective Date. | 29 |
|     | 11. | Contracts and Leases Entered Into After the Petition Date. | 29 |
| F.  | Conditions Precedent to Confirmation and Consummation of the Plan. | | 29 |
|     | 1.  | Conditions Precedent to the Effective Date. | 29 |
|     | 2.  | Waiver of Conditions Precedent. | 30 |
|     | 3.  | Substantial Consummation | 30 |
|     | 4.  | Effect of Non-Occurrence of Conditions to Consummation | 30 |
| G.  | Settlement, Release, Injunction, and Related Provisions | | 30 |
|     | 1.  | Compromise and Settlement of Claims, Interests, and Controversies | 30 |
|     | 2.  | Discharge of Claims | 31 |
|     | 3.  | Release of Liens | 31 |
|     | 4.  | Releases by the Debtors. | 31 |
|     | 5.  | Releases by Holders of Claims and Interests of the Debtors. | 32 |
|     | 6.  | Exculpation | 33 |
|     | 7.  | Injunction. | 33 |
|     | 8.  | Protection Against Discriminatory Treatment | 33 |
|     | 9.  | Recoupment | 34 |
|     | 10. | Reimbursement or Contribution | 34 |
|     | 11. | Term of Injunctions or Stays | 34 |
|     | 12. | Document Retention | 34 |
| **VI.** | **Confirmation of the Plan.** | | **34** |
| A.  | The Combined Hearing | | 34 |
| B.  | Deadline to Object to Approval of the Disclosure Statement and Confirmation of the Plan | | 34 |
| C.  | Requirements for Approval of the Disclosure Statement | | 34 |
| D.  | Requirements for Confirmation of the Plan. | | 35 |
|     | 1.  | Requirements of Section 1129(a) of the Bankruptcy Code | 35 |
|     | 2.  | The Debtor Release, Releases by Holders of Claims and Interests of the Debtors, Exculpation, and Injunction Provisions | 36 |
|     | 3.  | Feasibility/Financial Projections | 37 |
|     | 4.  | Best Interests of Creditors—Liquidation Analysis | 37 |

|  | 5. | Acceptance by Impaired Classes | 37 |
|  | 6. | Confirmation Without Acceptance by All Impaired Classes | 38 |
|  | 7. | Valuation of the Debtors | 39 |

**VII.    Voting Instructions.** ....... **39**
A.    Overview .... 39
B.    Solicitation Procedures ... 39
   1.    Solicitation Agent .... 39
   2.    Solicitation Package .... 39
   3.    Voting Deadline .... 40
   4.    Distribution of the Solicitation Package and Plan Supplement .... 40
C.    Voting Procedures .... 40
D.    Voting Tabulation .... 41

**VIII.    Risk Factors.** ... **42**
A.    Risks Related to the Restructuring .... 42
   1.    The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions are not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors.... 42
   2.    Even if the Restructuring Transactions are Successful, the Debtors Will Continue to Face Risks .... 43
   3.    Risks Related to the Take-Back Term Loan Facility, the New Common Stock .... 43
   4.    A Decline in the Reorganized Debtors' Credit Ratings Could Negatively Affect the Debtors' Ability to Access the Capital Markets in the Future .... 44
   5.    Risks Related to Confirmation and Consummation of the Plan.... 45
B.    Risks Related to Recoveries Under the Plan .... 47
   1.    The Debtors May Not Be Able to Achieve Their Projected Financial Results or Meet Their Post-Restructuring Debt Obligations .... 47
   2.    Estimated Valuations of the Debtors, the Take-Back Term Loan Facility, and the New Common Stock, and Estimated Recoveries to Holders of Allowed Term Loan Secured Claims and Existing Equity Interests Are Not Intended to Represent Potential Market Values.... 47
   3.    Holders of Claims That Acquire the New Common Stock Will Assert Significant Control Over the Reorganized Debtors.... 47
   4.    Certain Tax Implications of the Debtors' Bankruptcy and Reorganization May Increase the Tax Liability of the Reorganized Debtors .... 47
C.    Risks Related to the Offer and Issuance of Securities Under the Plan .... 48
   1.    The Debtors Do Not Intend to Offer to Register or to Exchange the New Common Stock in a Registered Exchange Offer .... 48
   2.    There is No Established Market for the New Common Stock .... 48
D.    Risk Factors Related to the Business Operations of the Debtors and Reorganized Debtors .... 48
   1.    The Debtors Will File Voluntary Petitions for Relief Under Chapter 11 of the Bankruptcy Code and Will Be Subject to the Risks and Uncertainties Associated with Any Chapter 11 Restructuring .... 48
   2.    Potential for the Loss of Key Members of the Executive Management Team .... 49
   3.    The Debtors May Not Be Able to Achieve Their Projected Financial Results.... 49
   4.    If the Debtors Do Not Obtain Additional Capital to Fund Their Operations and Obligations, the Debtors' Growth May Be Limited.... 50
   5.    Employee and Labor Risks .... 50
   6.    Litigation Matters. .... 50
   7.    International Risk Factors. .... 50
E.    Miscellaneous Risk Factors and Disclaimers .... 51
   1.    The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed .... 51
   2.    No Legal or Tax Advice Is Provided By This Disclosure Statement.... 51

|  |  | 3. | No Admissions Made | 51 |
|  |  | 4. | Failure to Identify Litigation Claims or Projected Objections | 51 |
|  |  | 5. | Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors | 51 |
|  |  | 6. | No Representations Outside This Disclosure Statement Are Authorized | 51 |
| IX. | | | **Important Securities Laws Disclosures.** | **52** |
|  | A. | | Plan Consideration | 52 |
|  | B. | | Exemption from Registration Requirements; Issuance and Resale of New Common Stock and New Warrants; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code | 52 |
|  |  | 1. | Exemption from Registration Requirements; Issuance and Resale of New Common Stock | 52 |
|  |  | 2. | Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code; Implications for Resale of New Common Stock | 53 |
| X. | | | **Certain U.S. Federal Tax Consequences of the Plan.** | **54** |
|  | A. | | Introduction | 54 |
|  | B. | | Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors, the Reorganized Debtors, and Equity Holders of Clover | 55 |
|  |  | 1. | Characterization of the Restructuring Transactions | 55 |
|  |  | 2. | Cancellation of Debt and Reduction of Tax Attributes | 56 |
|  |  | 3. | Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes | 56 |
|  | C. | | Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims | 58 |
|  |  | 1. | Consequences to Holders of Class 3 Term Loan Secured Claims | 58 |
|  |  | 2. | Consequences to Holders of Class 7 Existing Equity Interests | 58 |
|  |  | 3. | Accrued Interest | 59 |
|  |  | 4. | Market Discount | 59 |
|  |  | 5. | U.S. Federal Income Tax Consequences to U.S. Holders of Ownership and Disposition of the Take-Back Term Loans. | 59 |
|  |  | 6. | U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of New Common Stock | 61 |
|  |  | 7. | Ownership, Exercise, and Disposition of New Warrants | 62 |
|  |  | . | 62 | |
|  |  | 8. | Limitations on Use of Capital Losses | 62 |
|  |  | 9. | Medicare Tax | 62 |
|  | D. | | Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims | 63 |
|  |  | 1. | Gain Recognition | 63 |
|  |  | 2. | U.S. Federal Income Tax Consequences to Non-U.S. Holders of Payments of Interest and of Owning and Disposing of | 63 |
|  |  | 3. | Take-Back Term Loans. | 63 |
|  |  | 3. | U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Stock | 65 |
|  |  | 4. | Ownership, Exercise, and Disposition of the New Warrants | 66 |
|  |  | 5. | FIRPTA | 66 |
|  |  | 6. | FATCA | 67 |
|  |  | 7. | Information Reporting and Back-Up Withholding | 67 |
| XI. | | | **Recommendation of the Debtors.** | **69** |

**<u>EXHIBITS</u>**

| | |
|---|---|
| Exhibit A | Plan of Reorganization |
| Exhibit B | Corporate Structure of the Debtors |
| Exhibit C | Restructuring Support Agreement |
| Exhibit D | Financial Projections |
| Exhibit E | Valuation Analysis |
| Exhibit F | Liquidation Analysis |

# I.    Executive Summary.

### A.    Purpose of this Disclosure Statement and the Plan.

Clover Technologies Group, LLC and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "Debtors" or "Clover"), submit this disclosure statement (including all exhibits hereto, the "Disclosure Statement"), pursuant to sections 1125 and 1126 of the Bankruptcy Code, to Holders of Class 3 Term Loan Secured Claims against the Debtors and Holders of Class 7 Existing Equity Interests in Clover in connection with the solicitation of acceptances with respect to the *Joint Prepackaged Chapter 11 Plan of Reorganization of Clover Technologies Group, LLC and Its Debtor Affiliates* (as may be amended or modified from time to time and including all exhibits and supplements thereto, the "Plan").  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.[1]  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO <u>ACCEPT</u> THE PLAN.  THE DEBTORS BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND MAXIMIZE RECOVERIES TO HOLDERS OF CLAIMS AND INTERESTS.  THE DEBTORS BELIEVE THE PLAN IS THE BEST AVAILABLE ALTERNATIVE FOR IMPLEMENTING A RESTRUCTURING OF THE DEBTORS' BALANCE SHEET.**

### B.    Overview of the Transactions Contemplated by the Plan.

Clover is the worldwide leader in comprehensive returns management for consumer and technology devices. Formed through the consolidation of multiple industry-leading companies, Clover provides a full suite of after-market services including customized trade-in and buyback programs, repair and reclamation services, and remarketing and resale programs.  Clover is also a major worldwide employer, with approximately 9,100 employees currently employed across multiple continents.

As of December 13, 2019, the Debtors have approximately $644.1 million in total funded debt obligations. As explained more fully in Article III of this Disclosure Statement, the Debtors anticipate they will pay down a portion of their funded debt obligations with the proceeds of the Imaging Sale.

To implement a comprehensive financial restructuring of their funded debt, the Debtors will commence chapter 11 cases (the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") after commencement of the solicitation process.  The Debtors will seek joint administration of the Chapter 11 Cases for procedural purposes only and, upon commencement of the Chapter 11 Cases, will file the Plan, this Disclosure Statement, and a motion seeking to approve the Disclosure Statement and proposed solicitation process and Confirmation of the Plan.  On November 21, 2019, certain Holders of Term Loan Secured Claims (the "Consenting Term Loan Lenders"), certain Holders of the Chapter 11 Cases' Existing Equity Interests (the "Consenting Sponsors", and collectively with the Consenting Term Loan Lenders, the "Consenting Stakeholders"), and the Debtors entered into a restructuring support agreement.  On December 10, 2019, the Debtors and the Consenting Stakeholders amended and restated the restructuring support agreement (together with all exhibits thereto, and as amended, restated, and supplemented from time to time, the "Restructuring Support Agreement"), attached hereto as **Exhibit C**, that sets forth the principal terms of the Restructuring Transactions and requires the Consenting Stakeholders to support the Plan.

As set forth in the Plan, the Restructuring Transactions provide for a comprehensive in-court restructuring of Claims against and Interests in the Debtors that will deleverage the Company's capital structure and preserve the going-concern value of the Debtors' businesses, maximize recoveries available to all constituents, provide for an

---

[1]    Capitalized terms used but not defined in this Disclosure Statement have the meaning ascribed to such terms in the Plan.  Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I of the Plan.  **Any summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Plan, is qualified in its entirety by reference to the Plan, the exhibits, and other materials referenced in the Plan, the Plan Supplement, and the documents being summarized.  In the event of any inconsistencies between the terms of this Disclosure Statement and the Plan, the Plan shall govern.**

equitable distribution to the Debtors' stakeholders, and preserve the jobs of the Company's employees.  More specifically, the Restructuring Transactions provide, among other things, that:

- each Holder of an Allowed Term Loan Secured Claim shall receive its Pro Rata share of and interest in (i) 100% of the New Common Stock (subject to dilution from the Management Incentive Plan and the New Warrants); (ii) the Take-Back Term Loans; and (iii) 100% of Excess Cash, including any cash not distributed to the Term Loan Lenders in connection with the consummation of the Imaging Sale;

- each Holder of an Existing Equity Interest shall receive its Pro Rata share of and interest in the New Warrants;

- unless otherwise set forth in the Plan or paid in full in advance thereof, General Unsecured Claims shall be Reinstated;

- all Administrative Claims, Priority Tax Claims, and Other Secured Claims will be paid in full in Cash or receive such other treatment that renders such Claims Unimpaired;

- the Debtors shall obtain the Exit Facility in a form and substance acceptable to the Required Consenting Term Loan Lenders prior to the Effective Date.  The liens securing the Exit Facility shall be senior to the liens securing the Take-Back Term Loan Facility; and

- the parties to the Restructuring Support Agreement (including the Consenting Sponsors and the Consenting Term Loan Lenders) will grant full, mutual releases, subject to revocation as set forth in the Restructuring Support Agreement.

As described below, you are receiving this Disclosure Statement because you are a Holder of a Claim or Interest entitled to vote to accept or reject the Plan.  **Prior to voting on the Plan, you are encouraged to read this Disclosure Statement and all documents attached to this Disclosure Statement in their entirety.  As reflected in this Disclosure Statement, there are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement.  Certain of these risks, uncertainties, and factors are described in Section VIII of this Disclosure Statement, entitled "Risk Factors."**

**C.      Summary of Treatment of Claims and Interests and Description of Recoveries under the Plan.**

The Plan organizes the Debtors' creditor and equity constituencies into groups called "Classes."  For each Class, the Plan describes:  (1) the underlying Claim or Interest; (2) the recovery available to the Holders of Claims or Interests in that Class under the Plan; (3) whether the Class is Impaired or Unimpaired under the Plan; (4) the form of consideration, if any, that Holders in such Class will receive on account of their respective Claims or Interests; and (5) whether the Holders of Claims and Interests in such Class are entitled to vote to accept or reject the Plan.

The proposed distributions and classifications under the Plan are based upon a number of factors, including the Debtors' valuation and liquidation analyses.  The valuation of the Reorganized Debtors as a going concern is based upon the value of the Debtors' assets and liabilities as of an assumed Effective Date of December 31, 2019, and incorporates various assumptions and estimates, as discussed in detail in the Valuation Analysis, attached hereto as **Exhibit E**, prepared by the Debtors, together with their proposed financial advisor and investment banker Jefferies LLC ("Jefferies").

The table below provides a summary of the classification, description, and treatment of Claims and Interests under the Plan.  This information is provided in summary form below for illustrative purposes only and is qualified in its entirety by reference to the provisions of the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and satisfy the conditions necessary to consummate the Plan.  The recoveries available to Holders of Claims are estimates and actual recoveries may materially differ based on, among other things, whether the amount of Claims actually Allowed exceeds the estimates provided below.  In such an instance, the recoveries available to Holders of Allowed Claims could be materially lower

when compared to the estimates provided below.  To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.

For a more detailed description of the treatment of Claims and Interests under the Plan and the sources of satisfaction for Claims and Interests, see Section V of this Disclosure Statement, entitled "Summary of the Plan."

| Class | Claim or Interest | Status | Voting Rights | Projected Plan Recovery (%) |
|-------|-------------------|--------|---------------|------------------------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| 3 | Term Loan Secured Claims | Impaired | Entitled to Vote | 65%-77% |
| 4 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| 5 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) | 100% / 0% |
| 6 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) | 100% / 0% |
| 7 | Existing Equity Interests | Impaired | Entitled to Vote | 0% [2] |

**D.       Voting on the Plan.**

Certain procedures will be used to collect and tabulate votes on the Plan, as summarized in Section VII of this Disclosure Statement, entitled "Voting Instructions."   Readers should carefully read the voting instructions in Section VII herein.

Only Holders of Term Loan Secured Claims and Existing Equity Interests, which are classified in Classes 3 and 7 of the Plan, respectively, are entitled to vote on the Plan (the "Voting Classes").  Holders of Claims and Interests in Classes 1, 2, and 4 are conclusively presumed to accept the Plan because they are Unimpaired by the Plan.  Holders of Claims and Interests in Classes 5 and 6 are deemed to reject or presumed to accept the Plan because they are either (1) Unimpaired under the Plan and presumed to accept the Plan, or (2) Impaired and entitled to no recovery under the Plan and deemed to reject the Plan.

**The Voting Deadline is 11:59 p.m., prevailing Eastern Time, on January 15, 2020.**  To be counted as votes to accept or reject the Plan, each ballot (a "Ballot") must be properly executed, completed, and delivered (either by using the return envelope provided, by first class mail, overnight courier, personal delivery, or electronic submission) such that it is **actually received** before the Voting Deadline by Stretto (the "Solicitation Agent") as follows:

---

[2]       Pursuant to the Plan, Holders of Existing Equity Interests shall receive New Warrants that have *de minimis* value.

| **DELIVERY OF BALLOTS** |
|---|
| 1.   Ballots must be actually received by the Solicitation Agent before the Voting Deadline.<br><br>2.   Ballots may be returned by the following methods:  (a) in the enclosed pre-paid, pre-addressed return envelope; (b) via first class mail, overnight courier, or hand delivery to the address set forth below; or (c) via electronic submission through the Solicitation Agent's online voting portal at https://cases.stretto.com/Clover.<br><br><div align="center">CLOVER TECHNOLOGIES GROUP BALLOT PROCESSING<br>C/O STRETTO<br>8269 E 23RD AVE, STE. 275<br>DENVER, CO 80238</div><br>If you have any questions on the procedures for voting on the Plan, please contact the Solicitation Agent by emailing teamclover@stretto.com and referencing "Clover Technologies Group" in the subject line, or by calling (855) 923-0996 (domestic toll free) or (949) 341-7245 (international toll), and asking for the solicitation group. |

> **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT.  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL <u>NOT</u> BE COUNTED EXCEPT AS DETERMINED BY THE DEBTORS.**

**E.      Confirmation and Consummation of the Plan.**

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization.  When the Debtors file the Chapter 11 Cases, they will file a motion on the Petition Date requesting that the Bankruptcy Court set a date and time as soon as reasonably practicable after the Petition Date for a hearing (such hearing, the "Combined Hearing") for the Bankruptcy Court to determine whether the Disclosure Statement contains adequate information under section 1125(a) of the Bankruptcy Code, whether the Debtors' prepetition solicitation of acceptances in support of the Plan complied with section 1126(b) of the Bankruptcy Code, and whether the Plan should be confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed, as permitted by section 105(d)(2)(B)(vi) of the Bankruptcy Code.  The Combined Hearing, once set, may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the Entities who have filed an objection to the Plan, if any, without further notice to parties in interest.  The Bankruptcy Court, in its discretion and prior to the Combined Hearing, may put in place additional procedures governing the Combined Hearing.  Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Combined Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.  The Debtors, in the same motion requesting a date for the Combined Hearing, will request that the Bankruptcy Court set a date and time for parties in interest to file objections to the adequacy of the Disclosure Statement, the Debtors' prepetition solicitation of acceptances in support of the Plan, and Confirmation of the Plan. All such objections must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that they are received before the deadline to file such objections.

1.      **Combined Hearing.**

At the Combined Hearing, the Bankruptcy Court will determine whether the Disclosure Statement contains adequate information under section 1125(a) of the Bankruptcy Code, the Debtors' prepetition solicitation of acceptances in support of the Plan complied with section 1126(b) of the Bankruptcy Code, and the Plan should be confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed and subject to satisfaction or waiver of each condition precedent in Article IX of the Plan.  For a more detailed discussion of the Combined Hearing, see Section VI of this Disclosure Statement, entitled "Confirmation of the Plan."

2.      **Effect of Confirmation and Consummation of the Plan.**

Following Confirmation, and subject to satisfaction or waiver of each condition precedent in Article IX of the Plan, the Plan will be Consummated on the Effective Date.  Among other things, on the Effective Date, certain release, injunction, exculpation, and discharge provisions set forth in Article VIII of the Plan will become effective.  Accordingly, it is important to read the provisions contained in Article VIII of the Plan very carefully so that you understand how Confirmation and Consummation—which effectuates such release, injunction, exculpation, and discharge provisions—will affect you and any Claim or Interest you may hold with respect to the Debtors so that you may cast your vote accordingly.  These provisions are described in Section V of this Disclosure Statement.

**F.      Additional Plan-Related Documents.**

The Debtors will file certain documents that provide more details about implementation of the Plan in the Plan Supplement, which will be filed with the Bankruptcy Court no later than seven (7) calendar days before the Confirmation Objection Deadline.  The Debtors will serve a notice that will inform all parties that the initial Plan Supplement was filed, list the information included therein, and explain how copies of the Plan Supplement may be obtained.  Eligible Holders of Claims and Interests entitled to vote to accept or reject the Plan shall not be entitled to change their vote based on the contents of the Plan Supplement after the Voting Deadline.  The Plan Supplement will include:

- the New Organizational Documents;

- the Exit Facility Credit Agreement;

- the Take-Back Term Loan Credit Agreement;

- the New Warrant Agreement;

- the New Shareholders Agreement;

- the Management Incentive Plan;

- the Restructuring Steps Memorandum;

- the identity of the members of the Reorganized Clover Board and the officers of Reorganized Clover;

- the schedule of retained Causes of Action; and

- any other necessary documentation related to the Restructuring Transactions, each of which shall be in form and substance consistent with the Restructuring Support Agreement.

*THE FOREGOING EXECUTIVE SUMMARY IS ONLY A GENERAL OVERVIEW OF THIS DISCLOSURE STATEMENT AND THE MATERIAL TERMS OF, AND TRANSACTIONS PROPOSED BY, THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO, AND SHOULD BE READ IN CONJUNCTION WITH, THE MORE DETAILED DISCUSSIONS APPEARING ELSEWHERE IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED TO THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN.*

## II.    The Debtors' Business Operations and Capital Structure.

**A.    The Debtors' Corporate History.**

Clover was founded in 1996 as a printing supply company that refurbished and resold toner cartridges.  Over the following decades, Clover developed proprietary skills, knowledge, and processes, and a loyal customer base that included leading technology hardware producers, OEMs, retailers, wireless service carriers, and insurance providers.  Through organic growth and acquisitions, Clover grew from a printer cartridge reseller to an international, after-market supply chain manager with three main business segments:  Clover Imaging Group (the "Imaging Business"), Clover Wireless Group (the "Wireless Business"), and Clover Telecom (the "Telecom Business").  Clover's business segments provide customers with a full suite of after-market services including customized trade in and buyback programs, repair and reclamation services, and remarking and resale programs.  Clover is also a major worldwide employer—as of December 2019, Clover employs approximately 9,100 employees in over 120 countries.

After more than a decade of success in the printer supply industry, Clover launched the Wireless Business in 2012 through a series of competitor acquisitions, including Valu Tech Outsourcing, LLC ("Valu Tech").  The acquisition of Valu Tech provided Clover with a foundation of skilled employees, remanufacturing facilities, and an existing phone repair operation.  Valu Tech, however, was heavily dependent on a limited number of large customers.  Clover leveraged its new, diversified businesses to obtain significant service contracts with two of the largest tier-1 wireless phone service carriers in North America, and the Wireless Business expanded technical capabilities to service an expansive range of popular phone OEMs.

Despite initial success, the Wireless Business experienced performance variabilities due to rapid innovation in the mobile phone industry, increased device shelf life, and restrictive OEM policies.  As a result, in 2017, Clover hired a new management team to address inefficiencies and refocus the vision of the Wireless Business toward the future of after-market technology solutions.  The new management team immediately repositioned Clover's workforce, introduced automation and triage software, and increased resources to track and improve inefficient supply chain processes.  Once short-term performance was stabilized, the management team quickly went to work on three main initiatives:  (a) improving the speed and quality of services; (b) increasing buybacks and resales; and (c) diversifying Clover's customer base.

To further its goal of improving speed and quality, Clover instituted several processes, including halting its reliance on parts from foreign manufacturers.  Prior to 2017, the Wireless Business purchased a majority of its replacement parts from foreign suppliers, usually at a discount, which created unforeseen issues with device quality and repair efficiency.  Many of these parts were of low-quality or unusable, resulting in delays and low-quality output.  To address this issue, the management team began purchasing whole consumer and technology devices and repurposing used parts in other devices.  These operational changes allowed for more predictability and control over Clover's supply chain, and enabled the Wireless Business to comply with higher quality benchmarks required by its customers.

Clover also sought to address the wide margins in the Wireless Business's buyback and resale program for mobile phones.  Using proprietary valuation and sorting capabilities, Clover began to purchase devices in bulk, provide simpler reclamation services, and resell the devices for profit.  By instituting this "light-touch" reclamation process, Clover realized improved returns, and beginning in 2017, Clover increased the proportion of its operations involved in buyback and resale.

Most importantly, the Clover management team maneuvered dynamic shifts in the market by strategically acquiring competitors that would help fortify Clover's business model and diversify its customer base.  In November 2018, Clover acquired Technology Solutions & Services, Inc. ("TSSI"), recognizing that this company had the potential to further expand the Wireless Business's range of after-market services and decrease Clover's dependence on mobile phone customers.  Through TSSI, Clover applied its industry-leading business model and operational efficiencies to the laptop and tablet repair market, providing Clover additional diversification and extended market reach.  Additionally, as explained more fully below, Clover's December 2019 acquisition of Teleplan International N.V. ("Teleplan") brings with it similar benefits, including blue-chip customers in more than 120 countries across Europe, the Americas, and the Asia Pacific region.

In 2019, Clover continued this trend of diversifying its business and reducing its reliance on a limited number of dominant customers. Today, through its strategic acquisitions and streamlined business, Clover is poised to leverage its after-market expertise to service the entire electronics after-market economy. Clover has also increased its presence and contact with end-users and every-day customers. In July 2019, Clover expanded into e-commerce, providing Clover with a direct-to-consumer sales and buyback platform. Moving forward, Clover plans to apply its core services to a more varied suite of consumer devices, including wearable devices and emerging display technology, and to expand into previously under-serviced fields, including the healthcare industry and the information technology and data-collection industry.

**B.**    **The Debtors' Wireless Business Operations.**

Clover utilizes high-tech repair capabilities and proprietary industry expertise to provide service to various customers in the consumer and technology device industries. In addition, Clover purchases and resells devices directly to and from customers. Clover's current operations include (1) remanufacturing and (2) buyback and resale programs.

**1.**    **Remanufacturing.**

Clover's remanufacturing operations include the recovery, sorting and valuation, refurbishment, and distribution of devices.

*Recovery*. Clover provides custom and turnkey device recovery services to assist customers with aggregating used devices for repair, recycle, or resale. Clover collects devices returned directly by end-users, through insurance and warranty claims, and from institutional customers. Recovery services are offered on an order-by-order basis or can be vertically integrated with the customer's supply chain. Based on proprietary metrics, Clover is able to forecast device returns and integrate Clover's services with the timing demands of customers.

*Sorting and Valuation*. After devices are recovered, Clover uses component-level testing on recovered devices, evaluating them for condition and reparability. Clover sorts and catalogues tested devices and integrates them into the next applicable process, whether it be remanufacturing, remarketing, or recycling. Devices in need of, or under contract for, repairs are moved to remanufacturing assembly lines to be refurbished to OEM, insurance, or warranty standards. Devices in finished condition are minimally processed or repackaged as inventory for the appropriate customer or sale. Devices beyond economic repair are recycled by Clover or returned to the customer.

*Refurbishment*. Clover facilities utilize manual and automated remanufacturing lines to refurbish devices to like-new or OEM quality standards. Clover remanufacturing facilities utilize state of the art lifecycle labs for device testing and triage, class 100 clean rooms to test and repair processors, anodizing facilities to fix surface damage and reapply coloring, LCD reclamation and UV curing silk screens to mend screens and corresponding lights, and pad printing to restore logos and graphics. Given Clover's vast capabilities, Clover consistently exceeds OEM quality benchmarks for refurbished devices. Clover also prides itself on implementing environmentally friendly and certified refurbishing techniques to minimize its environmental footprint.

*Distribution*. After recovery, sorting, and remanufacturing as necessary, Clover offers distribution services to redistribute and remarket devices to its customers, or back into the marketplace using its worldwide distribution network. Clover's global footprint enables time-specific delivery nearly anywhere in the world.

**2.**    **Buyback and Resale.**

Clover also purchases devices directly from customers through strategic trade-in and buyback partnerships. These partnerships provide reciprocal benefits as Clover maximizes return to customers by directly purchasing used devices in bulk, which are then resold at a profit. Each batch of devices is put through Clover's sorting and valuation process to calculate the minimum input required for maximum resale value. Clover's unique ability to aggregate used devices and perform efficient reclamation services enables Clover to reinsert products into customers' ecosystems faster than any of its competitors.

### 3. Clover's Workforce.

Clover's dedicated and skilled employees form the backbone of its operations. As of the date hereof, Clover employs over 9,100 employees, of which approximately 100 are employed by the Debtors and the remaining are employed by non-debtor affiliates.

### C. Clover's Corporate Structure.

As set forth on the corporate structure chart attached hereto as **Exhibit B**, Clover currently owns, directly or indirectly, each of Clover's eight Wireless Business subsidiaries and the recently acquired Teleplan entities. Clover's consolidated corporate structure is illustrated below:



### D. Debtors' Capital Structure.

As of the solicitation date, Clover has approximately $644.1[3] million in aggregate funded-debt obligations arising under that certain Credit Agreement dated as of May 8, 2014 (the "Term Loan Credit Agreement," and the term loans thereunder, the "Term Loans") by and among 4L Holdings Corporation, as holdings, Clover Technologies Group, LLC and 4L Technologies Inc., as borrowers, the lenders party thereto (the "Term Loan Lenders"), and Wilmington Savings Fund Society, FSB, as administrative agent (as successor to Bank of America, N.A.) (the "Term Loan Agent," and together with the Term Loan Lenders, the "Secured Parties"). On July 18, 2014, the Debtors entered into an amendment to the Term Loan Credit Agreement to, among other things, provide incremental funding in the form of incremental term loans in an aggregate principal amount of $110 million.

---

[3]   The Debtors anticipate that a portion of their funded-debt obligations will be paid down using proceeds of the Imaging Sale.

The obligations arising under the Term Loan Credit Agreement are secured by (a) substantially all of the assets of the Borrowers, (b) 100% of the equity interests of the Borrowers, and (c) 100% of the equity interests of each direct subsidiary of any of the Borrowers (but limited to 65% of voting equity interest in the case of certain excluded subsidiaries).

As a privately held company, the Debtors and their non-debtor affiliates are not listed on any public exchange. As of the date hereof, the Debtors' ultimate parent has approximately 1,712,233 shares outstanding, of which approximately 68.35% is held by Golden Gate Capital and certain co-investors including JP Capital Partners, approximately 21.29% is held by current and former management including Chairman Jim Cerkleski and affiliated trusts, and approximately 10.36% is widely dispersed among legacy interest holders.

## III.    Events Leading to These Chapter 11 Cases.

### A.    Market and Industry Challenges.

The fast pace of evolution in the technology hardware industry and macroeconomic trends in the printing supply and consumer device industries led Clover to begin exploring restructuring options as early as 2016. At the time, customers of the Imaging Business were experiencing depressed demand for printers and associated supplies at a macro level due to an increase in digital (as opposed to print) content, as well as increased competition from foreign vendors and remanufacturers that cut corners on quality and labor to decrease overhead costs. In response to this constricting market, the Imaging Business's customers consolidated their businesses and tightened trade terms with service providers like Imaging, causing increased uncertainty in a shrinking market.

The Wireless Business experienced similar signals of market distress. Historically, the Wireless Business was reliant on a highly concentrated customer base, many of whom were large and influential industry players in their markets. Moreover, many of the Wireless Business's customers were subject to restrictive OEM policies that insisted on high quality standards, increasing pressure throughout the supply chain. Wielding their influence in the wireless device industry, these OEMs' policies led to unpredictable structural changes in the wireless device market that impacted the Wireless Business's ability to provide its remanufacturing services at efficient margins.

In early 2016, in light of the above challenges and its outstanding indebtedness, Clover retained an investment bank to help market the entire Clover enterprise for a potential sale, including all three of the Imaging Business, Wireless Business, and Telecom Business. Clover ran a full marketing process, in which it contacted a considerable number of potential buyers and entered into advanced negotiations with a potential foreign purchaser. Negotiations were ultimately terminated due to U.S. regulatory hurdles. Over this same period, Clover explored several opportunities to refinance its Term Loans, but these efforts did not result in a definitive refinancing transaction.

After terminating the sale of the whole business, Clover refocused its strategy towards optimizing efficiencies in each of its operational segments. To better address the distinct operational needs within each business, Clover separated the Imaging Business, Wireless Business, and Telecom Business into separate operating units, each with their own business plan, management teams, and operational facilities. In addition, Clover pivoted to exploring the sales of each of these business units, each on a stand-alone basis. On March 21, 2018, Clover closed a sale of the Telecom Business to a strategic purchaser.

### B.    Lender Discussions.

In April 2019, a leading wireless service carrier and key customer of the Wireless Business announced it would shift its process for procuring after-market devices for its subscriber base. The leading wireless carrier restricted the key replacement components that could be used to repair mobile phones to those that could be proven to have been reclaimed from phones already in circulation. In May 2019, the carrier decided to sole-source all older model replacement phones from an OEM, and to split the sourcing of newer model replacement phones between the OEM and used phones purchased (as opposed to repaired) from remanufacturers like the Wireless Business.

As a result of pressures facing the businesses, in June 2019, the Debtors engaged Kirkland & Ellis LLP ("Kirkland") as their legal advisor and Jefferies as their financial advisor to seek a comprehensive solution for the upcoming May 2020 maturity under the Term Loan Credit Agreement. Clover also engaged Alvarez & Marsal

("A&M") as restructuring advisor in October 2019 (collectively with Kirkland and Jefferies, the "Advisors"). Clover was intent on driving a transparent and arm's length restructuring process. Accordingly, to keep the Term Loan Lenders apprised of this process, Clover published a private lender update on July 9, 2019.

In connection with this process, the Consenting Term Loan Lenders retained Gibson, Dunn & Crutcher LLP ("Gibson") as legal counsel, Greenhill, LLC ("Greenhill") as financial advisor, and subsequently retained Pachulski Stang Ziehl & Jones, LLP as Delaware counsel (collectively, the "Ad Hoc Group Professionals"). In July and August 2019, the Debtors, the Consenting Term Loan Lenders' advisors entered into non-disclosure agreements that allowed the Debtors to share confidential information to foster a dialogue regarding a potential restructuring. Over the next several months, the Debtors, the Consenting Term Loan Lenders, and certain Consenting Sponsors, discussed go-forward business plans, the sale of the Imaging Business, and the acquisition of Teleplan (the "Teleplan Acquisition"). Following these negotiations, on November 21, 2019,[4] Clover, the Consenting Term Loan Lenders, and the Consenting Sponsors entered into the Restructuring Support Agreement, which supports an equitizing restructuring transaction, the Imaging Sale, and the Teleplan Acquisition. The Restructuring Support Agreement contemplates the terms of a comprehensive balance sheet restructuring accomplished through the Debtors' Plan that will substantially reduce Clover's debt burden and increase liquidity, while leaving trade creditors unaffected, and send a strong message to Clover's employees, vendors, and other business partners that Clover is well-positioned for future success.

## C.    Imaging Sale.

Beginning in 2018, Clover engaged Lincoln International LLC ("Lincoln") to explore a potential sale of the Imaging Business. Although the process progressed slowly initially, Clover and Lincoln re-engaged with certain potential parties throughout May and June 2019 regarding continued interest in purchasing the Imaging Business. In July 2019, Clover received three non-binding indications of interest from potential purchasers. On August 29, 2019, Clover, in consultation with the Consenting Term Loan Lenders, entered into an initial exclusivity agreement with Norwest Equity Partners X, LP (together with its affiliated purchasing entity, Clover Parent, LLC, "NEP") to progress discussions towards reaching definitive documentation. After additional arm's-length negotiations between NEP and Clover, Clover agreed to sell the Imaging Business to NEP on November 21, 2019. On the same day, Clover and NEP received HSR approval for the Imaging Sale. In connection with the Imaging Sale, Clover received an opinion from Stout Risius Ross, LLC that the consideration Clover received for the Imaging Business constituted reasonably equivalent value and was fair, from a financial point of view, to the equityholders and creditors of Clover. The Imaging Sale purchase price was $215.0 million, subject to certain price adjustments. The definitive documents for the Imaging Sale provide that, effective upon the closing of the Imaging Sale, (i) NEP and the Consenting Term Loan Lenders will release each other and (ii) the Consenting Term Loan Lenders will direct the Term Loan Agent, on behalf of the Term Loan Lenders under the Term Loan Credit Agreement, to release NEP from, among other things, any avoidance action or any other action under Chapter 5 of the Bankruptcy Code or the applicable state or federal nonbankruptcy law corollary thereof relating to the Imaging Sale (the "Imaging Sale Lender Release"). Similarly, Clover and its largest equityholder released NEP from any claims and avoidance actions, including, to the extent legally permissible, from any derivative claims, arising from the Imaging Sale (the "Imaging Sale Clover Release," and together with the Imaging Sale Lender Release, the "Imaging Sale Releases," and the claims released thereby, the "Imaging Sale Released Claims").

At the time of solicitation, the Imaging Sale has not yet closed, though the Debtors have entered into definitive documentation and expect the Imaging Sale to close in the near term and prior to the Petition Date. The Plan acknowledges, and the proposed Confirmation Order will acknowledge, (i) the granting, effectiveness, and enforceability of the Imaging Sale Releases and (ii) provide that the Imaging Sale Released Claims shall not be preserved or retained, whether pursuant to section 1123(b)(3)(B) of the Bankruptcy Code or otherwise. In the event the Imaging Sale does not close, it is possible that the Debtors need to make modifications and resolicit acceptances to the Plan. The Imaging Sale is expected to result in estimated net cash to the Debtors of $198.2 million after adjustments and transaction costs. The sale will also transform Clover's corporate structure, which will consist of the

---

[4]    On December 10, 2019, the Debtors and the Consenting Stakeholders entered into the Amended and Restated Restructuring Support Agreement.

Wireless Business, Teleplan, and their corresponding entities, leaving the Debtors a leaner, more streamlined and focused company, better positioned to serve its customer base.

**D.     Teleplan Acquisition.**

In 2019, the Debtors sought to continue their journey of growth and transformation.  The Debtors believed that the next step included access to resources that would increase their scale and capabilities.  As the Debtors looked to expand into international markets and to service customers with multinational contracts, they explored the possibility of acquiring Teleplan.  Similar to the Debtors' business, Teleplan provides end-to-end aftermarket support, but does so to leading blue-chip customers in the mobile, consumer electronics, and infrastructure equipment and products industries, a customer base that was previously not served by the Debtors.  Teleplan will also help the Debtors achieve diversification, operating in more than 120 countries across Europe, the Americas, and the Asia Pacific region, with multi-regional customers.  This enormous reach will greatly increase the global scope of the Debtors business.

The Wireless Business management team fully recognized the growth potential presented by Teleplan, a company that, though experiencing a period of financial stress, had the breadth, scale and reach that could help fuel the Debtors' growth.  A combination would not only accelerate growth exponentially and achieve access to tier-one global customers, but would also present opportunities to streamline inefficiencies, consolidate redundant production sites, and streamline combined businesses of Clover and Teleplan, and enable Clover to absorb Teleplan free from certain of its previously burdensome financial obligations.  Moreover, the combination of their businesses will reduce the Debtors' exposure to powerful OEMs in the market by diversifying the Debtors' customer base.

As the Debtors' business model shifts away from mobile and towards other technology devices and industries, the combined Clover and Teleplan company has the potential to alleviate some of the risk associated with overreliance on a limited customer base, market, or product type, given the minimal overlap between the customers and device markets served by Clover and Teleplan.  Further, Teleplan has an experienced management team that has proven experience in successfully integrating acquisitions and achieving identified synergies.  The Debtors believe they will achieve these synergies as quickly as 12 to 18 months post-combination.

After an extensive diligence process and conversations with both their Advisors and the Consenting Term Loan Lenders, on November 14, 2019, the Debtors executed definitive agreements to acquire Teleplan.  The Teleplan Acquisition ultimately closed on December 4, 2019.

**E.     Appointment of Disinterested Directors**

Prior to the Petition Date, Clover's board of directors appointed a single independent director, Neal Goldman. The board of directors delegated to the independent director the authority to review and act upon any conflicts matter related to the restructuring.  The independent director engaged Cooley LLP as legal counsel to lead the investigation regarding interested party issues in connection with the proposed restructuring transactions.

## IV.     The Debtors' Proposed Restructuring: Key Components.

The Debtors commenced these Chapter 11 Cases to implement this restructuring through the Plan, a copy of which is attached to this Disclosure Statement as **Exhibit A**.  The Consenting Sponsors and the Consenting Term Loan Lenders, comprised of Holders of over 70 percent of the Term Loans and over 72 percent of applicable Existing Equity Interests, have expressed their support for the Plan and the Debtors' Chapter 11 Cases as parties to the Restructuring Support Agreement.

**A.     The Restructuring Support Agreement and the Plan.**

The Restructuring Support Agreement contemplates a comprehensive financial restructuring of the Debtors achieved through the Plan that will deleverage the Debtors' balance sheet, while paying in full or reinstating all non-funded debt claims against the Debtors.  The key financial components and commitments of the restructuring pursuant to the Plan and Restructuring Support Agreement are as follows.  On the Effective Date:

- each Holder of an Allowed Term Loan Secured Claim shall receive its Pro Rata share of and interest in (i) 100% of the New Common Stock (subject to dilution from the Management Incentive Plan and the New Warrants); (ii) the Take-Back Term Loans; and (iii) 100% of Excess Cash, including any cash not distributed to the Term Loan Lenders in connection with the consummation of the Imaging Sale;

- each Holder of an Existing Equity Interest shall receive its Pro Rata share of and interest in the New Warrants;

- unless otherwise set forth in the Plan or paid in full in advance thereof, General Unsecured Claims shall be Reinstated;

- all Administrative Claims, Priority Tax Claims, and Other Secured Claims will be paid in full in Cash or receive such other treatment that renders such Claims Unimpaired;

- the Debtors shall obtain the Exit Facility in a form and substance acceptable to the Required Consenting Term Loan Lenders prior to the Effective Date.  The liens securing the Exit Facility shall be senior to the liens securing the Take-Back Term Loan Facility; and

- the parties to the Restructuring Support Agreement (including the Consenting Sponsors and the Consenting Term Loan Lenders) will grant full, mutual releases, subject to revocation as set forth in the Restructuring Support Agreement.

Pursuant to the Restructuring Support Agreement, the Debtors have secured key stakeholder support for the Plan and the value-maximizing financial restructuring it contemplates.  Certain Holders of Term Loan Secured Claims and Existing Equity Interests are party to the Restructuring Support Agreement and have all agreed under the Restructuring Support Agreement to support the Plan.  This consensus will save the Debtors material delay, expense, and value degradation that could have resulted from a non-consensual restructuring process.

In addition, the Plan provides for full, mutual releases for Holders of Existing Equity Interests.  In exchange for the releases, among other things, the Consenting Sponsors agree to (1) forgo contesting the full discharge and cancellation of the Existing Equity Interests, (2) waive entitlement to their General Unsecured Claims (if any), and (3) otherwise support the restructuring on the terms set forth in the Restructuring Support Agreement.  The Debtors believe the Consenting Sponsors' commitments under the Restructuring Support Agreement are essential to the Debtors' successful reorganization.

Finally, the Debtors maintain a broad "fiduciary out" under Section 17 of the Restructuring Support Agreement, which provides, in relevant part, that nothing in the Restructuring Support Agreement "shall require the Company, nor any board of directors or managers of the Company or any [Company subsidiary or affiliate], to take or refrain from taking any action pursuant to [the Restructuring Support Agreement] (including, without limitation, terminating [the Restructuring Support Agreement] pursuant to Section 12.02(c) [of the Restructuring Support Agreement], to the extent the respective board of directors or mangers reasonably determines in good faith, based on the written advice of external counsel (including counsel to the Company), that taking, or refraining from taking, such action, as applicable, would be inconsistent with its fiduciary obligations under applicable Law, and any such action or inaction pursuant to such exercise of fiduciary duties, including, without limitation, terminating the [Restructuring Support Agreement] pursuant to Section 12.02(c) . . . shall not be deemed to constitute a breach of [the Restructuring Support Agreement]."

**B.      The Debtors' Need for Liquidity and the Cash Collateral Order.**

As part of the Restructuring Support Agreement, the Debtors and the Consenting Term Loan Lenders agreed to the consensual use of cash collateral.  Consensus on cash collateral use and certainty on exit financing are key components of the Restructuring Support Agreement and critical to preserving and maximizing value for the Debtors' Estates.

Consensual use of cash collateral ensures that the Debtors have and will continue to have sufficient liquidity to fund operations during and after these proceedings, enabling business continuity into the foreseeable future.

Moreover, the Restructuring Support Agreement contains settlements of disputes that, if litigated, could delay the Debtors' emergence from chapter 11 and impose significant costs that would divert funds from operations and inhibit growth. Instead, the Debtors have secured an expedited path to confirmation of their Plan that will minimize the administrative costs to their Estates and hasten the Debtors' ability to capitalize on their new, lower debt profile and focus on their ongoing operational and strategic initiatives.

**C.    The Debtors' Proposed Disclosure Statement and Solicitation Process.**

Following the execution of the Restructuring Support Agreement, the Debtors will commence a solicitation of the Plan on December 13, 2019, by delivering a copy of the Plan and this related Disclosure Statement (including Ballots) to Holders of Class 3 Term Loan Secured Claims and Class 7 Existing Equity Interests, the only Classes entitled to vote to accept or reject the Plan. The Debtors have established January 15, 2020, at 11:59 p.m., prevailing Eastern Time, as the deadline for the receipt of votes to accept or reject the Plan (the "Voting Deadline"). The Debtors expect that they will commence the Chapter 11 Cases soon after the solicitation date.

The Debtors will seek Bankruptcy Court approval of the Voting Deadline at the outset of their Chapter 11 Cases. As soon as reasonably practicable after the Voting Deadline, the Solicitation Agent will file the Voting Report with the Bankruptcy Court setting forth the voting results for Allowed Class 3 Term Loan Secured Claims and Class 7 Existing Equity Interests. Based on the execution of the Restructuring Support Agreement by the Consenting Stakeholders, the Debtors believe that the Voting Report likely will show that the Holders of Claims and Interests entitled to vote on the Plan have overwhelmingly voted to accept the Plan. Accordingly, on the Petition Date, the Debtors intend to file the Plan, this Disclosure Statement, and a motion to approve the Solicitation Procedures and schedule the Combined Hearing to consider approval of this Disclosure Statement and Confirmation of the Plan. The following table sets forth the timetable for the solicitation process and the anticipated Chapter 11 Cases.

| Proposed Solicitation and Confirmation Timeline | |
| --- | --- |
| Record Date | December 13, 2019 |
| Commencement of Prepetition Solicitation | December 13, 2019 |
| Anticipated Petition Date | December 16, 2019 |
| Mailing of Combined Hearing Notice | One business day after entry of an order approving the Scheduling Motion. |
| Plan Supplement | January 8, 2020, at 5:00 p.m., prevailing Eastern Time, or such other date as the Court may direct. |
| Confirmation Objection Deadline | January 15, 2020, at 5:00 p.m., prevailing Eastern Time, or such other date as the Court may direct |
| Voting Deadline | January 15, 2020, at 11:59 p.m., prevailing Eastern Time |
| Deadline to File Reply Brief | January 17, 2020, at 4:00 p.m., prevailing Eastern Time, or such other date as the Court may direct |
| Anticipated Combined Hearing Date | January 21, 2020, or such other date as the Court may direct |

**D.    Employee and Equity Considerations in the Plan.**

Within 90 days of its formation, the Reorganized Clover Board shall establish an incentive program for the officers and other management of Reorganized Clover (the "Management Incentive Plan"), which may provide for equity-based incentive awards, issued at the applicable divisions or operating company levels, of up to 10% of New Common Stock, which may be in the form of options, warrants, restricted stock units, or other instruments.

E.    **The Debtors' First Day Motions and Certain Related Relief.**

To minimize disruption to the Debtors' operations and effectuate the terms of the Plan, on the Petition Date, the Debtors intend to file various first-day motions seeking authority to, among other things:  (1)  use cash collateral; (2) continue utilizing the Debtors' prepetition cash management system, including with respect to intercompany transactions; (3) pay certain prepetition claims in the ordinary course of business; (4) pay prepetition wages and certain administrative costs related to those wages; (5) pay certain taxes and fees that accrued or arose in the ordinary course of business before the Petition Date; (6) provide adequate assurance of payment for future utility services; (7) maintain and administer existing customer programs; (8) approve certain procedures regarding the transfer of stock to preserve the value of certain tax attributes; and (9) continue insurance policies and honor existing obligations in respect thereof. All of the relief requested by the first-day motions and throughout the Chapter 11 Cases will be subject to any orders regarding the Debtors' use of cash collateral.

F.    **Use of Cash Collateral.**

The Consenting Term Loan Lenders have agreed to the Debtors' consensual use of cash collateral on the terms of, and subject to the conditions set forth in, the Restructuring Support Agreement, the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to the Secured Parties, (III) Modifying the Automatic Stay, and (IV) Scheduling a Final Hearing* and the related order filed on the first day of the Chapter 11 Cases.  The Debtors will use cash collateral to, among other things, (1) pay the costs, fees and expenses associated with the Chapter 11 Cases, (2) make adequate protection payments to the Secured Parties, and (3) fund working capital needs, capital improvements, and expenditures of the Debtors during the Chapter 11 Cases, in accordance with an approved budget.  As part of, and subject to the terms of, the Restructuring Support Agreement, the Consenting Stakeholders agreed to support entry of the cash collateral orders.  Consensual use of cash collateral is a key component of the Restructuring Support Agreement and critical to preserving and maximizing value for the Debtors' estates.

The Debtors' use of cash collateral will be subject to (a) current cash payment of interest and expenses under the Term Loan Credit Agreement, (b) the provision of replacement liens to the extent of any diminution in value of the collateral (the "Prepetition Collateral") securing the Term Loan Secured Claims ("Diminution in Value"), (c) first-priority liens on unencumbered assets for the Secured Parties to the extent of any Diminution in Value, (d) reimbursement of the reasonable and documented fees and expenses of the Term Loan Lenders (including, without limitation, the fees and expenses of the Ad Hoc Group Professionals), and (e) superpriority administrative expense claims pursuant to section 507(b) of the Bankruptcy Code to the extent of any Diminution in Value, *provided*, *however*, that such adequate protection shall be subject to customary limitations for controlled foreign corporation and non-U.S. tax considerations.

G.    **Other Requested First-Day Relief and Retention Applications.**

The Debtors also plan to file motions and/or applications seeking certain customary relief, including the entry of an order directing the joint administration of the Debtors' Chapter 11 Cases under a single docket and the entry of orders approving the retention of the Debtors' bankruptcy advisors, including Kirkland as legal counsel, Jefferies as financial advisor and investment banker, A&M as restructuring advisor, and Stretto as Solicitation Agent.

## V.    Summary of the Plan.

SECTION V OF THIS DISCLOSURE STATEMENT IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE KEY TERMS, STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ENTIRE PLAN AND EXHIBITS TO THE PLAN.    ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL RELATED TERMS AND PROVISIONS, AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN.    INSTEAD, REFERENCE IS MADE TO THE PLAN AND ALL SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.  THE PLAN ITSELF (INCLUDING ATTACHMENTS) AND THE PLAN SUPPLEMENT WILL CONTROL THE TREATMENT OF HOLDERS OF CLAIMS AND INTERESTS UNDER THE PLAN.    TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS SECTION V AND THE PLAN (INCLUDING ANY ATTACHMENTS TO THE PLAN) AND THE PLAN SUPPLEMENT, THE PLAN AND PLAN SUPPLEMENT, AS APPLICABLE, SHALL GOVERN.

A.    **Treatment of Unclassified Claims.**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims set forth in Article III of the Plan.

1.    **Administrative Claims.**

Unless otherwise agreed to by the Holders of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) shall, with the reasonable consent of the Required Consenting Term Loan Lenders, either receive, in full and final satisfaction of its Administrative Claim, an amount of Cash equal to the amount of such Allowed Administrative Claim, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, in accordance with the following:    (a) if an Administrative Claim is Allowed as of the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); or (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter.

2.    **Professional Fee Claims.**

(a)    **Professional Fee Escrow Account.**

On or prior to the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way.  Such funds shall not be considered property of the Estates, the Debtors, or the Reorganized Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Debtors or the Reorganized Debtors, as applicable, from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account.  When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee

Escrow Account shall promptly be paid to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

### (b)    Final Fee Applications and Payment of Professional Fee Claims.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. The Reorganized Debtors shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

### (c)    Professional Fee Escrow Amount.

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors and Ad Hoc Group Professionals no later than five days before the anticipated Effective Date; *provided*, *however*, that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate a reasonable amount of unbilled fees and expenses of such Professional, taking into account any prior payments; *provided*, *however*, that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account.

### (d)    Post-Confirmation Date Fees and Expenses.

From and after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtors or the Reorganized Debtors, as applicable. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors and Reorganized Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors and Reorganized Debtors, as applicable, shall pay, within ten (10) business days after submission of a detailed invoice to the Debtors or Reorganized Debtors, as applicable, such reasonable claims for compensation or reimbursement of expenses incurred by the retained Professionals of the Debtors or the Reorganized Debtors, as applicable. If the Debtors or Reorganized Debtors, as applicable, dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors, as applicable, or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

### 3.    Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall, with the reasonable consent of the Required Consenting Term Loan Lenders, either be paid in full in Cash, or otherwise be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

**B.      Classification of Claims and Interests.**

        The Plan constitutes a separate Plan proposed by each Debtor, within the meaning of section 1121 of the Bankruptcy Code.  Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

        The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making distributions in accordance with the Plan in respect of Claims against and Interests in the Debtors under the Plan.  Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets, and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal Entities after the Effective Date.

        The following chart represents the classification of Claims and Interests for each Debtor pursuant to the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Term Loan Secured Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 5 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 6 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 7 | Existing Equity Interests | Impaired | Entitled to Vote |

        Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

**C.      Treatment of Classes of Claims and Interests**

        To the extent a Class contains Allowed Claims or Allowed Interests with respect to any Debtor, the classification of Allowed Claims and Allowed Interests is specified below.

        1.      Class 1 — Other Secured Claims

        (a)     *Classification*:  Class 1 consists of all Other Secured Claims.

        (b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive, subject to the reasonable consent of the Required Consenting Term Loan Lenders, either:

(i)        payment in full in Cash;

(ii)       delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

(iii)      Reinstatement of such Allowed Other Secured Claim under section 1124 of the Bankruptcy Code;

(iv)      such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code; or

(v)        the indubitable equivalent of such Claim.

(c)      *Voting*: Class 1 is Unimpaired under the Plan. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.      Class 2 — Other Priority Claims

(a)      *Classification*: Class 2 consists of all Other Priority Claims.

(b)      *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive either:

(i)        payment in full in Cash; or

(ii)       such other treatment rendering consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(c)      *Voting*: Class 2 is Unimpaired under the Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.      Class 3 — Term Loan Secured Claims

(a)      *Classification*: Class 3 consists of all Term Loan Secured Claims.

(b)      *Allowance:* On the Effective Date, Term Loan Secured Claims shall be Allowed in the aggregate principal amount of $644,101,000, plus any accrued but unpaid interest, fees, and other expenses arising under or in connection with the Term Loan Credit Agreement.

(c)      *Treatment*: Except to the extent that a Holder of Term Loan Secured Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Term Loan Secured Claim, each Holder of an Allowed Term Loan Secured Claim shall receive its Pro Rata share of and interest in:

(i)        the New Common Stock (subject to dilution from the Management Incentive Plan and the New Warrants);

(ii)       the Take-Back Term Loans; and

(iii)     the Excess Cash (to the extent not already distributed) and payment of interest on the Term Loans that is accrued and unpaid as of the Effective Date.

(d)     *Voting*:  Class 3 is Impaired under the Plan.  Holders of Allowed Term Loan Secured Claims are entitled to vote to accept or reject the Plan.

4.     Class 4 — General Unsecured Claims

(a)     *Classification*:  Class 4 consists of all General Unsecured Claims.

(b)     *Treatment*:  On the Effective Date, unless otherwise set forth herein or paid in full in advance thereof, all General Unsecured Claims shall be Reinstated.

(c)     *Voting*:  Class 4 is Unimpaired under the Plan.  Holders of General Unsecured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan.

5.     Class 5 — Intercompany Claims

(a)     *Classification*:  Class 5 consists of all Intercompany Claims.

(b)     *Treatment*:  Unless otherwise provided for under the Plan, each Allowed Intercompany Claim shall, on the Effective Date, be:

(i)     Reinstated;

(ii)     compromised, cancelled, setoff, contributed or distributed; or

(iii)     otherwise addressed at the election of the Debtors, subject to the reasonable consent of the Required Consenting Term Loan Lenders, such that Intercompany Claims are treated in a tax-efficient manner.

(c)     *Voting*:  Holders of Allowed Intercompany Claims in Class 5 are either Unimpaired, and such Holders are conclusively deemed to have accepted the Plan pursuant to section 1126(f), or Impaired, and such Holders are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject the Plan.

6.     Class 6 — Intercompany Interests

(a)     *Classification*:  Class 6 consists of all Intercompany Interests.

(b)     *Treatment*:  On the Effective Date, Intercompany Interests shall receive no recovery or distribution and shall be Reinstated to maintain the Debtors' corporate structure.

(c)     *Voting*:  Holders of Intercompany Interests in Class 6 are either Unimpaired, and such Holders are conclusively deemed to have accepted the Plan pursuant to section 1126(f), or Impaired, and such Holders are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

7.     Class 7 — Existing Equity Interests

(a)     *Classification*:  Class 7 consists of all Existing Equity Interests.

(b)   *Treatment*:  In full and final satisfaction of each applicable Existing Equity Interest, each applicable Holder thereof shall receive its Pro Rata share of and interest in the New Warrants.

(c)   *Voting*:  Class 7 is Impaired under the Plan.  Holders of applicable Existing Equity Interests are entitled to vote to accept or reject the Plan.

**D.    Means for Implementation of the Plan.**

**1.    General Settlement of Claims and Interests.**

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and is within the range of reasonableness.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final.

**2.    Restructuring Transactions.**

Following the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, shall take all actions set forth in the Restructuring Steps Memorandum and may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan and the Restructuring Support Agreement, which transactions may include, as applicable:  (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution or other certificates or documentation for other transactions as described in clause (a), pursuant to applicable state law; (d) the execution and delivery of the New Shareholders Agreement and the New Organizational Documents and any certificates or articles of incorporation, bylaws, or such other applicable formation, organizational, governance, or constitutive documents (if any) of each Reorganized Debtor (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable), and the issuance, distribution, reservation, or dilution, as applicable, of the New Common Stock, as set forth herein; (e) the execution and delivery of the Exit Facility Documents and the Take-Back Term Loan Documents (in both cases, including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable); (f) the execution and delivery of the New Warrant Agreement, and the issuance and distribution of the New Warrants; (g) the adoption of the Management Incentive Plan and the issuance and reservation of equity thereunder to the participants in the Management Incentive Plan on the terms and conditions set by the Reorganized Clover Board after the Effective Date; and (h) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Restructuring Transactions.

**3.    Sources of Consideration for Plan Distributions.**

The Debtors shall fund distributions under the Plan, as applicable, with:  (a) the New Common Stock; (b) the New Warrants; (c) the Take-Back Term Loan Facility; (d) the Exit Facility; and (e) the Debtors' Cash on hand.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other

20

documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain securities in connection with the Plan, including the New Common Stock and the New Warrants, will be exempt from SEC registration, as described more fully in Article IV.E of the Plan:

(a)       **Issuance and Distribution of the New Common Stock.**

On the Effective Date, the New Common Stock shall be issued and distributed to the Entities entitled to receive the New Common Stock pursuant to the Plan in accordance with the Restructuring Steps Memorandum. The issuance of New Common Stock by the Reorganized Debtors shall be authorized without the need for any further corporate action and without any action by the Holders of Claims or other parties in interest. All of the New Common Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance, as applicable, and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, as applicable, including the New Shareholders Agreement and the New Organizational Documents, which terms and conditions shall bind each Entity receiving such distribution of the New Common Stock. Any Entity's acceptance of New Common Stock shall be deemed as its agreement to the New Organizational Documents and the New Shareholders Agreement, as the same may be amended or modified from time to time following the Effective Date in accordance with their respective terms. The New Common Stock will not be registered on any exchange as of the Effective Date and shall not meet the eligibility requirements of the Depository Trust Company.

(b)       **Issuance of New Warrants.**

On the Effective Date, Reorganized Clover will issue the New Warrants only to the extent required to provide for distributions to Holders of applicable Existing Equity Interests, as contemplated by the Plan and as set forth and governed in all respects by the New Warrant Agreement. All of the New Warrants issued pursuant to the Plan shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance without the need for execution by any party thereto other than the applicable Reorganized Debtor(s).

The New Warrants shall be governed by the New Warrant Agreement.

(c)       **Take-Back Term Loan Facility.**

On the Effective Date, the Reorganized Debtors shall enter into the Take-Back Term Loan Facility, the terms of which will be set forth in the Take-Back Term Loan Facility Documents.

Confirmation of the Plan shall be deemed approval of the Take-Back Term Loan Facility and the Take-Back Term Loan Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtors to enter into and execute the Take-Back Term Loan Facility Documents and such other documents as may be required to effectuate the treatment afforded by the Take-Back Term Loan Facility.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Take-Back Term Loan Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Take-Back Term Loan Facility Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Take-Back Term Loan Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the Persons and Entities granted such Liens and security interests

shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.  In order to effect efficient distributions of the Take-Back Term Loans, the Term Loan Agent shall have reasonable discretion to impose a halt on assignments of Term Loans as of a date no earlier than three days before the anticipated Effective Date, which date shall be subject to the reasonable consent of the Required Consenting Term Loan Lenders.

       **(d)**       **Exit Facility.**

To the extent the Debtors obtain the Exit Facility, on and after the Effective Date, the Exit Facility Documents shall constitute legal, valid, and binding obligations of the Reorganized Debtors and be enforceable in accordance with their respective terms.  The terms and conditions of the Exit Facility Credit Agreement shall bind Reorganized Clover and each other Entity that enters into such Exit Facility Credit Agreement as a guarantor.  Any Entity's entry into the Exit Facility Credit Agreement shall be deemed as its agreement to the terms of such Exit Facility Credit Agreement, as amended or modified from time to time following the Effective Date in accordance with its terms.

Confirmation shall be deemed approval of the Exit Facility Documents (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and, to the extent not approved by the Bankruptcy Court previously, the Reorganized Debtors will be authorized to execute and deliver those documents necessary or appropriate to obtain the Exit Facility, including the Exit Facility Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit Facility.

On the Effective Date, all of the Claims, Liens, and security interests to be granted in accordance with the terms of the Exit Facility Documents (a) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents, (b) shall be deemed automatically attached and perfected on the Effective Date, subject only to such liens and security interests as may be permitted under the Exit Facility Documents, and (c) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

       **(e)**       **Cash on Hand.**

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand to fund distributions to certain Holders of Claims, including the payment of Allowed General Unsecured Claims as set forth in Article III of the Plan.

       **4.**       **New Shareholders Agreement.**

On the Effective Date, Reorganized Clover shall enter into and deliver the New Shareholders Agreement to each Holder of New Common Stock, and such parties shall be bound thereby, in each case, without the need for execution by any party thereto other than Reorganized Clover, *provided* that Reorganized Clover shall be authorized to require each such Holder that receives New Common Stock on the Effective Date to execute and deliver its signature page to the New Shareholders Agreement as a condition to receiving its distribution of New Common Stock thereunder.

       **5.**       **Exemption from Registration Requirements.**

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any Securities pursuant to and under the Plan, including the New Common Stock and the New Warrants, is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  The shares of

New Common Stock and the New Warrants to be issued under the Plan (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) subject to the terms of the New Shareholders Agreement, are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within ninety (90) days of such transfer, and (iii) is not an Entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code.

6.      **Corporate Existence.**

Except as otherwise provided in the Plan, the Plan Supplement, or pursuant to the Restructuring Steps Memorandum or Restructuring Transactions, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

7.      **Corporate Action.**

On or before the Effective Date, as applicable, all actions contemplated under the Plan or the Plan Supplement shall be deemed authorized and approved in all respects, including: (a) adoption or assumption, as applicable, of the agreements with existing management; (b) selection of the directors, managers, and officers for the Reorganized Debtors; (c) implementation of the Restructuring Transactions; (d) the issuance and distribution of the New Common Stock and New Warrants, as applicable; (e) the applicable Reorganized Debtors' entry into the Take-Back Term Loan Facility; (f) the applicable Reorganized Debtors' entry into the Exit Facility Documents, if applicable; and (g) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, as applicable, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the Exit Facility Documents (if applicable), the Take-Back Term Loan Facility Documents, the Restructuring Steps Memorandum, and the New Shareholders Agreement, and any and all other agreements, documents, securities, and instruments relating to the foregoing and the Restructuring Transactions. The authorizations and approvals contemplated by this Article IV.G of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

8.      **Vesting of Assets in the Reorganized Debtors.**

Except as otherwise provided in the Plan or the Plan Supplement, or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Debtor's Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing obligations under the Exit Facility Documents, the Take-Back Term Loan Facility Documents (in each case), and the Liens securing obligations on account of Other Secured Claims that are Reinstated pursuant to the Plan, if any). On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

9.      **Cancellation of Notes, Instruments, Certificates, and Other Documents.**

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims shall be cancelled, and the obligations of the Debtors or the

Reorganized Debtors and any non-Debtor Affiliates thereunder or in any way related thereto shall be discharged and deemed satisfied in full, and the Term Loan Agent shall be released from all duties thereunder; *provided*, *however*, that notwithstanding Confirmation or the occurrence of the Effective Date, any credit document or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of (a) allowing Holders of Allowed Claims to receive distributions under the Plan, (b) allowing and preserving the rights of the Term Loan Agent to make distributions pursuant to the Plan, (c) preserving the Term Loan Agent's rights to compensation and indemnification as against any money or property distributable to the Term Loan Lenders and the Holders of Term Loan Secured Claims, including permitting the Term Loan Agent to maintain, enforce, and exercise its charging liens against such distributions, (d) preserving all rights, including rights of enforcement, of the Term Loan Agent against any Person other than any of the Released Parties (including the Debtors), including with respect to indemnification or contribution from the Term Loan Lenders and Holders of Term Loan Secured Claims, pursuant and subject to the terms of the Term Loan Credit Agreement, (e) permitting the Term Loan Agent to enforce any obligation (if any) owed to the Term Loan Agent under the Plan, (f) permitting the Term Loan Agent to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, (g) permitting the Term Loan Agent and the Term Loan Lenders to assert any rights with respect to the obligations under the Term Loan Credit Agreement, and (h) permitting the Term Loan Agent to perform any functions that are necessary to effectuate the foregoing; *provided*, *further*, *however*, that (1) the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in the Plan, and (2) except as otherwise provided in the Plan, the terms and provisions of the Plan shall not modify any existing contract or agreement that would in any way be inconsistent with distributions under the Plan.  The Term Loan Agent shall be discharged and shall have no further obligation or liability except as provided in the Plan and Confirmation Order, and after the performance by the Term Loan Agent and its representatives and professionals of any obligations and duties required under or related to the Plan or Confirmation Order, the Term Loan Agent shall be relieved of and released from any obligations and duties arising thereunder.  The fees, expenses, and costs of the Term Loan Agent, including fees, expenses, and costs of its professionals incurred after the Effective Date in connection with the Term Loan Credit Agreement and reasonable and documented costs and expenses associated with effectuating distributions pursuant to the Plan will be paid by the Reorganized Debtors in the ordinary course.

10.      **Effectuating Documents; Further Transactions.**

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors and managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Support Agreement, the Take-Back Term Loan Facility Documents, the Exit Facility Documents, the New Organizational Documents, the New Shareholders Agreement, the New Warrant Agreement, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

11.      **Exemption from Certain Taxes and Fees.**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to:  (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other Interest in the Debtors or the Reorganized Debtors, including the Exit Facility, the Take-Back Term Loan Facility (in each case), the New Common Stock, and the New Warrants; (b) the Restructuring Transactions; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; (e) the grant of collateral as security for the Take-Back Term Loan Facility or Exit Facility, as applicable; or (f) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, in each case shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local

governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 12.    New Organizational Documents.

The New Organizational Documents shall, among other things:  (a)  authorize the issuance, distribution, and reservation of the New Common Stock and the New Warrants to the Entities entitled to receive such Interests under the Plan; and (b) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, prohibit the issuance of non-voting equity Securities.

On or immediately before the Effective Date, Clover or Reorganized Clover, as applicable, will file its New Organizational Documents with the applicable Secretary of State and/or other applicable authorities in its state of incorporation or formation in accordance with the applicable laws of their respective state of incorporation or formation, to the extent required for such New Organizational Documents to become effective.  After the Effective Date, Reorganized Clover may amend and restate its formation, organizational, and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of such documents.

### 13.    Directors and Officers.

As of the Effective Date, the terms of the current members of the boards of directors of the Debtors shall have expired, and the officers of the Reorganized Debtors shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent known and determined, on or prior to the Effective Date, the number and identity of the members of the Reorganized Clover Board shall be determined by the Required Consenting Term Loan Lenders in accordance with the Plan, the Restructuring Support Agreement and/or the applicable New Organizational Documents.

On the Effective Date, the officers and overall management structure of Reorganized Clover, and all officers and management decisions with respect to Reorganized Clover (and/or any of its direct or indirect subsidiaries), compensation arrangements, and affiliate transactions shall only be subject to the approval of the Reorganized Clover Board.

From and after the Effective Date, each director, officer, or manager of the Reorganized Debtors shall be appointed and serve pursuant to the terms of their respective charters and bylaws or other formation and constituent documents, including the New Shareholders Agreement and the New Organizational Documents, and applicable laws of the respective Reorganized Debtor's jurisdiction of formation.  To the extent that any such director or officer of the Reorganized Debtors is an "insider" under the Bankruptcy Code, the Debtors will disclose the nature of any compensation to be paid to such director or officer.

### 14.    Management Incentive Plan.

Within ninety (90) days of the Effective Date, the Reorganized Clover Board shall make a determination with respect to adoption of the Management Incentive Plan.  For the avoidance of doubt, the terms and conditions of the Management Incentive Plan (including any related agreements, policies, programs, other arrangements, and the Management Incentive Plan participants) shall be determined solely by the Reorganized Clover Board after the Effective Date and shall be consistent in all respects with the Restructuring Support Agreement.

### 15.    Preservation of Causes of Action.

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence

and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in any Definitive Documentation or other disclosure included in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to Article IV.O of the Plan include any claim or Cause of Action with respect to, or against, a Released Party.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action preserved pursuant to the first paragraph of this Article IV.O that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The applicable Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

**16.    Release of Avoidance Actions.**

On the Effective Date, the Debtors, on behalf of themselves and their Estates, shall release any and all Avoidance Actions, and the Debtors, the Reorganized Debtors, and any of their successors or assigns, and any Entity acting on behalf of the Debtors or the Reorganized Debtors shall be deemed to have waived the right to pursue any and all Avoidance Actions, except for Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors.

**E.    Treatment of Executory Contracts and Unexpired Leases.**

**1.    Assumption of Executory Contracts and Unexpired Leases.**

On the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts and Unexpired Leases shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, and regardless of whether such Executory Contract or Unexpired Lease is identified on the Assumed Executory Contract and Unexpired Lease List, unless such Executory Contract and Unexpired Lease: (a) was assumed or rejected previously by the Debtors; (b) previously expired or terminated pursuant to its own terms; (c) is the subject of a motion to reject filed on or before the Effective Date; or (d) is identified on the Rejected Executory Contract and Unexpired Lease List.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumption, assumption and assignment, or rejection, as applicable, of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Lease List, and the Rejected Executory Contract and Unexpired Leases List, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the

Bankruptcy Court on or after the Effective Date by a Final Order.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List and the Assumed Executory Contract and Unexpired Lease List at any time through and including thirty (30) days after the Effective Date.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

**2.      Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Solicitation Agent and served on the Reorganized Debtors no later than thirty (30) days after the effective date of such rejection.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Solicitation Agent within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.G of the Plan, notwithstanding anything in a Proof of Claim to the contrary.**

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim pursuant to Article III.B of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

**3.      Cure of Defaults and Objections to Cure and Assumption.**

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

In the event of a dispute regarding:  (a) the amount of any payments to cure such a default; (b) the ability of the Reorganized Debtors or any assignee to provide adequate assurance of future performance under the Executory Contract or Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following either (1) the entry of a Final Order or orders resolving the dispute and approving the assumption or (2) the settlement of the dispute between the parties which may be entered into without further order of the Bankruptcy Court.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  For the avoidance of doubt, assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not override or otherwise release any indemnification obligations in such Executory Contract or Unexpired Lease. **Any Proof of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed**

**shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

4.    **Insurance Policies.**

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, the Debtors shall be deemed to have assumed all insurance policies, as well as any agreements, documents, and instruments relating to such insurance policies or coverage of all insured Claims.  Except as set forth in Article V.F of the Plan, nothing in the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (a) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (b) alters or modifies the duty, if any, that the insurers or third party administrators pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor.  For the avoidance of doubt, insurers and third party administrators shall not need to nor be required to file or serve a cure objection or a request, application, claim, Proof of Claim, or motion for payment and shall not be subject to any claims bar date or similar deadline governing cure amounts or Claims.

5.    **Indemnification Obligations.**

All indemnification obligations in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be assumed and remain in full force and effect after the Effective Date, and shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose by the Reorganized Debtors, as applicable.

6.    **Director, Officer, Manager, and Employee Liability Insurance.**

The Reorganized Debtors shall purchase and maintain new D&O liability insurance policies for directors, officers, employees, attorneys, or other professionals and agents of the Reorganized Debtors on terms and conditions acceptable to the Required Consenting Term Loan Lenders.

7.    **Employee and Retiree Benefits.**

Except as otherwise provided in the Plan, on and after the Effective Date, subject to any Final Order and, without limiting any authority provided to the Reorganized Clover Board under the Debtors' respective formation and constituent documents, the Reorganized Debtors shall:  (a) amend, adopt, assume, and/or honor in the ordinary course of business any contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for, among other things, compensation, including any incentive plans, retention plans, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity from and after the Petition Date; and (b) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order; *provided* that the consummation of the transactions contemplated in the Plan shall not constitute a "change in control" with respect to any of the foregoing arrangements.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

8.    **Modifications, Amendments, Supplements, Restatements, or Other Agreements.**

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such

Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 9.    Reservation of Rights.

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Reorganized Debtors, as applicable, shall have thirty (30) calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date.

### 10.    Nonoccurrence of Effective Date.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

### 11.    Contracts and Leases Entered Into After the Petition Date.

Contracts and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business.

## F.    Conditions Precedent to Confirmation and Consummation of the Plan.

### 1.    Conditions Precedent to the Effective Date.

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX of the Plan:

- the Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably acceptable to the Required Consenting Term Loan Lenders and the Term Loan Agent, and the Confirmation Order shall not be stayed, modified, or vacated and shall not be subject to any pending appeal, and the appeals period for the Confirmation Order shall have expired; *provided* that the requirement that the Confirmation Order not be subject to any pending appeal and the appeals period for the Confirmation Order shall have expired or have been waived by the Required Consenting Term Loan Lenders;

- if applicable, the Exit Facility shall have closed and be in full force and effect;

- the Restructuring Support Agreement shall continue to be in full force and effect;

- all agreements or other arrangements by and among the Debtors and any of the Sponsors or their respective Affiliates or related parties shall be terminated with no consideration payable in connection therewith as of the Effective Date;

- the Debtors shall have paid or reimbursed all reasonable and documented fees and out-of-pocket expenses of the Term Loan Lenders (as applicable) in connection with the Restructuring Transactions, including the reasonable and documented fees and expenses of the Ad Hoc Group Professionals;

- the Professional Fee Escrow Amount shall have been deposited into the Professional Fee Escrow Account pending approval of the Professional Fee Claims by the Bankruptcy Court;

- each document or agreement constituting the Definitive Documentation shall be in form and substance consistent with the Restructuring Support Agreement and the Restructuring Term Sheet, including the Definitive Documentation Consent Rights;

- all governmental approvals and consents that are legally required for the consummation of the Restructuring shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, shall have expired;

- the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan; and

- the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan, shall have been filed and shall be in form and substance consistent with the approval rights set forth in the Restructuring Support Agreement.

### 2.    Waiver of Conditions Precedent.

The Debtors, with the consent of the Required Consenting Term Loan Lenders (not to be unreasonably delayed, conditioned, or withheld), may waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

### 3.    Substantial Consummation.

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, with respect to any of the Debtors, shall be deemed to occur on the Effective Date with respect to such Debtor.

### 4.    Effect of Non-Occurrence of Conditions to Consummation.

If the Effective Date does not occur with respect to any of the Debtors, the Plan shall be null and void in all respects with respect to such Debtor, and nothing contained in the Plan or the Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or Claims against or Interests in such Debtors; (b) prejudice in any manner the rights of such Debtors, any Holders of a Claim or Interest, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by such Debtors, any Holders, or any other Entity in any respect.

## G.    Settlement, Release, Injunction, and Related Provisions.

### 1.    Compromise and Settlement of Claims, Interests, and Controversies.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

2.        **Discharge of Claims and Termination of Interests.**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Debtor Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or noncontingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (a) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

3.        **Release of Liens.**

**Except (a) with respect to the Liens securing (1) the Exit Facility, (2) the Take-Back Term Loan Facility, (3) Other Secured Claims that are Reinstated pursuant to the Plan, and (4) obligations pursuant to Executory Contracts and Unexpired Leases assumed pursuant to the Plan, or (b) as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates and, subject to the consummation of the applicable distributions contemplated in the Plan, shall be fully released and discharged, at the sole cost of and expense of the Reorganized Debtors, and the Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns**.

4.        **Releases by the Debtors.**

**P**ursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:**

        (a)        **the Debtors, the Debtors' restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement;**

        (b)        **any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, including any Claims (whether direct or derivative), obligations, rights, suits, damages, Causes of Action (whether direct or derivative), remedies, and liabilities whatsoever based on or relating to, or in any manner arising from, in whole or in part the**

negotiation, formulation, or preparation of the Imaging Sale and Imaging Sale Definitive Agreement; *provided* that if the closing of the Imaging Sale has occurred, the Debtors, the Reorganized Debtors, and their Estates acknowledge (i) the granting, effectiveness, and enforceability of the Imaging Sale Releases and (ii) that the Imaging Sale Released Claims shall not be preserved or retained, whether pursuant to section 1123(b)(3)(B) of the Bankruptcy Code or otherwise;

(c)     the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

(d)     any other act or omission, transaction, agreement, event, or other occurrence, in each case relating to any of the foregoing (a), (b), or (c), taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in any Definitive Documentation or other document or disclosure included with or contained in the Plan Supplement) executed to implement the Plan.

5.     Releases by Holders of Claims and Interests of the Debtors.

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

(a)     the Debtors, the Debtors' restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement;

(b)     any transaction that is part of the Restructuring Transactions, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the order confirming the Plan in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, including any Claims (whether direct or derivative), obligations, rights, suits, damages, Causes of Action (whether direct or derivative), remedies, and liabilities whatsoever based on or relating to, or in any manner arising from, in whole or in part the negotiation, formulation, or preparation of the Imaging Sale and Imaging Sale Definitive Agreement; *provided* that if the closing of the Imaging Sale has occurred, the each Releasing Party acknowledges (i) the granting, effectiveness, and enforceability of the Imaging Sale Releases and (ii) that the Imaging Sale Released Claims shall not be preserved or retained, whether pursuant to section 1123(b)(3)(B) of the Bankruptcy Code or otherwise;

(c)     the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

(d)     any other act or omission, transaction, agreement, event, or other occurrence, in each case relating to any of the foregoing (a), (b), or (c), taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in any Definitive Documentation or other document or disclosure included with or contained in the Plan Supplement) executed to implement the Plan.

6.      **Exculpation.**

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and, upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

7.      **Injunction.**

Except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan, shall be discharged pursuant to the Plan, or are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

8.      **Protection Against Discriminatory Treatment.**

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

9.      **Recoupment.**

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

10.     **Reimbursement or Contribution.**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent, or (b) the relevant Holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

11.     **Term of Injunctions or Stays.**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

12.     **Document Retention.**

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

## VI.     <u>Confirmation of the Plan.</u>

A.      **The Combined Hearing.**

At the Combined Hearing, the Bankruptcy Court will determine whether to approve the Disclosure Statement and whether the Plan should be confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed. **The Combined Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Combined Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Solicitation Procedures.**

B.      **Deadline to Object to Approval of the Disclosure Statement and Confirmation of the Plan.**

Upon commencement of the Chapter 11 Cases and scheduling of the Combined Hearing, the Debtors will provide notice of the Combined Hearing and, if approved by the Bankruptcy Court, the notice will provide that objections to the Disclosure Statement and Confirmation of the Plan must be filed and served at or before 5:00 p.m., prevailing Eastern Time, on January 15, 2020. Unless objections to the Disclosure Statement or Confirmation of the Plan are timely served and filed, they may not be considered by the Bankruptcy Court.

C.      **Requirements for Approval of the Disclosure Statement.**

Pursuant to sections 1125(g) and 1126(b) of the Bankruptcy Code, the prepetition solicitation of votes to accept or reject a chapter 11 plan must comply with applicable federal or state securities laws and regulations (including the registration and disclosure requirements thereof) or, if such laws and regulations do not apply, provide "adequate information" under section 1125 of the Bankruptcy Code. At the Combined Hearing, the Debtors will seek a determination from the Bankruptcy Court that the Disclosure Statement satisfies sections 1125(g) and 1126(b) of the Bankruptcy Code.

**D.      Requirements for Confirmation of the Plan.**

    **1.      Requirements of Section 1129(a) of the Bankruptcy Code.**

        Among the requirements for Confirmation are the following:  (a) the Plan is accepted by all Impaired Classes of Claims and Interests or, if the Plan is rejected by an Impaired Class, at least one Impaired Class of Claims or Interests has voted to accept the Plan and a determination that the Plan "does not discriminate unfairly" and is "fair and equitable" as to Holders of Claims or Interests in all rejecting Impaired Classes; (b) the Plan is feasible; and (c) the Plan is in the "best interests" of Holders of Impaired Claims and Interests.

        At the Combined Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy Code.  Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, will be disclosed to the Bankruptcy Court, and any such payment (a) made before Confirmation will be reasonable or (b) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each Holder of an Impaired Claim against or Interest in the Debtors will accept the Plan, or each non-accepting Holder will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases Allowed Administrative Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

        Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class.  Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan of reorganization if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class.

2.      **The Debtor Release, Releases by Holders of Claims and Interests of the Debtors, Exculpation, and Injunction Provisions.**

Article VIII of the Plan provides for releases of certain claims and Causes of Action the Debtors may hold against the Released Parties. The Released Parties are, collectively, and in each case in such Party's capacity as such: (a) the Debtors and the Reorganized Debtors; (b) the Secured Parties; (c) the Term Loan Agent; (d) the Sponsors; (e) the Consenting Stakeholders; (f) with respect to each of the foregoing Entities in clauses (a) through (e), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, and funds; and (g) with respect to each of the foregoing Entities in clauses (a) through (f), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (with respect to clause (f), each solely in their capacity as such); *provided*, *however*, that any Holder of a Claim or Interest in a voting Class that objects to the Plan and votes to reject the Plan (and thereby opts out of the releases) shall not be a "Released Party."

Article VIII of the Plan provides for releases of certain claims and Causes of Action that Holders of Claims or Interests may hold against the Released Parties in exchange for the good and valuable consideration and the valuable compromises made by the Released Parties. The Holders of Claims and Interests who are releasing certain claims and Causes of Action against non-Debtors are, collectively, and in each case in such Holder's capacity as such: (a) the Debtors and the Reorganized Debtors; (b) the Consenting Term Loan Lenders; (c) the Term Loan Agent; (d) the Sponsors; (e) with respect to each of the foregoing Entities in clauses (a) through (d), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, and funds; (f) with respect to each of the foregoing Entities in clauses (a) through (e), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (with respect to clause (e), each solely in their capacity as such); and (g) all Holders of Claims and Interests not described in the foregoing clauses (a) through (f); *provided*, *however*, that any Holder of a Claim or Interest that (1) votes to reject the Plan and (2) objects to the releases in the Plan, shall not be a "Releasing Party" for purposes of the Plan.

Article VIII of the Plan provides for the exculpation of each Exculpated Party for certain acts or omissions taken in connection with the Chapter 11 Cases. The released and exculpated claims are limited to those claims or Causes of Action that may have arisen in connection with, related to, or arising out of the Plan, this Disclosure Statement, or the Chapter 11 Cases. The Exculpated Parties are, collectively, and in each case in such Party's capacity as such: (a) the Debtors and the Reorganized Debtors; and (b) with respect to each of the foregoing entities, each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, and advisors.

Article VIII of the Plan permanently enjoins Entities who have held, hold, or may hold Claims, Interests, or Liens that have been discharged or released pursuant to the Plan or are subject to exculpation pursuant to the Plan from asserting such Claims, Interests, or Liens against each Debtor, the Reorganized Debtors, and the Released Parties.

Under applicable law, a debtor release of the Released Parties is appropriate where: (a) there is an identity of interest between the debtor and the third party, such that a suit against the released non-debtor party is, at core, a suit against the debtor or will deplete assets of the estate; (b) there is a substantial contribution by the non-debtor of assets to the reorganization; (c) the injunction is essential to the reorganization; (d) there is overwhelming creditor support for the injunction; and (e) the chapter 11 plan will pay all or substantially all of the claims affected by the injunction. *In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013). Importantly, these factors are "neither exclusive nor are they a list of conjunctive requirements," but "[i]nstead, they are helpful in weighing the equities of the particular case after a fact-specific review." *Id.* Further, a chapter 11 plan may provide for a release of third party claims against non-debtors where such releases are consensual. *Id.* at 304–06. In addition, exculpation is appropriate where it applies to estate fiduciaries. *Id.* at 306. Finally, an injunction is appropriate where it is necessary to the reorganization and fair pursuant to section 105(a) of the Bankruptcy Code. *In re W.R. Grace & Co.*, 475 B.R. 34, 107 (D. Del. 2012). In addition, approval of the releases, exculpations, and injunctions for each Released Party and each Exculpated Party as part of Confirmation of the Plan will be limited to the extent such releases, exculpations, and injunctions are permitted by applicable law.

The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things, the releases are narrowly tailored to the Debtors' restructuring process, and each of the Released Parties has contributed value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue confirmation of the Plan. The Debtors believe that each of the Released Parties has played an integral role in formulating the Plan and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure. The Debtors further believe that such releases, exculpations, and injunctions are a necessary part of the Plan, including by allowing General Unsecured Claims to remain Unimpaired and ride through these Chapter 11 Cases and reducing the Debtors' leverage and interest burden. In addition, the Debtors believe the releases by Holders of Claims and Interests are entirely consensual under the established case law in the United States Bankruptcy Court for the District of Delaware. *See Indianapolis Downs*, 486 B.R. at 304–06. The Debtors will be prepared to meet their burden to establish the bases for the releases, exculpations, and injunctions for each of the Released Parties and each Exculpated Party as part of Confirmation of the Plan.

### 3. Feasibility/Financial Projections.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan of reorganization is not likely to be followed by the liquidation of the reorganized debtor or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the chapter 11 plan). For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared certain unaudited pro forma financial statements with regard to the Reorganized Debtors (the "Financial Projections"), which projections and the assumptions upon which they are based are attached hereto as **Exhibit D**. Based on these Financial Projections, the Debtors believe the deleveraging contemplated by the Plan meets the financial feasibility requirement. Moreover, the Debtors believe that sufficient funds will exist to make all payments required by the Plan. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

### 4. Best Interests of Creditors—Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their Advisors, prepared the Liquidation Analysis, attached hereto as **Exhibit F**, showing that the value of the distributions provided to Holders of Allowed Claims and Interests under the Plan would be the same or greater than under a hypothetical chapter 7 liquidation. Accordingly, the Debtors believe that the Plan is in the best interests of creditors.

### 5. Acceptance by Impaired Classes.

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of the claim or interest; (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or (c) provides that, on the consummation date, the holder of such claim receives cash equal to the allowed amount of that claim or, with respect to any equity interest, the holder of such interest receives value equal to the greater of (i) any fixed liquidation preference to which the holder of such equity interest is entitled, (ii) the fixed redemption price to which such holder is entitled, or (iii) the value of the interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in

that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number of creditors actually voting cast their ballots in favor of acceptance. For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan. Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

6.      **Confirmation Without Acceptance by All Impaired Classes.**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, provided that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminately unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class of Claims or Interests rejects the Plan, including Classes of Claims or Interests deemed to reject the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, utilizing the "cramdown" provision under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify the Plan in accordance with Article I and X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the requirements for cramdown and the Debtors will be prepared to meet their burden to establish that the Plan can be Confirmed pursuant to section 1129(b) of the Bankruptcy Code as part of Confirmation of the Plan.

(a)      **No Unfair Discrimination.**

The "unfair discrimination" test applies with respect to classes of claim or interests that are of equal priority but are receiving different treatment under a proposed plan. The test does not require that the treatment be the same or equivalent, but that the treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. Under certain circumstances, a proposed plan may treat two classes of unsecured creditors differently without unfairly discriminating against either class.

With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. Accordingly, the Debtors believe that the Plan meets the standard to demonstrate that the Plan does not unfairly discriminate and the Debtors will be prepared to meet their burden to establish that there is no unfair discrimination as part of Confirmation of the Plan.

(b)      **Fair and Equitable Test.**

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class. The Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan. There is no Class receiving more than a 100% recovery and no junior Class is receiving a distribution under the Plan until all senior Classes have received a 100% recovery or agreed to receive a different treatment under the Plan.

(i)      **Secured Claims**.

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (A) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (B) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the claimant's liens.

### (ii)     Unsecured Claims.

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (A) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (B) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

### (iii)     Interests.

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either: (A) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of: (1) the allowed amount of any fixed liquidation preference to which such holder is entitled; (2) any fixed redemption price to which such holder is entitled; or (3) the value of such interest; or (B) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

### 7.     Valuation of the Debtors.

The Debtors' investment banker, Jefferies, has prepared an independent valuation analysis, which is attached to this Disclosure Statement as **Exhibit E** (the "Valuation Analysis"). The Valuation Analysis should be considered in conjunction with the Risk Factors discussed in Section VIII of this Disclosure Statement, entitled "Risk Factors," and the Financial Projections. The Valuation Analysis is dated as of December 13, 2019, and is based on data and information as of that date. Holders of Claims and Interests should carefully review the information in **Exhibit E** in its entirety. The Debtors believe that the Valuation Analysis demonstrates that the Plan is "fair and equitable" to the non-accepting classes.

## VII.     Voting Instructions.

### A.     Overview.

Holders of Claims and Interests entitled to vote should carefully read the below voting instructions.

### B.     Solicitation Procedures.

### 1.     Solicitation Agent.

The Debtors have proposed to retain Stretto to act, among other things, as the Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan. The Solicitation Agent will process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and will file the Voting Report as soon as practicable after the Voting Deadline.

### 2.     Solicitation Package.

The following materials constitute the solicitation package (the "Solicitation Package") distributed to Holders of Claims and Interests in the Voting Classes:

- the Debtors' cover letter in support of the Plan;

- the appropriate Ballot and applicable voting instructions, together with a pre-addressed, postage pre-paid return envelope;

- a form of Combined Hearing Notice; and

- this Disclosure Statement and all exhibits hereto, including the Plan and all exhibits thereto (which may be distributed in paper or USB-flash drive format).

**3.      Voting Deadline.**

The period during which Ballots with respect to the Plan will be accepted by the Debtors will terminate at **11:59 p.m. prevailing Eastern Time on January 15, 2020**, unless the Debtors extend the date until which Ballots will be accepted.  Except to the extent that the Debtors so determine or as permitted by the Bankruptcy Court, Ballots that are received after the Voting Deadline will not be counted or otherwise used by the Debtors in connection with the Debtors' request for Confirmation of the Plan (or any permitted modification thereof).

The Debtors reserve the right, at any time or from time to time, to extend the period of time (on a daily basis, if necessary) during which Ballots will be accepted for any reason, including determining whether or not the requisite number of acceptances have been received, by making a public announcement of such extension no later than the first Business Day next succeeding the previously announced Voting Deadline.  The Debtors will give notice of any such extension in a manner deemed reasonable to the Debtors in their discretion.  There can be no assurance that the Debtors will exercise its right to extend the Voting Deadline.

**4.      Distribution of the Solicitation Package and Plan Supplement.**

The Debtors will cause the Solicitation Agent to distribute the Solicitation Package to Holders of Claims and Interests in the Voting Classes on December 13, 2019, which is 31 days before the Voting Deadline.

The Solicitation Package (except the Ballots) may also be obtained from the Solicitation Agent by:  (a) calling the Debtors' restructuring hotline at (855) 923-0996 (domestic toll-free) or (949) 341-7245  (international toll), and asking for the solicitation group; (b) emailing teamclover@stretto.com and referencing "Clover Technologies Group" in the subject line; or (c) writing to the following address:  Clover Technologies Group Ballot Processing, c/o Stretto, 8269 E 23rd Ave, Ste. 275, Denver, CO 80238.  When the Debtors file the Chapter 11 Cases, you may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Clover or for a fee at https://ecf.deb.uscourts.gov/.

The Debtors will file the Plan Supplement in accordance with the terms of the Plan.  As the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.  The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement at no cost from the Solicitation Agent by:  (a) calling the Solicitation Agent at one of the telephone numbers set forth above; (b) visiting the Debtors' restructuring website, https://cases.stretto.com/Clover; or (c) emailing the Solicitation Agent at the email address set forth above.

**C.      Voting Procedures.**

The voting record date is December 13, 2019, (the "Voting Record Date"), which date was used for to determine which Holders of Claims and Interests are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures.  Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

In order for the Holder of a Claim or Interest in the Voting Classes to have such Holder's Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and delivered by: (a) using the enclosed pre-paid, pre-addressed return envelope; (b) via first-class mail, overnight courier, or hand delivery to the Solicitation Agent at Clover Technologies Group Ballot Processing, c/o Stretto, 8269 E 23rd Ave, Ste. 275, Denver, CO 80238; or (c) via electronic submission through the Solicitation Agent's online voting portal at

https://cases.stretto.com/Clover, so that such Holder's Ballot is **actually received** by the Solicitation Agent before the Voting Deadline.

The Debtors are providing the Solicitation Package to Holders of Class 3 Term Loan Secured Claims and Holders of Class 7 Existing Equity Interests. If a Holder of a Claim or Interest in a Voting Class transfers all of such Claim or Interest to one or more parties on or after the Voting Record Date and before the Holder has cast its vote on the Plan, such Claim or Interest is automatically deemed to have provided a voting proxy to the purchaser(s) of the Holder's Claim or Interest, and such purchaser(s) shall be deemed to be the Holder(s) thereof as of the Voting Record Date for purposes of voting on the Plan, *provided* that the transfer complies with the applicable requirements under the Restructuring Support Agreement, if applicable.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM OR INTEREST BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM OR INTEREST MUST VOTE ALL OF ITS CLAIMS OR INTERESTS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM OR INTEREST WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM OR INTEREST HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS OR INTERESTS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN. IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLASS OF CLAIMS OR INTERESTS AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM OR INTEREST IN THE VOTING CLASSES FOLLOWS THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT.

D.    **Voting Tabulation.**

A Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or an assertion or admission of a Claim. Only Holders of Claims and Interests in the Voting Classes shall be entitled to vote with regard to such Claims and Interests.

Unless the Debtors decide otherwise, Ballots received after the Voting Deadline may not be counted. A Ballot will be deemed delivered only when the Solicitation Agent actually receives the executed Ballot as instructed in the applicable voting instructions. No Ballot should be sent to the Debtors, the Debtors' agents (other than the Solicitation Agent), or the Debtors' financial or legal advisors.

The Bankruptcy Code may require the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to confirmation of the Plan. In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

To the extent there are multiple Claims or Interests within Voting Classes, the Debtors may, in their discretion, and to the extent possible, aggregate the Claims or Interests of any particular Holder within a Voting Class for the purpose of counting votes.

In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The following Ballots will not be counted in determining the acceptance or rejection of the Plan:  (a) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim or Interest; (b) any Ballot that is not actually received by the Solicitation Agent by the Voting Deadline (unless the Debtors determine otherwise or as permitted by the Court); (c) any unsigned Ballot; (d) any Ballot that partially rejects and partially accepts the Plan; (e) any Ballot superseded by a later, timely submitted valid Ballot; (f) any improperly submitted Ballot, or any form of ballot other than the official form of Ballot sent by the Solicitation Agent (unless the Debtors determine otherwise or as permitted by the Court); and (g) any Ballot cast by a person or entity that does not hold a Claim or Interest in a Class that is entitled to vote on the Plan.

As soon as reasonably practicable after the Voting Deadline, the Solicitation Agent will file the Voting Report with the Bankruptcy Court.  The Voting Report shall, among other things, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity (each, an "Irregular Ballot"), including those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, or damaged.  The Solicitation Agent will attempt to reconcile the amount of any Claim or Interest reported on a Ballot with the Debtors' records, but in the event such amount cannot be timely reconciled without undue effort on the part of the Solicitation Agent, the amount shown in the Debtors' records shall govern.  The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots.  Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

## VIII.    Risk Factors.

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES.  THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN.   EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE REORGANIZED DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

A.    **Risks Related to the Restructuring.**

1.    **The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions are not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors.**

Subject to the terms of the Restructuring Support Agreement, if the Restructuring Transactions are not consummated, the Debtors will thereafter consider all available restructuring alternatives, including filing an alternative chapter 11 plan, converting to a chapter 7 plan, commencing section 363 sales of the Debtors' assets, and any other transaction that would maximize the value of the Debtors' Estates.  The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the Confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors.  For example, it would adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, lenders, and credit ratings agencies;

- the Debtors' enterprise value; and

- the Debtors' business relationship with customers and vendors.

    **2.**    **Even if the Restructuring Transactions are Successful, the Debtors Will Continue to Face Risks.**

The Restructuring Transactions are generally designed to reduce the Debtors' leverage, cash interest expense, improve the Debtors' liquidity and provide the Debtors' greater flexibility to generate long-term growth. Even if the Restructuring Transactions are implemented, the Debtors will continue to face a number of risks, including certain risks that are beyond the Debtors' control, such as changes in economic conditions, changes in the Debtors' industry, and changes in demand for Debtors' services. As a result of these risks, there is no guarantee that the Restructuring Transactions will achieve the Debtors' stated goals.

    **3.**    **Risks Related to the Take-Back Term Loan Facility, the New Common Stock, and the New Warrants.**

The following are some of the risks that apply to Holders of Claims against the Debtors or other parties who become Holders of the Take-Back Term Loan Facility, the New Common Stock, or the New Warrants pursuant to the Plan. There are additional risk factors related to ownership of the Take-Back Term Loan Facility and the New Common Stock that Holders of Claims against the Debtors should consider before deciding to vote to accept or reject the Plan.

    **(a)**    **The Consideration Under the Plan Does Not Reflect any Independent Valuation of Claims against or Interests in the Debtors.**

The Debtors have not obtained or requested an opinion from any bank or other firm as to the fairness of the consideration under the Plan.

    **(b)**    **The Terms of the New Shareholders Agreement Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court.**

The terms of the New Shareholders Agreement are subject to change based on negotiations between the Debtors and the Consenting Term Loan Lenders. Holders of Claims and Interests that are not the Consenting Term Loan Lenders will not participate in these negotiations and the results of such negotiations may affect the rights of shareholders in Reorganized Clover following the Effective Date.

    **(c)**    **The Take-Back Term Loan Facility May Have a Later Maturity Than the Term Loans, and Any Holder of Term Loan Secured Claims May Be Subject to Greater Risk That the Debtors Will Be Unable to Repay or Refinance the Take-Back Term Loan Facility Upon Maturity.**

If the Plan is implemented, following the Effective Date, the Take-Back Term Loan Facility may have a later maturity than the Term Loans. Holders of an Allowed Term Loan Secured Claim will be exposed to the risk of nonpayment on the Take-Back Term Loan Facility for a longer period than under the Term Loans.

    **(d)**    **The Take-Back Term Loan Facility Will Be Secured Only to the Extent of the Value of the Assets Granted as Security for the Take-Back Term Loans. The Fair Market Value of the Reorganized Debtors Upon Any Foreclosure May Not Be Sufficient to Repay the Holders of the Take-Back Term Loan in Full.**

The Take-Back Term Loans will be secured by a first-priority lien on certain collateral (the "Take-Back Term Loan Collateral"). The fair market value of the Take-Back Term Loan Collateral may not be sufficient to repay both the Take-Back Term Loans and all of the Holders of other debt holding a security interest in the Take-Back Term

Loan Collateral, if any, upon any foreclosure. The fair market value of the Take-Back Term Loan Collateral is subject to fluctuations based on factors that include, among other things, a decline in revenue in the Debtors' businesses. The amount to be received by creditors upon a sale of any Take-Back Term Loan Collateral would be dependent on numerous factors, including the value obtainable by selling the Take-Back Term Loan Collateral at the time, general market and economic conditions, and the timing and the manner of sale.

In the event that a subsequent bankruptcy or similar proceeding is commenced by or against the Reorganized Debtors, Holders of the Take-Back Term Loan Facility may be deemed to have an unsecured claim if the Reorganized Debtors' obligations under the Take-Back Term Loan Facility exceed the value of the Take-Back Term Loan Collateral. Upon a finding by a bankruptcy court that the Take-Back Term Loan Facility is under-collateralized, the Claims in the bankruptcy proceeding with respect to such debt instrument, absent an election by the Holders of the Take-Back Term Loans pursuant to section 1111(b) of the Bankruptcy Code, would be bifurcated between a secured claim and an unsecured claim, and the unsecured claim would not be entitled to the benefits of security in the Take Back Term Loan Collateral. Additionally, some or all accrued but unpaid interest may be disallowed in any bankruptcy proceeding.

The security interests granted in favor of the administrative agent under the Take-Back Term Loan Facility Documents (the "Take-Back Term Loan Agent") may be subject to practical problems generally associated with the realization of security interests in collateral. For example, the Take-Back Term Loan Agent may need to obtain the consent of a third party to obtain or enforce a security interest in a contract, and the Debtors cannot assure parties to the Take-Back Term Loan that the Take-Back Term Loan Agent will be able to obtain any such consent. The consents of any third parties may not be given when required to facilitate a foreclosure on any particular assets. Accordingly, the Take-Back Term Loan Agent may not have the ability to foreclose upon such assets, and the value of the Take-Back Term Loan Collateral may significantly decrease.

(e)     **The Reorganized Debtors May Not Be Able to Generate or Receive Sufficient Cash to Service Their Debt and May Be Forced to Take Other Actions to Satisfy their Obligations, Which May Not Be Successful.**

The Reorganized Debtors' ability to make scheduled payments on their debt obligations depends on their financial condition and operating performance, which is subject to prevailing economic and competitive conditions and certain financial, business, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may not be able to maintain a level of cash flow sufficient to permit them to pay the principal, premium, if any, and interest on their debt, including the Take-Back Term Loan Facility.

If cash flows and capital resources are insufficient to fund the Reorganized Debtors' debt obligations, they could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance debt, including the Take-Back Term Loan Facility. These alternative measures may not be successful, may not be completed on economically attractive terms, or may not be adequate to satisfy their debt obligations when due.

Further, if the Reorganized Debtors suffer or appear to suffer from a lack of available liquidity, the evaluation of their creditworthiness by counterparties and rating agencies and the willingness of third parties to do business with them could be adversely affected.

4.     **A Decline in the Reorganized Debtors' Credit Ratings Could Negatively Affect the Debtors' Ability to Access the Capital Markets in the Future.**

The Debtors' or the Reorganized Debtors' credit ratings could be lowered, suspended, or withdrawn entirely, at any time, by the rating agencies, if, in each rating agency's judgment, circumstances warrant, including as a result of exposure to the credit risk and the business and financial condition of the Debtors or the Reorganized Debtors, as applicable. Downgrades in the Reorganized Debtors' long-term debt ratings may make it more difficult to refinance their debt and increase the cost of any debt that they may incur in the future.

5.      **Risks Related to Confirmation and Consummation of the Plan.**

(a)      **The Restructuring Support Agreement May Be Terminated.**

As more fully set forth in Sections 12 and 17 of the Restructuring Support Agreement, the Restructuring Support Agreement may be terminated upon the occurrence of certain events, including, among others, the Debtors' failure to meet specified milestones relating to the filing, confirmation, and consummation of the Plan, and breaches by the Debtors and/or the Consenting Stakeholders of their respective obligations under the Restructuring Support Agreement. In the event that the Restructuring Support Agreement is terminated, the Debtors may seek to implement an alternative to the Plan, including a non-consensual restructuring alternative or a potential liquidation of their assets.

(b)      **Conditions Precedent to Confirmation May Not Occur.**

As more fully set forth in Article IX of the Plan, the occurrence of Confirmation and the Effective Date are each subject to a number of conditions precedent. If each condition precedent to Confirmation is not met or waived, the Plan will not be confirmed, and if each condition precedent to Consummation is not met or waived, the Effective Date will not take place. In the event that the Plan is not confirmed or is not Consummated, the Debtors may seek confirmation of a new plan. Pursuit of a new plan may require consents or concessions from the Consenting Stakeholders. The Debtors can provide no assurances that such consents or concessions would be obtained. If the Debtors do not secure sufficient working capital to continue their operations or if the new plan is not confirmed, however, the Debtors may be forced to liquidate their assets.

(c)      **Parties in Interest May Object to the Plan's Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(d)      **The Debtors May Not Be Able to Satisfy Vote Requirements.**

Pursuant to sections 1126(c) and 1126(d) of the Bankruptcy Code, section 1129(a)(7)(A)(i) of the Bankruptcy Code will be satisfied with respect to Class 3 Term Loan Secured Claims and Class 7 Existing Equity Interests, respectively, if Holders of at least two-thirds in amount and more than one-half in number of the Holders that vote on the Plan cast votes to accept the Plan. There is no guarantee that the Debtors will receive the necessary acceptances from Holders of Claims or Interests in the Voting Classes. If the Voting Classes vote to reject the Plan the Debtors may elect to amend the Plan.

(e)      **The Debtors May Not Be Able to Secure Confirmation.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (i) the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes; (ii) the plan is not likely to be followed by a liquidation or a need for further financial reorganization unless liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting holders of claims and interests within a particular Class under the plan will not be less than the value of distributions such Holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. For a more detailed discussion of the confirmation requirements, see Section VI of this Disclosure Statement, entitled "Confirmation of the Plan." A dissenting Holder of an Allowed Claim or Interest might challenge either the adequacy of this Disclosure Statement or whether the voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement and the voting results are appropriate, the Bankruptcy Court can decline to confirm the Plan if it finds that any of the statutory requirements for

Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

If the Plan is not Confirmed, it is unclear what distributions, if any, Holders of Allowed Claims and Interests will receive with respect to their Allowed Claims and Interests, as applicable.

Subject to the limitations contained in the Plan and the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Any modifications could result in a less favorable treatment of any Class than the treatment currently provided in the Plan, such as a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan.

<p style="text-align:center;">(f)        <strong>Parties in Interest May Object to the Releases Contained in the Plan.</strong></p>

Confirmation is also subject to the Bankruptcy Court's approval of the settlement, release, injunction, and related provisions described in Article VIII of the Plan. Certain parties in interest may assert that the Debtors cannot demonstrate that they meet the standards for approval of releases, exculpations, and injunctions established by the United States Court of Appeals for the Third Circuit.

<p style="text-align:center;">(g)        <strong>The Debtors May Not Be Able to Pursue Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes.</strong></p>

Generally, a bankruptcy court may confirm a plan under the Bankruptcy Code's "cramdown" provisions over the objection of an impaired non-accepting class of claims or interests if at least one impaired class of claims has accepted the plan (with acceptance being determined without including the vote of any "insider" in that accepting class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the rejecting impaired classes.

As to Class 3 (Term Loan Secured Claims) and Class 7 (Existing Equity Interests), while the Debtors believe they have secured Plan support from the Holders of such Claims and Interests that exceeds the requisite two-thirds in amount and more than one-half in number of the Allowed Class 3 Term Loan Secured Claims and the requisite two-thirds amount for Allowed Class 7 Existing Equity Interests pursuant to the Restructuring Support Agreement, the amount required for an accepting class of claims or interests pursuant to section 1126(c) or 1126(d), as applicable, of the Bankruptcy Code, there is no guarantee that those Holders will vote those Claims or Interests in favor of the Plan. There can be no assurances that the Debtors will confirm a chapter 11 plan and emerge as a reorganized company in that event, and it is unclear what distributions, if any, Holders of Allowed Claims and Interests will receive with respect to their Allowed Claims and Interests in that instance. In addition, the pursuit of an alternative restructuring proposal may result in, among other things, increased expenses relating to Professional Fee Claims.

Finally, to the extent that a Voting Class votes to reject the Plan, the Debtors may not be able to seek to "cramdown" such Voting Class under section 1129(b) of the Bankruptcy Code because there is no other impaired Class of Claims entitled to vote under the Plan.

<p style="text-align:center;">(h)        <strong>The Debtors May Object to the Amount or Classification of a Claim or Interest.</strong></p>

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection or dispute. Any Holder of a Claim or Interest that is subject to an objection or dispute may not receive its expected share of the estimated distributions described in this Disclosure Statement.

<p style="text-align:center;">(i)        <strong>The Debtors' Historical Financial Information May Not Be Comparable to the Financial Information of the Reorganized Debtors.</strong></p>

As a result of Consummation and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

<p style="text-align:center;">46</p>

(j)        **The Effective Date May Not Occur.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

**B.        Risks Related to Recoveries Under the Plan.**

**1.        The Debtors May Not Be Able to Achieve Their Projected Financial Results or Meet Their Post-Restructuring Debt Obligations.**

The Financial Projections represent management's best estimate of the future financial performance of the Debtors or the Reorganized Debtors, as applicable, based on currently known facts and assumptions about future operations of the Debtors or the Reorganized Debtors, as applicable, as well as the U.S. and world economy in general and the relevant industries in which the Debtors operate. There is no guarantee that the Financial Projections will be realized, and actual financial results may differ significantly from the Financial Projections. To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due, or may not be able to meet their operational needs, all of which may negatively affect the value of the New Common Stock. Further, a failure of the Reorganized Debtors to meet their projected financial results could lead to cash flow and working capital constraints, which may require the Debtors to seek additional working capital. The Reorganized Debtors may be unable to obtain such working capital when required, or may only be able to obtain such capital on unreasonable or cost prohibitive terms. For example, the Reorganized Debtors may be required to take on additional debt, the interest costs of which could adversely affect the results of the operations and financial condition of the Reorganized Debtors, and also have a negative effect on the value of the New Common Stock. In addition, if any such required capital is obtained in the form of equity, the New Common Stock to be issued to Holder of Allowed Term Loan Secured Claims under the Plan could be diluted.

**2.        Estimated Valuations of the Debtors, the Take-Back Term Loan Facility, and the New Common Stock, and Estimated Recoveries to Holders of Allowed Term Loan Secured Claims and Existing Equity Interests Are Not Intended to Represent Potential Market Values.**

The Debtors' estimated recoveries to Holders of Allowed Claims and Allowed Interests are not intended to represent the market value of the Debtors' Securities. The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including, among others: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; (e) the assumption that capital and equity markets remain consistent with current conditions; and (f) the Debtors' ability to maintain critical existing customer relationships.

**3.        Holders of Claims That Acquire the New Common Stock Will Assert Significant Control Over the Reorganized Debtors.**

Upon Consummation of the Plan, Holders of Allowed Term Loan Secured Claims will become Holders of 100% of the New Common Stock in Reorganized Clover pursuant to the Plan. As a result, following Consummation, certain Holders of Allowed Class 3 Term Loan Secured Claims may exercise substantial influence over the Reorganized Debtors and their affairs.

**4.        Certain Tax Implications of the Debtors' Bankruptcy and Reorganization May Increase the Tax Liability of the Reorganized Debtors.**

Holders of Allowed Claims should carefully review Section I and X of this Disclosure Statement, entitled "Certain U.S. Federal Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors.

C.      **Risks Related to the Offer and Issuance of Securities Under the Plan.**

1.      **The Debtors Do Not Intend to Offer to Register or to Exchange the New Common Stock in a Registered Exchange Offer.**

The New Common Stock and the New Warrants have not been registered under the Securities Act or any state securities laws and, subject to the discussion of section 1145 of the Bankruptcy Code below and as summarized in Section IX of this Disclosure Statement, entitled "Important Securities Laws Disclosures" unless so registered, may not be re-offered or re-sold except pursuant to an exemption from the registration requirements of the Securities Act and applicable state securities laws. The Debtors do not intend to register the New Common Stock or the New Warrants under the Securities Act or to offer to exchange the New Common Stock or the New Warrants in an exchange offer registered under the Securities Act. As a result, the New Common Stock and the New Warrants may be transferred or re-sold only in transactions exempt from the securities registration requirements of federal and applicable state laws. In addition, the Debtors are not subject to the reporting requirements of the Securities Act, and Holders of the New Common Stock and the New Warrants will not be entitled to any information except as expressly required by the New Shareholders Agreement.

The Debtors believe that the issuance of the New Common Stock and the New Warrants with respect to Allowed Claims and Interests is covered by section 1145 of the Bankruptcy Code. Accordingly, the Debtors believe that the New Common Stock to be issued to Holders of Allowed Class 3 Term Loan Secured Claims on account of such Claims and the New Warrants to be issued to Holders of Class 7 Existing Equity Interests may be resold without registration under the Securities Act or other federal securities laws, unless the Holder is (a) an "underwriter" (as discussed in Section IX.B.2IX.B.2 below) with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code; or (b) an affiliate of the Reorganized Debtors (or has been such an "affiliate" within 90 days of such transfer).

The information that the Debtors are required to provide in order to issue the New Common Stock and the New Warrants may be less than the Debtors would be required to provide if the New Common Stock and the New Warrants were registered. Among other things, the Debtors may not be required to provide: (a) separate financial information for any subsidiary; (b) selected historical consolidated financial data of Clover; (c) selected quarterly financial data of Clover; (d) certain information about the Debtors' disclosure controls and procedures and their internal controls over financial reporting; and (e) certain information regarding the Debtors' executive compensation policies and practices and historical compensation information for their executive officers. This lack of information could impair your ability to evaluate your ownership and the marketability of the New Common Stock and the New Warrants.

2.      **There is No Established Market for the New Common Stock for the New Warrants.**

The New Common Stock and the New Warrants will be new issuances of Securities and there is no established trading market for those securities. The Debtors do not intend to apply for the New Common Stock to be listed on any securities exchange or to arrange for quotation on any automated dealer quotation system. You may not be able to sell your New Common Stock or New Warrants at a particular time or at favorable prices. As a result, the Debtors cannot assure you as to the liquidity of any trading market for the New Common Stock or the New Warrants. Accordingly, you may be required to bear the financial risk of your ownership of the New Common Stock indefinitely. If a trading market were to develop, future trading prices of the New Common Stock and the New Warrants may be volatile and will depend on many factors, including: (a) the Debtors' operating performance and financial condition; (b) the interest of securities dealers in making a market for them; and (c) the market for similar securities.

D.      **Risk Factors Related to the Business Operations of the Debtors and Reorganized Debtors.**

1.      **The Debtors Will File Voluntary Petitions for Relief Under Chapter 11 of the Bankruptcy Code and Will Be Subject to the Risks and Uncertainties Associated with Any Chapter 11 Restructuring.**

For the duration of the Chapter 11 Cases, the Debtors' operations and the Debtors' ability to execute their business strategy will be subject to the risks and uncertainties associated with bankruptcy. These risks include, among other things:

- the Debtors' ability to obtain approval of the Bankruptcy Court with respect to pleadings and motions filed in the Chapter 11 Cases from time to time;

- the Debtors' ability to obtain creditor and Bankruptcy Court approval for, and then to Consummate, the Plan to emerge from bankruptcy;

- the occurrence of any event, change, or other circumstance that could give rise to the termination of the Restructuring Support Agreement;

- the Debtors' ability to obtain and maintain normal trade terms with service providers and maintain contracts that are critical to their operations;

- the Debtors' ability to attract, motivate, and retain key employees;

- the Debtors' ability to attract and retain customers; and

- the Debtors' ability to fund and execute their business plan.

The Debtors will also be subject to risks and uncertainties with respect to the actions and decisions of creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Plan.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events or publicity associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with their customers, as well as their suppliers and employees, which, in turn, could adversely affect the Debtors' operations and financial condition. Also, pursuant to the Bankruptcy Code, the Debtors need Bankruptcy Court approval for transactions outside the ordinary course of business, which may limit their ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot predict or quantify the ultimate effect that events occurring during the Chapter 11 Cases will have on their businesses, financial condition, and results of operations.

As a result of the Chapter 11 Cases, the realization of assets and the satisfaction of liabilities are subject to uncertainty. While operating as debtors in possession, and subject to approval of the Bankruptcy Court, or otherwise as permitted in the normal course of business or by Bankruptcy Court order, the Debtors may sell or otherwise dispose of assets and liquidate or settle liabilities. Further, the Plan could materially change the amounts and classifications of assets and liabilities reported in the historical consolidated financial statements. The historical consolidated financial statements do not include any adjustments to the reported amounts of assets or liabilities that might be necessary as a result of Confirmation.

### 2. Potential for the Loss of Key Members of the Executive Management Team.

If the Debtors were to lose key members of their senior management team on account of the Chapter 11 Cases or otherwise, the Debtors' business, financial condition, liquidity, and results of operations could be adversely affected.

### 3. The Debtors May Not Be Able to Achieve Their Projected Financial Results.

The Financial Projections set forth in this Disclosure Statement represent the best estimate of the future financial performances of the Debtors based on currently known facts and assumptions about future operations as well as the United States and world economies in general, and the relevant industries in which the Debtors operate. The actual financial results may differ significantly from the projections. If the Debtors do not achieve their projected financial results, then the value of the Debtors' debt or equity issued pursuant to the Plan may experience a decline and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. There are numerous factors and assumptions inherent in estimating the Debtors' future financial results, many of which are beyond the Debtors' control, including changes in consumer behavior, including a shift away from use of certain devices for which the Debtors have a large market share; macroeconomic trends in the consumer electronic device industries; internal OEM policies that restrict the use of the Debtors' services; and increased competition from foreign or cheap competition or device clones.

49

4.      **If the Debtors Do Not Obtain Additional Capital to Fund Their Operations and Obligations, the Debtors' Growth May Be Limited.**

The Debtors may require additional capital to fund their operations and obligations, which will depend on several factors, including:

- the Debtors' ability to enter into new customer agreements and to extend the duration of existing agreements;

- the success rate of the Debtors' sales efforts;

- costs of recruiting and retaining qualified personnel;

- expenditures and investments to implement the Debtors' business strategy; and

- the identification and successful completion of acquisitions.

If the Debtors cannot raise additional capital, the Debtors may be required to curtail internal growth initiatives and/or forgo the pursuit of acquisitions.  The Debtors do not know whether additional financing will be available on commercially acceptable terms, if at all, when needed.  If sufficient funding is not available or is not available on commercially acceptable terms, the Debtors' ability to fund their operations, support the growth of their business, or otherwise respond to competitive pressures could be significantly delayed or limited, which could materially adversely affect the Debtors' business, financial condition, or results of operations.

5.      **Employee and Labor Risks.**

The Debtors' employees are essential to the Debtors' ability to generate revenue.  Certain of the Debtors' employees, and those of their non-Debtor affiliates, require extensive skills and training to provide the Debtors' unique set of repair and engineering services.  When unemployment rates are low, it can be difficult for the Debtors to find qualified and affordable personnel.  The Debtors may be unable to hire and retain a sufficient skilled labor force necessary to support the Debtors' operating requirements and growth strategy.  The Debtors' labor expenses may increase as a result of a shortage of skilled personnel.  Additionally, the Debtors may also be forced to incur significant training expenses if they are unable to hire employees with the requisite skills.  Accordingly, labor shortages or increased labor or training costs could materially adversely affect the Debtors' business, financial condition, or results of operations.

6.      **Litigation Matters.**

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.  Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

Specific litigation includes or may include (1) workers' compensation cases involving current and former employees, (2) personal injury suits involving the Debtors' products, (3) wrongful termination employee actions, (4) regulatory matters, and (5) other litigation matters that have since been closed.

7.      **International Risk Factors.**

The Debtors' non-Debtor affiliates have significant operations and assets in many international locations that may experience oppressive fiscal and monetary policy.  Governments in some of these countries exercise

significant influence over their respective economies.  As a result, the Debtors are subject to political, legal, and socio-economic risks specific to these countries that could have an impact on the Debtors' business and financial performance.

**E.      Miscellaneous Risk Factors and Disclaimers.**

**1.      The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.**

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

**2.      No Legal or Tax Advice Is Provided By This Disclosure Statement.**

This Disclosure Statement is not legal advice to any person or Entity.  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each reader should consult its own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation.

**3.      No Admissions Made.**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

**4.      Failure to Identify Litigation Claims or Projected Objections.**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement.  The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

**5.      Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

**6.      No Representations Outside This Disclosure Statement Are Authorized.**

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure voting Holders' acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by voting Holders in arriving at their decision.  Holders of Claims and Interests in Voting Classes should promptly report unauthorized representations or inducements to counsel to the Debtors and the Office of the United States Trustee for the District of Delaware.

<div align="center">

IX.   <u>**Important Securities Laws Disclosures**</u>.

</div>

A.   **Plan Consideration.**

The Plan provides for the Reorganized Debtors to distribute Pro Rata (1) $80 million of the Take-Back Term Loan Facility to Holders of Allowed Class 3 Term Loan Secured Claims, pending the Imaging Sale; (2) 100% of the New Common Stock in Reorganized Clover to Holders of Allowed Class 3 Term Loan Secured Claims; (3) the Excess Cash (and any accrued and unpaid interest) to Holders of Allowed Class 3 Term Loan Secured Claims; and (4) the New Warrants to Holders of Allowed Class 7 Existing Equity Interests.  The Debtors believe that shares of New Common Stock and New Warrants may constitute "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and all applicable state Blue Sky Laws.

B.   **Exemption from Registration Requirements; Issuance and Resale of New Common Stock and New Warrants; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code.**

1.   **Exemption from Registration Requirements; Issuance and Resale of New Common Stock and New Warrants.**

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any applicable state Blue Sky Laws) shall not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if:  (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.  In reliance upon these exemptions, the offer, issuance and distribution of the New Common Stock and the New Warrants in respect of Claims or Interests as contemplated by the Plan will not be registered under the Securities Act or any applicable state Blue Sky Laws.

The Debtors believe that the issuance of the New Common Stock and New Warrants in respect of Claims or Interests as contemplated by the Plan is covered by section 1145 of the Bankruptcy Code.  Accordingly, the Debtors believe that such New Common Stock and New Warrants may be resold without registration under the Securities Act or other federal securities laws, unless the Holder is an "underwriter" (as discussed in Section IX.B.2 below) with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code, or an affiliate of the Reorganized Debtors (or has been such an "affiliate" within 90 days of such transfer).  The Debtors will seek to obtain, as part of the Confirmation Order, a provision confirming such exemption.  In addition, the New Common Stock and the New Warrants to be issued in respect of Claims or Interests as contemplated by the Plan generally may be able to be resold without registration under applicable state Blue Sky Laws by a Holder that is not an underwriter or an affiliate of the Reorganized Debtors pursuant to various exemptions provided by the respective Blue Sky Laws of those states.  However, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined.

Recipients of the New Common Stock and New Warrants to be issued in respect of Claims or Interests as contemplated by the Plan are advised to consult with their own legal advisors as to the availability and applicability of section 1145 of the Bankruptcy Code to such New Common Stock and New Warrants and any other potential exemption from registration under the Securities Act or applicable state Blue Sky Laws in any given instance and as to any applicable requirements or conditions to such availability.

Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock or the New Warrants to be issued in respect of Claims or Interests as contemplated by the Plan is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.  For the avoidance of doubt, all of the New Common Stock shall be subject to the terms of the New Shareholders Agreement.

The Debtors do not have any contract, arrangement, or understanding relating to, and will not, directly or indirectly, pay any commission or other remuneration to any broker, dealer, salesperson, agent, or any other person for soliciting votes to accept or reject the Plan.  The Debtors have received assurances that no person will provide any information to Holders of Term Loan Secured Claims relating to the solicitation of votes on the Plan other than to

<div align="center">52</div>

refer such Holders to the information contained in this Disclosure Statement.  In addition, no broker, dealer, salesperson, agent, or any other person, is engaged or authorized to express any statement, opinion, recommendation, or judgment with respect to the relative merits and risks of the Plan.  Thus, no person will receive any commission or other remuneration, directly or indirectly, for soliciting votes to accept or reject the Plan or in connection with the offer of any Securities that may be the deemed to occur in connection with voting on the Plan.

> **2.**     **Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code; Implications for Resale of New Common Stock and New Warrants.**

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions of an entity that is not an issuer":  (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer," for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  In addition, the legislative history of section 1145 of the Bankruptcy Code may suggest that a creditor who owns 10% or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to the New Common Stock or the New Warrants to be issued in respect of Claims or Interests as contemplated by the Plan would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Common Stock or the New Warrants to be issued in respect of Claims or Interests as contemplated by the Plan and, in turn, whether any Person may freely resell such New Common Stock or New Warrants.  The Debtors recommend that potential recipients of the New Common Stock or New Warrants to be issued in respect of Claims or Interests as contemplated by the Plan consult their own counsel concerning their ability to freely trade such securities without registration under the federal and applicable state Blue Sky Laws.

Under certain circumstances, Holders of the New Common Stock or the New Warrants to be issued in respect of Claims or Interests as contemplated by the Plan who are deemed to be "underwriters" may be entitled to resell their New Common Stock or New Warrants pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.  Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person after a specified holding period if current information regarding the issuer is publicly available and certain other conditions are met, and, if such seller is an affiliate of the issuer, if volume limitations and manner of sale requirements are met.

**IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF**

**SECURITIES CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

<div align="center">

**X.**     **Certain U.S. Federal Tax Consequences of the Plan.**

</div>

**A.**     **Introduction.**

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Reorganized Debtors, and to certain Holders of Claims and Interests. The following summary does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote to accept or reject the Plan. This summary is based on the U.S. Internal Revenue Code of 1986, as amended ("IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders of Claims or Interests in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders of Claims or Interests subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, small business investment companies, foreign taxpayers, Persons who are related to the Debtors within the meaning of the IRC, Persons using a mark-to-market method of accounting, Holders of Claims or Interests who are themselves in bankruptcy, and regulated investment companies and those holding, or who will hold, Claims, the New Common Stock, the New Warrants, or the Take-Back Term Loan, as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed. Furthermore, this summary assumes that a Holder of a Claim or Interest holds only Claims in a single Class and holds Claims or Interests as "capital assets" (within the meaning of section 1221 of the IRC). This discussion does not address special considerations that may apply to persons who are both Holders of Claims and Interests Holders. This summary also assumes that the various debt and other arrangements to which the Debtors and Reorganized Debtors are or will be a party to will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. This summary does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder that for U.S. federal income tax purposes is: (1) an individual citizen or resident of the United States; (2) a corporation created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder or a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

<div align="center">54</div>

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

B. **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors, the Reorganized Debtors, and Equity Holders of Clover.**

1. **Characterization of the Restructuring Transactions.**

As of December 31, 2018, the Debtors estimate that they have approximately $11 million of disallowed interest expense carryforwards under section 163(j) of the IRC (the "163(j) Deductions") and approximately $0.5 million of foreign tax credit carryforwards (together with any federal net operating losses, capital losses, interest expenses, and certain other tax attributes, collectively, the "Tax Attributes"). The Debtors may generate additional Tax Attributes in 2019 and prior to the Effective Date in 2020, including as a result of the Imaging Sale. Any Tax Attributes remaining upon implementation of the Plan may be available to offset taxable income or directly offset federal tax liability in future years, thereby reducing the Debtors' future aggregate tax obligations, subject to the discussion below regarding section 382 of the IRC. As discussed below, however, certain of the Debtors' Tax Attributes are expected to be reduced upon implementation of the Plan.

The tax consequences of the implementation of the Plan to the Debtors and Reorganized Debtors will differ depending on whether the Restructuring Transactions are structured as a taxable sale of the assets and/or stock of any Debtor (a "Taxable Transaction") to the Reorganized Debtors or as a recapitalization of the Debtors (a "Recapitalization Transaction").[5] The Debtors have not yet determined how the Restructuring Transactions will be structured, whether in whole or in part. Such decision will depend on, among other things, the amount of the expected reduction in the aggregate tax basis of such assets by excluded cancellation of indebtedness income ("COD Income"), whether a Taxable Transaction would give rise to taxable income and whether sufficient Tax Attributes are available to offset it, the comparative depreciation and amortization deductions that will be available to the Reorganized Debtors in either structure, expectations regarding the Reorganized Debtors' "earnings and profits" in either structure, and the amount and character of any losses with respect to the stock of the Debtors, in each case for U.S. federal, state, and local income tax purposes.

If the transactions undertaken pursuant to the Plan are structured as a Taxable Transaction, the Debtors would realize gain or loss upon the transfer in an amount equal to the difference between the aggregate fair market value of the assets transferred by the Debtors and the Debtors' aggregate tax basis in such assets. Gain, if any, would be reduced by the amount of such Debtors' available Tax Attributes, and any remaining gain would be recognized by the Debtors and result in a cash tax obligation. If a Reorganized Debtor purchases assets or stock of any Debtor pursuant to a Taxable Transaction, the Reorganized Debtor will take a fair market value basis in the transferred assets or stock, and the Reorganized Debtors would not succeed to any of the tax attributes of the selling Debtor or Debtors under section 381 of the IRC. However, if a Taxable Transaction involves a purchase of stock, the entity whose stock is transferred will retain its basis in its assets, (subject to reduction due to COD Income, as described below), unless an election is made pursuant to section 338(h)(10) or 336(e) of the IRC with respect to the purchase to treat the purchase as the purchase of assets.

---

[5]   For the avoidance of doubt, in the case of a Recapitalization Transaction, the issuer of the New Common Stock shall be 4L Ultimate Topco.

2.      **Cancellation of Debt and Reduction of Tax Attributes.**

In general, absent an exception, a taxpayer will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the issue price of the Take-Back Term Loans, and (ii) the fair market value of the New Common Stock or other consideration, and (iii) the amount of Excess Cash paid (if any), in each case, given in satisfaction of such indebtedness at the time of the exchange.

A taxpayer will not, however, be required to include COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. In general, tax attributes will be reduced in the following order:  (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject immediately after the discharge); (f) passive activity loss and credit carryovers; and (g) foreign tax credits carryovers. In the absence of contrary guidance, it appears to be the case that the 163(j) Deductions are not subject to reduction under these rules. Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.  Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC.

As noted above, in connection with the Restructuring Transactions, the Debtors expect to realize COD Income. The exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan because the amount of COD Income will depend, in part, on the issue price of the Take-Back Term Loans and the fair market value of the New Common Stock, neither of which can be determined until after the Plan is consummated.

3.      **Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes**

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, the Reorganized Debtors' ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC. [6]

Under sections 382 and 383 of the IRC, if the Debtors undergo an "ownership change," the amount of any remaining NOL carryforwards, tax credit carryforwards, 163(j) Deductions, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change and cost recovery deductions) of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses)

---

[6]     The IRS issued proposed regulations in September 2019, that would revoke IRS Notice 2003-65 and make substantial changes to the way limitations under section 382 of the IRC are calculated. The changes would decrease the limitation set forth in section 382 of the IRC in most cases and potentially cause entities that would have had a net unrealized built-in gain under Notice 2003-65 to instead have a net unrealized built-in loss, which would result in additional limitations on the ability to deduct Pre-Change Losses (as defined below). It is expected that any finalized regulations will apply only to ownership changes occurring after the regulations are finalized. The Debtors anticipate that the Effective Date will occur before these proposed regulations are finalized and, accordingly, the remainder of this discussion assumes that Notice 2003-65 will apply to the Reorganized Debtors. In the event the proposed regulations are finalized prior to the Effective Date, and such finalized regulations do not contain a "transition" or "grandfather" rule that would prevent the finalized regulations from being applied to the Debtors and/or Reorganized Debtors, the Debtors will make a supplemental filing to explain the potential effect of such finalized regulations.

recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of section 382 of the IRC are complicated, but as a general matter, the Debtors anticipate that the issuance of New Common Stock pursuant to the Plan will result in an "ownership change" of the Debtors for these purposes, and that the Reorganized Debtors' use of the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the IRC applies.

(a)        **General Section 382 Annual Limitation.**

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), and (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs, currently 1.59 percent for December 2019). The annual limitation may be increased to the extent that the Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

(b)        **Special Bankruptcy Exceptions.**

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding. An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). If the requirements of the 382(l)(5) Exception are satisfied, a debtor's Pre-Change Losses would not be limited on an annual basis, but, instead, NOL carryforwards would be reduced by the amount of any interest deductions claimed by the debtor during the three taxable years preceding the effective date of the plan of reorganization and during the part of the taxable year prior to and including the effective date of the plan of reorganization in respect of all debt converted into stock pursuant to the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of (a) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or (b) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

The Debtors have not determined whether the 382(l)(5) Exception will be available or, if it is available, whether the Reorganized Debtors will elect out of its application.

**C.** **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote.**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan.  U.S. Holders are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

**1.** **Consequences to Holders of Class 3 Term Loan Secured Claims.**

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release, and discharge of their Claims, each U.S. Holder of an Class 3 Allowed Term Loan Secured Claim will receive its Pro Rata share of (a) the New Common Stock in Reorganized Clover (i.e., 4L Ultimate Topco in the case of the Recapitalization Transaction and a new Clover entity in the case of the Taxable Transaction), (b) the Take-Back Term Loans, and (c) the Excess Cash (if any).

Regardless of whether the Restructuring Transactions are structured as a Taxable Transaction or as a Recapitalization Transaction, the U.S. Holders of the Class 3 Term Loan Secured Claims will be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the IRC.[7]  Other than with respect to any amounts received that are attributable to accrued but untaxed interest, the U.S. Holder should recognize gain or loss in an amount equal to the difference, if any, between (a) the sum of (1) Cash (if any) and (2) the fair market value (or issue price, in the case of debt instruments) of non-Cash consideration received, and (b) the U.S. Holder's adjusted tax basis in its Term Loan Secured Claim.  The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the U.S. Holder, the rules regarding "market discount," as discussed below and accrued but untaxed interest, whether the Term Loan Secured Claim constitutes a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Term Loan Secured Claim.  If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Term Loan Secured Claim for more than one year at the time of the exchange.  The holding period for debt received should begin on the day following the Effective Date. Subject to the rules regarding accrued but untaxed interest, the U.S. Holder should obtain a tax basis in the non-Cash consideration received equal to the fair market value (or issue price, in the case of debt instruments) of such property.

**2.** **Consequences to Holders of Class 7 Existing Equity Interests.**

Pursuant to the Plan, in exchange for full and final satisfaction of each applicable Existing Equity Interest, each applicable U.S. Holder thereof shall receive its Pro Rata share of and interest in the New Warrants.

Regardless of whether the Restructuring Transactions are structured as a Taxable Transaction or a Recapitalization Transaction, a U.S. Holder of a Class 7 Allowed Existing Equity Interest, as applicable, will be treated as receiving its Pro Rata share of the New Warrants in a taxable exchange under section 1001 of the IRC.  Each U.S. Holder of such Existing Equity Interest should recognize gain or loss equal to the difference between (1) the fair market value of New Warrants received and (2) such U.S. Holder's adjusted basis, if any, in such Existing Equity Interest.  The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the U.S. Holder and whether the Existing Equity Interest constitutes a capital asset in the hands of the U.S. Holder.  If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Existing Equity Interest for more than one year at the time of the exchange.  A U.S. Holder's tax basis in any New Warrants received should equal the fair market value of such property as of the date such property is distributed to the U.S. Holder.  A U.S. Holder's holding period for the New Warrants received should begin on the day following receipt thereof.

---

[7]    A Recapitalization Transaction will be taxable to the U.S. Holders of the Class 3 Allowed Term Loan Secured Claims because the New Common Stock and the Tack-Back Term Loans received by such U.S. Holders are each issued by different entities -- 4L Ultimate Topco and 4L Holdings Corporation, respectively -- than the entity that is the obligor on the Class 3 Allowed Term Loan Secured Claims.

### 3. Accrued Interest.

To the extent that any amount received by a U.S. Holder of a Term Loan Secured Claim under the Plan is attributable to accrued but untaxed interest on the debt instruments constituting the surrendered Term Loan Secured Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Term Loan Secured Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such Term Loan Secured Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a U.S. Holder is not sufficient to fully satisfy all principal and interest on Allowed Term Loan Secured Claims, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Term Loan Secured Claims in each Class will be allocated first to the principal amount of Allowed Term Loan Secured Claims, with any excess allocated to unpaid interest that accrued on these Term Loan Secured Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest. Certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Term Loan Secured Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### 4. Market Discount.

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of a Term Loan Secured Claim who exchanges the Term Loan Secured Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Term Loan Secured Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of an Allowed Term Loan Secured Claim (determined as described above) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Term Loan Secured Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). U.S. Holders should consult their own tax advisors concerning the application of the market discount rules to their Term Loan Secured Claims.

### 5. U.S. Federal Income Tax Consequences to U.S. Holders of Ownership and Disposition of the Take-Back Term Loans.

#### (a) Payments of Qualified Stated Interest.

Payments or accruals of "qualified stated interest" (as defined below) on the Take-Back Term Loans will be includible in the U.S. Holder's gross income as ordinary interest income and taxable at the time that such payments are accrued or are received in accordance with such U.S. Holder's regular method of accounting for U.S. federal income tax purposes. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of the Take-Back Term Loans, at a single fixed rate of interest, or, subject to certain conditions, based on one or more interest indices.

       **(b)**       **Original Issue Discount.**

Where, as here, U.S. Holders of Class 3 Term Loan Secured Claims receiving debt instruments are also receiving other property in exchange for their Claims (i.e., New Common Stock and Excess Cash), the "investment unit" rules may apply to the determination of the "issue price" for any debt instrument received in exchange for their Class 3 Term Loan Secured Claims. In such case, the issue price of the Take-Back Term Loan will depend, in part, on the issue price of the "investment unit" (*i.e.*, the Take-Back Term Loan, New Common Stock, and Excess Cash), and the respective fair market values of the elements of consideration that compose the investment unit. The issue price of an investment unit is generally determined in the same manner as the issue price of a debt instrument. As a result, the issue price of the investment unit will depend on whether the investment unit is considered, for U.S. federal income tax purposes and applying rules similar to those applied to debt instruments, to be traded on an established market. In general, consideration can be treated as being traded on an established market for these purposes even if no trades actually occur and there are merely firm or indicative quotes available with respect to the items discussed below. Additionally, when determining fair market value under these rules, actual trades and firm quotes will generally be dispositive, while it may be possible to refute the application of mere "indicative" quotes if such indicative quotes "materially misrepresent[] the fair market value of the property" being valued.

If none of the components of the investment unit nor the surrendered Class 3 Term Loan Secured Claims are publicly traded on an established market, then the issue price of the Take-Back Term Loan would generally be determined under section 1273(b)(4) or 1274 of the IRC, as applicable. If none of the components of the investment unit are publicly traded on an established market, but the Class 3 Term Loan Secured Claims are so traded, then the issue price of the investment unit will be determined by the fair market value of the Class 3 Term Loan Secured Claims.

If the investment unit received in exchange for Class 3 Term Loan Secured Claims was considered to be traded on an established market, the issue price of the investment unit would be the fair market value of the investment unit. However, under applicable Treasury Regulations, a debt instrument, including the Take-Back Term Loans, will not be treated as publicly traded if the outstanding stated principal amount of the issue that includes the debt instrument is $100 million or less on the relevant determination date. Accordingly, at least a portion of the investment unit received in exchange for the Class 3 Term Loan Secured Claims will not be treated as publicly traded. The law is somewhat unclear on whether an investment unit is treated as publicly traded if some, but not all, elements of such investment unit are publicly traded. If the Take-Back Term Loans are not publicly traded on an established market, the New Common Stock is traded on an established market, and the surrendered Class 3 Term Loan Secured Claims are publicly traded on an established market, the issue price of the investment unit may *either* be determined by reference to (a) the fair market value of the investment unit *or* (b) by reference to the fair market value of the surrendered Class 3 Term Loan Secured Claims.

If an issue price is determined for the investment unit received in exchange for surrendered Class 3 Term Loan Secured Claims under the above rules, then the issue price of an investment unit is allocated among the elements of consideration making up the investment unit based on their relative fair market values, with such allocation determining the issue price of the Take-Back Term Loans.

An issuer's allocation of the issue price of an investment unit is binding on all U.S. Holders of the investment unit unless a U.S. Holder explicitly discloses a different allocation on a timely filed income tax return for the taxable year that includes the acquisition date of the investment unit.

As discussed above, a debt instrument, such as the Take-Back Term Loans, is treated as issued with OID for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by more than a *de minimis* amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than "qualified stated interest." Stated interest payable at a fixed rate is "qualified stated interest" if it is unconditionally payable in cash at least annually. The terms of any Take-Back Term Loans have not yet been determined; to the extent not all the interest on the Take-Back Term Loans is unconditionally payable in cash at least annually, the Take-Back Term Loans may be considered to be issued with OID. Moreover, the Take-Back Term Loans could be treated as issued with OID to the extent the allocation rules described above result in the Take-Back Term Loans having an issue price that is less than their stated redemption price at maturity.

For purposes of determining whether there is OID, the *de minimis* amount is generally equal to ¼ of 1 percent of the principal amount of the Take-Back Term Loans multiplied by the number of complete years to maturity from their original issue date, or if the Take-Back Term Loans provide for payments other than payments of qualified stated interest before maturity, multiplied by the weighted average maturity (as determined under applicable Treasury Regulations). If the Take-Back Term Loans are issued with OID, a U.S. Holder generally (i) will be required to include the OID in gross income as ordinary interest income as it accrues on a constant yield to maturity basis over the term of the Take-Back Term Loans, in advance of the receipt of the cash attributable to such OID and regardless of the holder's method of accounting for U.S. federal income tax purposes, but (ii) will not be required to recognize additional income upon the receipt of any Cash payment on the Take-Back Term Loans that is attributable to previously accrued OID that has been included in its income. If the amount of OID on the New Loans is *de minimis*, rather than being characterized as interest, any payment attributable to the *de minimis* OID will be treated as gain from the sale of the Take-Back Term Loans, and a Pro Rata amount of such *de minimis* OID must be included in income as principal payments are received on the Take-Back Term Loans.

(c)      **Acceleration of Income Recognition for Certain U.S. Holders.**

Accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the IRC) generally will be required to include certain items of income such as OID no later than the time such amounts are reflected on such a financial statement. This could result in an acceleration of income recognition for income items differing from the above description, although recently proposed regulations provide that OID and market discount on the Take-Back Term Loans would not be subject to acceleration under these rules.

(d)      **Sale, Taxable Exchange, or other Taxable Disposition.**

Upon the disposition of the Take-Back Term Loans by sale, exchange, retirement, redemption or other taxable disposition, a U.S. Holder will generally recognize gain or loss equal to the difference, if any, between (i) the amount realized on the disposition (other than amounts attributable to accrued but unpaid interest, which will be taxed as ordinary interest income to the extent not previously so taxed) and (ii) the U.S. Holder's adjusted tax basis in the Take-Back Term Loans, as applicable. A U.S. Holder's adjusted tax basis in their interest in the Take-Back Term Loans will depend on whether, as described above, the Take-Back Term Loans are considered a "security" for tax purposes and whether the U.S. Holder receives the Take-Back Term Loans (if any) as part of a transaction that is treated as a recapitalization for U.S. federal income tax purposes. A U.S. Holder's adjusted tax basis will generally be increased by any accrued OID previously included in such U.S. Holder's gross income. A U.S. Holder's gain or loss will generally constitute capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has held such Take-Back Term Loans for longer than one year. Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term capital gains. The deductibility of capital losses is subject to certain limitations.

6.      **U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of New Common Stock.**

(a)      **Dividends on New Common Stock.**

Any distributions made on account of the New Common Stock of Reorganized Clover will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Clover as determined under U.S. federal income tax principles. "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates. To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Common Stock. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales,

or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends-received deduction may be disallowed.

### (b)    Sale, Redemption, or Repurchase of New Common Stock.

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Stock of Reorganized Clover. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has held the New Common Stock for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described above.

### 7.    Ownership, Exercise, and Disposition of New Warrants.

A U.S. Holder that elects to exercise the New Warrants will be treated as purchasing, in exchange for its New Warrants and the amount of Cash funded by the U.S. Holder to exercise the New Warrants, the New Common Stock it is entitled to purchase pursuant to the New Warrants. Such a purchase will generally be treated as the exercise of an option under general tax principles, and as such a U.S. Holder should not recognize income, gain or loss for U.S. federal income tax purposes when it exercises the New Warrants. A U.S. Holder's aggregate tax basis in the New Common Stock will equal the sum of (i) the amount of Cash paid by the U.S. Holder to exercise its New Warrants plus (ii) such U.S. Holder's tax basis in its New Warrants immediately before the New Warrants are exercised.

Under section 305 of the IRC, certain transactions that affect an increase in the proportionate interest of a shareholder or warrant holder (treating warrants as stock for this purpose) in the corporation's assets are treated as creating deemed distributions to such shareholder or warrant holder in respect of such "stock" interest. Any deemed distribution will be taxed and reported to the IRS in the same manner as an actual distribution on stock and thus could potentially be taxable as a dividend (in whole or in part), despite the absence of any actual payment of cash (or property) to the Holder in connection with such distribution.

In the event that a U.S. Holder sells its New Warrants in a taxable transaction, the U.S. Holder will recognize gain or loss upon such sale in an amount equal to the difference between the amount realized upon such sale and the U.S. Holder's tax basis in the New Warrants. Such gain or loss will be treated as gain or loss from the sale or exchange of property which has the same character as the New Common Stock to which the New Warrants relate would have had in the hands of the U.S. Holder if such stock had been acquired by the U.S. Holder upon exercise. If such sale gives rise to capital gain or loss to the U.S. Holder, such gain or loss will be long-term or short-term in character based upon the length of time such U.S. Holder has held his or her New Warrants.

### 8.    Limitations on Use of Capital Losses.

A U.S. Holder of an Allowed Term Loan Secured Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. A corporate U.S. Holder who has more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### 9.    Medicare Tax.

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals,

estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

**D.      Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims.**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. This discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the New Common Stock and the Take-Back Term Loans.

> **1.      Gain Recognition.**

Any gain realized by a Non-U.S. Holder on the exchange of its Term Loan Secured Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply). In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

> **2.      U.S. Federal Income Tax Consequences to Non-U.S. Holders of Payments of Interest and of Owning and Disposing of Take-Back Term Loans.**

>> **(a)      Payments of Interest (Including Interest Attributable to Accrued but Untaxed Interest).**

Subject to the discussion of backup withholding and FATCA below, interest income (which, for purposes of this discussion of Non-U.S. Holders, includes OID and accrued but untaxed interest, including in each case any such amounts paid to a Non-U.S. Holder under the Plan) of a Non-U.S. Holder that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will qualify for the so-called "portfolio interest exemption" and, therefore, will not be subject to U.S. federal income tax or withholding, provided that:

- the Non-U.S. Holder does not own, actually or constructively, a 10 percent or greater interest in Reorganized Clover (or, in the case of interest received pursuant to the Plan, Clover) within the meaning of Section 871(h)(3) of the IRC and Treasury Regulations thereunder;

- the Non-U.S. Holder is not a controlled foreign corporation related to Reorganized Clover (or, in the case of interest received pursuant to the Plan, Clover), actually or constructively through the ownership rules under Section 864(d)(4) of the IRC;

- the Non-U.S. Holder is not a bank that is receiving the interest on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business; and

- the beneficial owner gives Reorganized Clover (or, as applicable, Clover) or Reorganized Clover's (or, as applicable, Clover's) paying agent an appropriate IRS Form W-8 (or suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed establishing its status as a Non-U.S. Holder.

If not all of these conditions are met, interest on the Take-Back Term Loans paid to a Non-U.S. Holder or interest paid to a Non-U.S. Holder pursuant to the Plan that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will generally be subject to U.S. federal income tax and withholding at a 30 percent rate, unless an applicable income tax treaty reduces or eliminates such withholding and the Non-U.S. Holder claims the benefit of that treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.

If interest on the Take-Back Term Loans or interest paid to a Non-U.S. Holder pursuant to the Plan is effectively connected with a trade or business in the United States ("ECI") carried on by the Non-U.S. Holder, the Non-U.S. Holder will be required to pay U.S. federal income tax on that interest on a net income basis generally in the same manner as a U.S. Holder (and the 30 percent withholding tax described above will not apply, provided the appropriate statement is provided to the Reorganized Clover (or, with respect to interest received pursuant to the Plan, Clover) or Reorganized Clover's (or, as applicable, Clover's) paying agent) unless an applicable income tax treaty provides otherwise.  To claim an exemption from withholding, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe).  If a Non-U.S. Holder is eligible for the benefits of any income tax treaty between the United States and its country of residence, any interest income that is ECI will be subject to U.S. federal income tax in the manner specified by the treaty if the Non-U.S. Holder claims the benefit of the treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.  In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional "branch profits tax" at a 30 percent rate, or, if applicable, a lower treaty rate, on its effectively connected earnings and profits attributable to such interest (subject to adjustments).

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and, as applicable, must be updated periodically. Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.  Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

        **(b)**        **Sale, Taxable Exchange, or Other Disposition of the Take-Back Term Loan.**

A Non-U.S. Holder will generally not be subject to U.S. federal income tax on any gain realized on a sale, exchange, retirement, redemption or other taxable disposition of the Take-Back Term Loan (other than any amount representing accrued but unpaid interest on the loan)  unless:

- the gain is ECI (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment that such Non-U.S. Holder maintains in the United States); or

- in the case of a Non-U.S. Holder who is a nonresident alien individual, such Non-U.S. Holder is present in the United States for 183 or more days in the taxable year of disposition and certain other requirements are met.

If a Non-U.S. Holder falls under the first of these exceptions, unless an applicable income tax treaty provides otherwise, the Non-U.S. Holder will generally be taxed on the net gain derived from the disposition of the Take-Back Term Loans under the graduated U.S. federal income tax rates that are applicable to U.S. Holders and, if the Non-U.S. Holder is a foreign corporation, it may also be subject to the branch profits tax described above in "Payments of Interest (Including Interest Attributable to Accrued, Untaxed Interest)." To claim an exemption from withholding, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe). If an individual Non-U.S. Holder falls under the second of these exceptions, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent

(unless a lower applicable treaty rate applies) on the amount by which the gain derived from the disposition exceeds such Non-U.S. Holder's capital losses allocable to sources within the United States for the taxable year of the disposition.

<ol start="3">
<li><strong>U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Stock.</strong></li>
</ol>

      (a)      **Dividends on New Common Stock.**

Any distributions made with respect to New Common Stock of Reorganized Clover (other than certain distributions of stock of Reorganized Clover) will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Clover, as determined under U.S. federal income tax principles (and thereafter first as a return of capital which reduces basis and then, generally, capital gain). Except as described below, dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or, if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or such successor form as the IRS designates), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

      (b)      **Sale, Redemption, or Repurchase of New Common Stock of Reorganized Clover.**

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Common Stock of Reorganized Clover unless:

      (i)      such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

      (ii)      such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

      (iii)      the issuer of such New Common Stock is or has been during a specified testing period a "U.S. real property holding corporation" (a "USRPHC") under the FIRPTA rules (as defined and discussed below).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Stock. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). The FIRPTA rules are discussed in greater detail below.

4.      **Ownership, Exercise, and Disposition of the New Warrants.**

A Non-U.S. Holder that elects to exercise the New Warrants will be treated as purchasing, in exchange for its New Warrants and the amount of Cash funded by the Non-U.S. Holder to exercise the New Warrants, the New Common Stock it is entitled to purchase pursuant to the New Warrants.  Such a purchase will generally be treated as the exercise of an option under general tax principles, and as such a Non-U.S. Holder (to the extent such Non-U.S. Holder is subject to U.S. federal income tax, as described above) should not recognize income, gain or loss for U.S. federal income tax purposes when it exercises the New Warrants.  A Non-U.S. Holder's aggregate tax basis in the New Common Stock will equal the sum of (i) the amount of Cash paid by the Non-U.S. Holder to exercise its New Warrants plus (ii) such Non-U.S. Holder's tax basis in its New Warrants immediately before the New Warrants are exercised.

Any deemed distribution under section 305 of the Tax Code (as discussed above), will be taxed and reported to the IRS in the same manner as an actual distribution on stock and will be subject to the rules described above under "Dividends on New Common Stock of Reorganized Clover" with respect to such Non-U.S. Holder.

In the event that a Non-U.S. Holder sells its New Warrants in a taxable transaction, the Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition unless as described above under "Sale, Redemption, or Repurchase of New Common Stock of Reorganized Clover."  If a Non-U.S. Holder is subject to U.S. federal income tax, any such gain or loss will be treated as gain or loss from the sale or exchange of property which has the same character as the New Common Stock to which the New Warrants relate would have had in the hands of the Non-U.S. Holder if such stock had been acquired by the Non-U.S. Holder upon exercise.  If such sale gives rise to capital gain or loss to the Non-U.S. Holder, such gain or loss will be long-term or short-term in character based upon the length of time such Non-U.S. Holder has held his or her New Warrants.

Under Treasury Regulations issued pursuant to section 871(m) of the IRC, withholding at a rate of 30 percent (subject to certain treaty considerations) would apply to certain "dividend equivalent" payments made or deemed made to Non-U.S. Holders in respect of financial instruments that reference U.S. stocks.  The Treasury Regulations promulgated under section 871(m) of the IRC do not apply to a payment to the extent that the payment is already treated as a deemed dividend under the rules described above, and therefore generally would not apply in respect of adjustments to the conversion rate of the New Warrants.  However, because the rules under section 871(m) of the IRC are complex, it is possible that they will apply in certain circumstances in which the deemed dividend rules described below do not apply, in which case the rules under section 871(m) of the IRC might require withholding at a different time or amount than the deemed dividend.  Importantly in Notice 2018-72, the IRS extended certain transition relief that makes section 871(m) of the IRC inapplicable to instruments that are not so-called "delta one" instruments.  The Debtors will make a determination regarding the applicable of section 871(m) of the IRC to the New Warrants prior to the Effective Date.

5.      **FIRPTA.**

Under the Foreign Investment in Real Property Tax Act ("FIRPTA"), gain on the disposition of certain investments in U.S. real property is subject to U.S. federal income tax in the hands of Non-U.S. Holders and treated as ECI that is subject to U.S. federal net income tax even if a Non-U.S. Holder is not otherwise engaged in a U.S. trade or business.

With respect to New Common Stock of Reorganized Clover, rules with respect to USRPHCs may apply. In general, a corporation is a USRPHC if the fair market value of the corporation's U.S. real property interests (as defined in the IRC and applicable Treasury Regulations) equals or exceeds 50 percent of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of the 5-year period ending on the effective time of the applicable disposition or the period of time the Non-U.S. Holder held an interest in such corporation. Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such Non-U.S. Holder's adjusted tax basis in such interest) will constitute ECI.  Further, the buyer of the New Common Stock of Reorganized Clover may be required to withhold a tax equal to 15 percent of the amount realized on the sale. The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's U.S. federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the Non-

U.S. Holder properly and timely files a tax return with the IRS.  The Debtors do not anticipate that Clover has been or is, or that Reorganized Clover will be, a USRPHC, although no guarantees can be made in that regard.

Under the FIRPTA rules, if the stock of a USRPHC is regularly traded on an established securities market, a person that holds 5 percent or less of such stock (after taking into account certain attribution rules) will not be subject to substantive FIRPTA taxation or FIRPTA withholding upon a disposition of its shares, and FIRPTA withholding upon dispositions will generally be inapplicable other than in the case of certain distributions and redemptions by the issuer.  Whether and when the New Common Stock of Reorganized Clover will be considered regularly traded on an established securities market will depend, in part, on whether a market develops in such equity, and cannot currently be determined.

The FIRPTA rules will also not apply if, at the time of a disposition, the corporation does not directly or indirectly hold any United States real property interests ("USRPIs") and it had directly or indirectly disposed of all of the USRPIs it directly or indirectly owned in one or more fully taxable transactions.

6.      **FATCA.**

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules were previously scheduled to take effect on January 1, 2020, that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

7.      **Information Reporting and Back-Up Withholding.**

The Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XI.     Recommendation of the Debtors.

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to Holders of Allowed Claims and Interests than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims and Interests entitled to vote to accept or reject the Plan support Confirmation and vote to accept the Plan.

Clover Technologies Group, LLC,
on behalf of itself and each of the other Debtors

By: */s/ Andrew Buck*

Name:  Andrew Buck
Title:  Chief Financial Officer, Clover Wireless LLC

Prepared By:

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:     (302) 426-1189
Facsimile:      (302) 426-9193
Email:          dpacitti@klehr.com
                myurkewicz@klehr.com

-and-

Morton R. Branzburg (*pro hac vice* pending)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
1835 Market Street
Suite 1400
Philadelphia, PA 19103
Telephone:     (215) 569-3007
Facsimile:      (215) 568-6603
Email:          mbranzburg@klehr.com

-and-

Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Matthew C. Fagen (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                matthew.fagen@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

**Exhibit A**

**Plan of Reorganization**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CLOVER TECHNOLOGIES GROUP, LLC, *et al.*,[1] | ) | Case No. 19-12680 (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION
## OF CLOVER TECHNOLOGIES GROUP, LLC AND ITS DEBTOR AFFILIATES

---

**THIS PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. THIS PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.**

---

Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Matthew C. Fagen (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone: (302) 426-1189
Facsimile:  (302) 426-9193

-and-

Morton R. Branzburg (*pro hac vice* pending)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone: (215) 569-3007
Facsimile:  (215) 568-6603

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Dated:  December 17, 2019

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Clover Technologies Group, LLC (9236); 4L Holdings Corporation (0292); 4L Technologies Inc. (5035); Clover Ithaca Properties, LLC (9236); Refurb Holdings, LLC (1230); Clover Wireless, LLC (0313); and Valu Tech Outsourcing, LLC (3563).  The location of the Debtors' service address in these chapter 11 cases is: 5850 Granite Parkway, Suite 720, Plano, Texas 75024.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................................1

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**............................................................1
- A.  *Defined Terms* ...................................................................................................................1
- B.  *Rules of Interpretation* ......................................................................................................9
- C.  *Computation of Time* .......................................................................................................10
- D.  *Governing Law*.................................................................................................................10
- E.  *Reference to Monetary Figures*.......................................................................................10
- F.  *Reference to the Debtors or the Reorganized Debtors*.....................................................10
- G.  *Controlling Document*......................................................................................................10

**ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS**.................................................11
- A.  *Administrative Claims*......................................................................................................11
- B.  *Professional Fee Claims* ..................................................................................................11
- C.  *Priority Tax Claims*..........................................................................................................12

**ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS**.........12
- A.  *Classification of Claims and Interests* .............................................................................12
- B.  *Treatment of Classes of Claims and Interests* .................................................................13
- C.  *Special Provision Governing Unimpaired Claims* ..........................................................16
- D.  *Elimination of Vacant Classes* ........................................................................................16
- E.  *Voting Classes; Presumed Acceptance by Non-Voting Classes*.......................................16
- F.  *Subordinated Claims and Interests* ..................................................................................16
- G.  *Intercompany Interests* ....................................................................................................16
- H.  *Controversy Concerning Impairment*...............................................................................16
- I.  *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*..............................16

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** .......................................17
- A.  *General Settlement of Claims and Interests* ....................................................................17
- B.  *Restructuring Transactions*..............................................................................................17
- C.  *Sources of Consideration for Plan Distributions* ...........................................................17
- D.  *New Shareholders Agreement* ..........................................................................................19
- E.  *Exemption from Registration Requirements*.....................................................................19
- F.  *Corporate Existence* .........................................................................................................20
- G.  *Corporate Action* .............................................................................................................20
- H.  *Vesting of Assets in the Reorganized Debtors*..................................................................20
- I.  *Cancellation of Notes, Instruments, Certificates, and Other Documents* .......................21
- J.  *Effectuating Documents; Further Transactions*...............................................................21
- K.  *Exemption from Certain Taxes and Fees* .........................................................................21
- L.  *New Organizational Documents* ......................................................................................22
- M.  *Directors and Officers* .....................................................................................................22
- N.  *Management Incentive Plan*..............................................................................................22
- O.  *Preservation of Causes of Action* ....................................................................................23
- P.  *Release of Avoidance Actions* ..........................................................................................23

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ......................23
- A.  *Assumption of Executory Contracts and Unexpired Leases*.............................................23
- B.  *Claims Based on Rejection of Executory Contracts or Unexpired Leases*......................24
- C.  *Cure of Defaults and Objections to Cure and Assumption* .............................................24
- D.  *Insurance Policies*............................................................................................................25
- E.  *Indemnification Obligations*.............................................................................................25

*F.*      *Director, Officer, Manager, and Employee Liability Insurance* .................................................25
*G.*      *Employee and Retiree Benefits*................................................................................................25
*H.*      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*......................26
*I.*      *Reservation of Rights* ..............................................................................................................26
*J.*      *Nonoccurrence of Effective Date* ............................................................................................26
*K.*      *Contracts and Leases Entered Into After the Petition Date* ....................................................26

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** ...............................................**26**
*A.*      *Timing and Calculation of Amounts to Be Distributed* ...........................................................26
*B.*      *Distribution Agent*..................................................................................................................27
*C.*      *Rights and Powers of Distribution Agent*................................................................................27
*D.*      *Delivery of Distributions*.........................................................................................................27
*E.*      *Manner of Payment* .................................................................................................................28
*F.*      *Compliance Matters* ................................................................................................................28
*G.*      *No Postpetition or Default Interest on Claims* ........................................................................28
*H.*      *Allocation Between Principal and Accrued Interest* ................................................................29
*I.*      *Setoffs and Recoupment* ..........................................................................................................29
*J.*      *Claims Paid or Payable by Third Parties* ...............................................................................29

**ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS**......................**30**
*A.*      *Disputed Claims Process* .........................................................................................................30
*B.*      *Claims Administration Responsibilities* ..................................................................................30
*C.*      *Estimation of Claims and Interests* .........................................................................................30
*D.*      *Adjustment to Claims Without Objection* ................................................................................31
*E.*      *No Distributions Pending Allowance* ......................................................................................31
*F.*      *Distributions After Allowance* ................................................................................................31
*G.*      *No Interest* ..............................................................................................................................31

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ......................**31**
*A.*      *Compromise and Settlement of Claims, Interests, and Controversies* ......................................31
*B.*      *Discharge of Claims and Termination of Interests* ..................................................................31
*C.*      *Release of Liens* ......................................................................................................................32
*D.*      *Releases by the Debtors* ..........................................................................................................32
*E.*      *Releases by Holders of Claims and Interests of the Debtors* ....................................................33
*F.*      *Exculpation* .............................................................................................................................33
*G.*      *Injunction* ...............................................................................................................................34
*H.*      *Protection Against Discriminatory Treatment* ........................................................................34
*I.*      *Recoupment*.............................................................................................................................34
*J.*      *Reimbursement or Contribution* ..............................................................................................35
*K.*      *Term of Injunctions or Stays* ...................................................................................................35
*L.*      *Document Retention* .................................................................................................................35

**ARTICLE IX. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**...........................................**35**
*A.*      *Conditions Precedent to the Effective Date.* ............................................................................35
*B.*      *Waiver of Conditions Precedent* ..............................................................................................36
*C.*      *Substantial Consummation* ......................................................................................................36
*D.*      *Effect of Non-Occurrence of Conditions to Consummation* ......................................................36

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**..............................**36**
*A.*      *Modification of Plan* ...............................................................................................................36
*B.*      *Effect of Confirmation on Modifications*.................................................................................37
*C.*      *Revocation or Withdrawal of Plan* ..........................................................................................37

**ARTICLE XI. RETENTION OF JURISDICTION** ...................................................................................**37**

**ARTICLE XII. MISCELLANEOUS PROVISIONS** ...............................................................................**38**
    A.      *Immediate Binding Effect*.............................................................................38
    B.      *Additional Documents*.................................................................................39
    C.      *Statutory Fees*.............................................................................................39
    D.      *Reservation of Rights*.................................................................................39
    E.      *Successors and Assigns*..............................................................................39
    F.      *Service of Documents*.................................................................................39
    G.      *Entire Agreement* .......................................................................................41
    H.      *Plan Supplement Exhibits* ..........................................................................41
    I.      *Non-Severability* ........................................................................................42
    J.      *Votes Solicited in Good Faith* ....................................................................42
    K.      *Waiver or Estoppel*.....................................................................................42
    L.      *Closing of Chapter 11 Cases*......................................................................42

**INTRODUCTION**

Clover Technologies Group, LLC and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and, collectively, the "Debtors") propose this joint plan of reorganization (the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code.  Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan.  Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code.  Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable.   The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, and certain related matters.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY, PARTICULARLY HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**

A.      *Defined Terms*

1.      "*4L Ultimate Topco*" means 4L Ultimate Topco Corporation, a Delaware corporation and indirect parent entity of the Debtors.

2.      "*Ad Hoc Group Professionals*" means, collectively, Gibson Dunn, Greenhill, and Pachulski Stang Ziehl & Jones LLP retained in connection with the Chapter 11 Cases, as applicable, to represent certain Consenting Term Loan Lenders.

3.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; and (c) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

4.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

5.      "*Allowed*" means, as to a Claim or an Interest, a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable.  For the avoidance of doubt, (a) there is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) Unimpaired Claims shall be affirmatively determined to be Allowed Claims to the same extent such Claims would be allowed under applicable non-bankruptcy law.

6.      "*Assumed Executory Contract and Unexpired Lease List*" means the list, as determined by the Debtors or the Reorganized Debtors, as applicable, of Executory Contracts and Unexpired Leases (with proposed cure amounts) that will be assumed by the Reorganized Debtors, which list shall be included in the Plan Supplement.

7.      "*Assumed Executory Contracts and Unexpired Leases*" means those Executory Contracts and Unexpired Leases to be assumed by the applicable Reorganized Debtors, as set forth on the Assumed Executory Contract and Unexpired Lease List.

8.      "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other Claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in

interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, 547 through and including 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

9. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

10. "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the Chapter 11 Cases, including, to the extent of a withdrawal of the reference under 28 U.S.C. § 157, the United States District Court for the District of Delaware.

11. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

12. "*Business Day*" means any day, other than a Saturday, Sunday, or a legal holiday, as defined in Bankruptcy Rule 9006(a).

13. "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits, checks, and cash equivalents, as applicable.

14. "*Cash Collateral Budget*" has the meaning assigned to such term in the Restructuring Support Agreement.

15. "*Cash Collateral Orders*" means, collectively, the interim order and final order entered by the Bankruptcy Court authorizing the Debtors to, among other things, use cash collateral, in each case, subject to the Definitive Documentation Consent Rights.

16. "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim.

17. "*Chapter 11 Cases*" means the procedurally consolidated cases filed or to be filed (as applicable) for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

18. "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors, whether or not assessed or Allowed.

19. "*Claims Register*" means the official register of Claims against the Debtors maintained by the Solicitation Agent.

20. "*Class*" means a category of Holders of Claims or Interests under section 1122(a) of the Bankruptcy Code.

21. "*Clover*" means 4L Holdings Corporation, a Delaware corporation.

22.    "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

23.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to Bankruptcy Rule 3020(b)(2) and section 1128 of the Bankruptcy Code, including any adjournments thereof, at which the Bankruptcy Court will consider confirmation of the Plan.

24.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code and approving the Disclosure Statement.

25.    "*Confirmation*" means entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

26.    "*Consenting Sponsors*" means those Sponsors that are signatories to the Restructuring Support Agreement and remain parties thereto as of the Effective Date.

27.    "*Consenting Stakeholders*" means the Consenting Term Loan Lenders and the Consenting Sponsors.

28.    "*Consenting Term Loan Lenders*" means those Term Loan Lenders that are signatories to the Restructuring Support Agreement (including through the execution of a joinder or transfer agreement as contemplated thereunder).

29.    "*Consummation*" means the occurrence of the Effective Date.

30.    "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

31.    "*Definitive Documentation Consent Rights*" means the rights of the Debtors, the Required Consenting Term Loan Lenders, and the Consenting Sponsors with respect to the Definitive Documentation under the Restructuring Support Agreement, including that the Definitive Documentation be consistent in all respects with the Restructuring Support Agreement and otherwise in form and substance reasonably acceptable to the Debtors, the Required Consenting Term Loan Lenders and, solely to the extent required by the Restructuring Support Agreement, the Consenting Sponsors.

32.    "*Definitive Documentation*" means, collectively, the documents related to or otherwise utilized to implement or effectuate the Restructuring Transactions, including, among others:  (a) the first day pleadings and all orders sought pursuant thereto; (b) the Plan; (c) the Plan Supplement; (d) the Disclosure Statement; (e) the Solicitation Materials; (f) the Exit Facility Credit Agreement; (g) the New Shareholders Agreement; (h) the motion seeking to schedule a combined hearing to consider approval of the Disclosure Statement and confirmation of the Plan; (i) any orders relating to the use of cash collateral (including any exhibits, schedules, amendments, modifications, or supplements thereto, or any order authorizing the incurrence of credit pursuant to section 364 of the Bankruptcy Code); (j) the Confirmation Order; (k) any other exhibits, schedules, amendments, modifications, supplements or other documents and/or agreements relating to any of the foregoing; (l) such other definitive documentation relating to a recapitalization or restructuring of the Debtors as is necessary or desirable to consummate the Restructuring Transactions; and (m) any and all deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments, or other documents related to the Restructuring Transactions (including any exhibits, amendments, modifications or supplements made from time to time thereto).

33.    "*Disclosure Statement*" means the *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Clover Technologies Group, LLC and its Debtor Affiliates*, as may be amended, supplemented or modified from time to time, and all exhibits, schedules, supplements, modifications, and amendments thereto.

34.     "*Disputed*" means, as to a Claim or an Interest, a Claim or an Interest:  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court; *provided*, *however*, that in no event shall a Claim that is deemed Allowed pursuant to this Plan be a Disputed Claim.

35.     "*Distribution Agent*" means, as applicable, the Reorganized Debtors or any Entity the Reorganized Debtors select to make or to facilitate distributions in accordance with the Plan.

36.     "*Distribution Record Date*" means the date for determining which Holders of Allowed Claims and Interests are eligible to receive distributions pursuant to the Plan, which date shall be the Effective Date.

37.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan.

38.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

39.     "*Estate*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

40.     "*Excess Cash*" means the sum of:  (a) all net Cash proceeds generated from the consummation of the Imaging Sale, subject to achieving the minimum Cash balance levels in clause (b) of the this sentence; and, as applicable, (b) all balance sheet Cash in excess of (i) with respect to the "Imaging" business of the Debtors, all $6.8 million of foreign cash plus $7.5 million of domestic cash, (ii) with respect to the "Wireless" business of the Debtors, consolidated cash of $7.5 million, (iii) with respect to the "Teleplan" business of the Debtors, consolidated cash of €7.5 million, (iv) post-closing peak usage needs to be determined by the Debtors and Required Consenting Term Loan Lenders in good faith (and the determination thereof shall not include customer prepayments), and (v) tax leakage (whether due to withholding tax, income tax, or other tax considerations) and repatriation costs, with the Debtors and Required Consenting Term Loan Lenders to discuss in good faith whether to instead leave cash subject to such tax leakage and repatriation costs on the balance sheet.

41.     "*Exculpated Party*" means, collectively, and in each case in its capacity as such:  (a) the Debtors and the Reorganized Debtors; and (b) with respect to each of the foregoing entities, each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, and advisors.

42.     "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

43.     "*Existing Equity Interests*" means all existing securities issued by the Debtors or their parent entities.

44.     "*Exit Facility Credit Agreement*" means the credit agreement governing the Exit Facility, which shall be in form and substance acceptable to the Required Consenting Term Loan Lenders.

45.     "*Exit Facility Documents*" means the Exit Facility Credit Agreement and any other agreements and documents executed in connection therewith or related thereto.

46.     "*Exit Facility*" means a senior secured revolving credit facility or delayed draw term loan facility in form and substance acceptable to the Required Consenting Term Loan Lenders.

47.     "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

48.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, modified, or amended, is

not subject to any pending stay and as to which the time to reasonable appeal, move for reargument, reconsideration, or rehearing, or seek certiorari has expired and no appeal, motion for reargument, reconsideration, or rehearing or petition for certiorari has been timely taken or filed, or as to which any appeal that has been taken, motion for reargument, reconsideration, or rehearing that has been granted or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

49.     "*General Unsecured Claim*" means any Claim other than a Term Loan Secured Claim, an Administrative Claim (including, for the avoidance of doubt, a Professional Fee Claim), an Other Secured Claim, a Priority Tax Claim, an Other Priority Claim, or an Intercompany Claim.

50.     "*Gibson Dunn*" means Gibson, Dunn & Crutcher LLP, counsel to certain of the Consenting Term Loan Lenders.

51.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

52.     "*Greenhill*" means Greenhill & Co., LLC, financial advisor to certain of the Consenting Term Loan Lenders.

53.     "*Holder*" means an Entity holding a Claim or an Interest, or, if applicable, an Entity receiving or retaining Interests in Clover or the New Common Stock, as applicable.

54.     "*Imaging Sale Buyer*" means the "Buyer" as defined in the Imaging Sale Definitive Agreement.

55.     "*Imaging Sale Definitive Agreement*" means that certain Purchase and Sale Agreement by and among the Imaging Sale Buyer, Clover Imaging Holdings, LLC, Clover Technologies Group, LLC, 4L Ultimate Topco, 4L Holdings, and 4L Technologies Inc., as from time to time amended, modified, supplemented, or restated, including any exhibits or schedules thereto (including the Lender Group Release and the Seller Group Release (each as defined in the Imaging Sale Definitive Agreement)).

56.     "*Imaging Sale Releases*" has the meaning assigned to such term in the Restructuring Support Agreement.

57.     "*Imaging Sale Released Claims*" has the meaning assigned to such term in the Restructuring Support Agreement.

58.     "*Imaging Sale*" means the sale of the business, assets, liabilities, and equity interests owned by Clover Technologies Group, LLC and related to the "Imaging" business of the Debtors, pursuant to the Imaging Sale Definitive Agreement.

59.     "*Impaired*" means, with respect to any Class of Claims or Interests, a Claim or an Interest that is not Unimpaired.

60.     "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

61.     "*Intercompany Interest*" means an Interest held by a Debtor or an Affiliate of a Debtor.

62.     "*Interest*" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in a Debtor, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights,

convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

63.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

64.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

65.    "*Management Incentive Plan*" means that certain management incentive plan, if any, of Reorganized Clover, which management incentive plan shall reserve up to 10% of the New Common Stock, on a fully diluted basis, to be awarded to participants on terms and conditions to be determined at the discretion of the Reorganized Clover Board (including with respect to allocation, participation, timing, and structure of such awards) following the Effective Date, which shall include options to purchase New Common Stock and which may include New Common Stock, options, warrants, and restricted stock units or other instruments.

66.    "*New Common Stock*" means the common stock, limited liability company membership units, or functional equivalent thereof of Reorganized Clover to be issued on the Effective Date.

67.    "*New Organizational Documents*" means the form of certificate or articles of incorporation, bylaws, or such other applicable formation documents (if any) of Reorganized Clover, each of which shall be included in the Plan Supplement and materially consistent with the Restructuring Support Agreement.

68.    "*New Shareholders Agreement*" means that certain shareholders agreement that will govern certain matters related to the governance of Reorganized Clover and the New Common Stock, which shall be in form and substance acceptable to the Required Consenting Term Loan Lenders and, prior to the Effective Date, otherwise subject to the consent rights set forth in the Restructuring Support Agreement.

69.    "*New Warrant Agreement*" means the agreement governing the New Warrants, which, for avoidance of doubt, shall constitute Definitive Documentation.

70.    "*New Warrants*" has the meaning assigned to the term "Warrants" in the Restructuring Support Agreement.

71.    "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

72.    "*Other Secured Claim*" means any Secured Claim against the Debtors, including any Secured Tax Claim (to the extent applicable), other than a Term Loan Secured Claim.

73.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

74.    "*Petition Date*" means the date on which each of the Debtors commence the Chapter 11 Cases.

75.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan to be filed by the Debtors as may be amended, supplemented, altered, or modified from time to time on the terms set forth herein, and which includes:  (a) the New Organizational Documents; (b) the Exit Facility Credit Agreement; (c) the Take-Back Term Loan Credit Agreement; (d) the New Warrant Agreement; (e) the New Shareholders Agreement; (f) the Management Incentive Plan; (g) the Restructuring Steps Memorandum; (h) the identity of the members of the Reorganized Clover Board and the officers of Reorganized Clover; (i) the Rejected Executory Contract and Unexpired Lease List; (j) the Assumed Executory Contract and Unexpired Lease List; (k) the schedule of retained Causes of Action; and (l) any other necessary documentation related to the Restructuring Transactions, each of which shall be in form and substance consistent with the Restructuring Support Agreement.

76.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

77.     "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

78.     "*Professional Fee Claims*" means all Claims for accrued, contingent, and/or unpaid fees and expenses (including transaction and success fees) incurred by a Professional in the Chapter 11 Cases on or after the Petition Date and through and including the Confirmation Date that the Bankruptcy Court has not denied by Final Order.  To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Professional Fee Claims.

79.     "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on or before the Effective Date in an amount equal to the Professional Fee Escrow Amount.

80.     "*Professional Fee Escrow Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors and Ad Hoc Group Professionals as set forth in Article II.B of the Plan.

81.     "*Professional*" means an Entity retained in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code.

82.     "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

83.     "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

84.     "*Rejected Executory Contract and Unexpired Lease List*" means the list, as determined by the Debtors or the Reorganized Debtors, as applicable, of Executory Contracts and Unexpired Leases that will be rejected by the Reorganized Debtors pursuant to the Plan, which list shall be included in the Plan Supplement.

85.     "*Released Party*" means collectively, and in each case in its capacity as such:  (a) the Debtors and the Reorganized Debtors; (b) the Secured Parties; (c) the Term Loan Agent; (d) the Sponsors; (e) the Consenting Stakeholders; (f) with respect to each of the foregoing Entities in clauses (a) through (e), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, and funds; and (g) with respect to each of the foregoing Entities in clauses (a) through (f), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (with respect to clause (f), each solely in their capacity as such); *provided*, *however*, that any Holder of a Claim or Interest in a voting Class that objects to the Plan and votes to reject the Plan (and thereby opts out of the releases) shall not be a "Released Party."

86.     "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors and the Reorganized Debtors; (b) the Consenting Term Loan Lenders; (c) the Term Loan Agent; (d) the Sponsors; (e) with respect to each of the foregoing Entities in clauses (a) through (d), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, and funds; (f) with respect to each of the foregoing Entities in clauses (a) through (e), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (with respect to clause (e), each solely in their capacity as such); and (k) all Holders of Claims and Interests not described in the foregoing clauses (a) through (f);

7

*provided*, *however*, that any Holder of a Claim or Interest that (1) votes to reject the Plan and (2) objects to the releases in the Plan, shall not be a "Releasing Party" for purposes of the Plan.

87.     "*Reorganized Clover*" means either (a) 4L Ultimate Topco, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, or (b) a new corporation, limited liability company, or partnership that may be formed to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors and issue the New Common Stock to be distributed pursuant to the Plan.

88.     "*Reorganized Clover Board*" means the board of directors (or other applicable governing body) of Reorganized Clover.

89.     "*Reorganized Debtor*" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, including Reorganized Clover.

90.     "*Required Consenting Term Loan Lenders*" means, as of the relevant date, one or more Consenting Term Loan Lenders that individually or collectively hold more than 50% of the aggregate outstanding principal amount of Term Loans that are held by all such Consenting Term Loan Lenders represented by Gibson Dunn.

91.     "*Restructuring Steps Memorandum*" means the summary of transaction steps to complete the restructuring contemplated by the Plan, which shall be included in the Plan Supplement.

92.     "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of November 21, 2019, by and among the Debtors, the Consenting Sponsors, and the Consenting Term Loan Lenders, including all exhibits and attachments thereto, and as amended, restated, and supplemented from time to time in accordance with its terms.

93.     "*Restructuring Term Sheet*" means the term sheet attached as Exhibit A to the Restructuring Support Agreement (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms of the Restructuring Support Agreement).

94.     "*Restructuring Transactions*" means the transactions described in Article IV.B of the Plan.

95.     "*SEC*" means the Securities and Exchange Commission.

96.     "*Secured Parties*" means the Term Loan Agent and the Term Loan Lenders.

97.     "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

98.     "*Secured*" means, when referring to a Claim:  (a) secured by a valid, perfected, and enforceable Lien on collateral in which the applicable Estate has an interest to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code; (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code; or (c) Allowed pursuant to the Plan as a Secured Claim.

99.     "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

100.     "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

101.     "*Solicitation Agent*" means Bankruptcy Management Solutions, Inc. d/b/a Stretto, the notice, claims, and solicitation agent retained by the Debtors for the Chapter 11 Cases.

8

102. "*Solicitation Materials*" means all solicitation materials in respect of the Plan together with the Disclosure Statement, which Solicitation Materials shall be in accordance with the Restructuring Support Agreement and the Definitive Documentation.

103. "*Sponsors*" means the Holders of the applicable Existing Equity Interests.

104. "*Take-Back Term Loan Credit Agreement*" means the agreement governing the Take-Back Term Loan Facility.

105. "*Take-Back Term Loan Facility Documents*" means the definitive documents governing the Take-Back Term Loan Facility, including the Take-Back Term Loan Credit Agreement, which shall be in form and substance reasonably acceptable to the Debtors and the Required Consenting Term Loan Lenders.

106. "*Take-Back Term Loan Facility*" means a new take-back term loan facility, to be entered into by the Debtors and the Term Loan Lenders, which shall be in accordance to the terms set forth in the Restructuring Term Sheet.

107. "*Take-Back Term Loans*" means the loans under the Take-Back Term Loan Facility.

108. "*Teleplan*" means AMS Holding B.V., a private limited liability company incorporated under the laws of the Netherlands.

109. "*Term Loan Agent*" means Wilmington Savings Fund Society, FSB, in its capacity as administrative agent under the Term Loan Credit Agreement.

110. "*Term Loan Credit Agreement*" means that certain Credit Agreement dated as of May 8, 2014, among Clover, as holdings, Clover Technologies Group, LLC and 4L Technologies Inc., as borrowers, the Term Loan Lenders, the Term Loan Agent, and certain other Debtors as guarantors.

111. "*Term Loan Lenders*" has the meaning assigned to the term "Term Lender" in the Term Loan Credit Agreement.

112. "*Term Loan Secured Claim*" means any Claim derived from, based upon, or secured by the Term Loan Credit Agreement.

113. "*Term Loans*" has the meaning assigned to the term "Term Loans" in the Term Loan Credit Agreement.

114. "*U.S. Trustee*" means the Office of the United States Trustee for the District of Delaware.

115. "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

116. "*Unimpaired*" means a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

B.    *Rules of Interpretation*

For purposes of the Plan, except as otherwise provided in this Plan: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference in the Plan to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (c) unless otherwise specified, all references in the Plan to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (d) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any

particular portion of the Plan; (e) any effectuating provisions may be interpreted by the Debtors (subject to the terms of the Restructuring Support Agreement) or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) unless otherwise specified in the Plan, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (h) any term used in capitalized form in the Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (i) references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (j) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like as applicable; (k) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (l) the terms "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (m) except as otherwise provided in the Plan, any reference to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

C.      *Computation of Time*

Unless otherwise specifically stated in the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed in the Plan.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document*

In the event of an inconsistency between the Plan, the Restructuring Support Agreement, and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and any document included in the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control.  In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan.

A.    *Administrative Claims*

Unless otherwise agreed to by the Holders of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) shall, with the reasonable consent of the Required Consenting Term Loan Lenders, either receive, in full and final satisfaction of its Administrative Claim, an amount of Cash equal to the amount of such Allowed Administrative Claim, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, in accordance with the following:  (a) if an Administrative Claim is Allowed as of the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); or (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter.

B.    *Professional Fee Claims*

1.    Professional Fee Escrow Account

On or prior to the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way.  Such funds shall not be considered property of the Estates, the Debtors, or the Reorganized Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Debtors or the Reorganized Debtors, as applicable, from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account.  When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

2.    Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders.  The Reorganized Debtors shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

3.         Professional Fee Escrow Amount

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors and Ad Hoc Group Professionals no later than five days before the anticipated Effective Date; *provided*, *however*, that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate a reasonable amount of unbilled fees and expenses of such Professional, taking into account any prior payments; *provided*, *however*, that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account.

4.         Post-Confirmation Date Fees and Expenses

From and after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtors or the Reorganized Debtors, as applicable. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors and Reorganized Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors and Reorganized Debtors, as applicable, shall pay, within ten (10) business days after submission of a detailed invoice to the Debtors or Reorganized Debtors, as applicable, such reasonable claims for compensation or reimbursement of expenses incurred by the retained Professionals of the Debtors or the Reorganized Debtors, as applicable. If the Debtors or Reorganized Debtors, as applicable, dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors, as applicable, or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

C.       *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall, with the reasonable consent of the Required Consenting Term Loan Lenders, either be paid in full in Cash, or otherwise be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

### ARTICLE III.
### CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

A.       *Classification of Claims and Interests*

This Plan constitutes a separate Plan proposed by each Debtor within the meaning of section 1121 of the Bankruptcy Code. Except for the Claims addressed in Article II of this Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

This Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making distributions in accordance with the Plan in respect of Claims against and Interests in the Debtors under the Plan.  Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets, and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal Entities after the Effective Date.

The following chart represents the classification of Claims and Interests for each Debtor pursuant to the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Term Loan Secured Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 5 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 6 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 7 | Existing Equity Interests | Impaired | Entitled to Vote |

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

B.      *Treatment of Classes of Claims and Interests*

To the extent a Class contains Allowed Claims or Allowed Interests with respect to any Debtor, the classification of Allowed Claims and Allowed Interests is specified below.

1.      Class 1 — Other Secured Claims

(a)     *Classification*:  Class 1 consists of all Other Secured Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive, subject to the reasonable consent of the Required Consenting Term Loan Lenders, either:

(i)     payment in full in Cash;

(ii)    delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

13

        (iii)      Reinstatement of such Allowed Other Secured Claim under section 1124 of the Bankruptcy Code;

        (iv)      such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code; or

        (v)      the indubitable equivalent of such Claim.

(c)     *Voting*: Class 1 is Unimpaired under the Plan. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.     Class 2 — Other Priority Claims

(a)     *Classification*: Class 2 consists of all Other Priority Claims.

(b)     *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive either:

        (i)      payment in full in Cash; or

        (ii)      such other treatment rendering consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(c)     *Voting*: Class 2 is Unimpaired under the Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.     Class 3 — Term Loan Secured Claims

(a)     *Classification*: Class 3 consists of all Term Loan Secured Claims.

(b)     *Allowance*: On the Effective Date, Term Loan Secured Claims shall be Allowed in the aggregate principal amount of $644,101,000, plus any accrued but unpaid interest, fees, and other expenses arising under or in connection with the Term Loan Credit Agreement.

(c)     *Treatment*: Except to the extent that a Holder of Term Loan Secured Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Term Loan Secured Claim, each Holder of an Allowed Term Loan Secured Claim shall receive its Pro Rata share of and interest in:

        (i)      the New Common Stock (subject to dilution from the Management Incentive Plan and the New Warrants);

        (ii)      the Take-Back Term Loans; and

        (iii)      the Excess Cash (to the extent not already distributed) and the payment of interest on the Term Loans that is accrued and unpaid as of the Effective Date.

(d)     *Voting*: Class 3 is Impaired under the Plan. Holders of Allowed Term Loan Secured Claims are entitled to vote to accept or reject the Plan.

4.    Class 4 — General Unsecured Claims

(a)    *Classification*:  Class 4 consists of all General Unsecured Claims.

(b)    *Treatment*:  On the Effective Date, unless otherwise set forth herein or paid in full in advance thereof, all General Unsecured Claims shall be Reinstated.

(c)    *Voting*:  Class 4 is Unimpaired under the Plan.  Holders of General Unsecured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan.

5.    Class 5 — Intercompany Claims

(a)    *Classification*:  Class 5 consists of all Intercompany Claims.

(b)    *Treatment*:  Unless otherwise provided for under the Plan, each Allowed Intercompany Claim shall, on the Effective Date, be:

(i)    Reinstated;

(ii)    compromised, cancelled, setoff, contributed or distributed; or

(iii)    otherwise addressed at the election of the Debtors, subject to the reasonable consent of the Required Consenting Term Loan Lenders, such that Intercompany Claims are treated in a tax-efficient manner.

(c)    *Voting*:  Holders of Allowed Intercompany Claims in Class 5 are either Unimpaired, and such Holders are conclusively deemed to have accepted the Plan pursuant to section 1126(f), or Impaired, and such Holders are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject the Plan.

6.    Class 6 — Intercompany Interests

(a)    *Classification*:  Class 6 consists of all Intercompany Interests.

(b)    *Treatment*:  On the Effective Date, Intercompany Interests shall receive no recovery or distribution and shall be Reinstated to maintain the Debtors' corporate structure.

(c)    *Voting*:  Holders of Intercompany Interests in Class 6 are either Unimpaired, and such Holders are conclusively deemed to have accepted the Plan pursuant to section 1126(f), or Impaired, and such Holders are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

7.    Class 7 —Existing Equity Interests

(a)    *Classification*:  Class 7 consists of all Existing Equity Interests.

(b)    *Treatment*:  In full and final satisfaction of each applicable Existing Equity Interest, each applicable Holder thereof shall receive its Pro Rata share of and interest in the New Warrants.

(c)    *Voting*: Class 7 is Impaired under the Plan.  Holders of applicable Existing Equity Interests are entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D.    *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.    *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court to deem the Plan accepted by the Holders of such Claims or Interests in such Class.

F.    *Subordinated Claims and Interests*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

G.    *Intercompany Interests*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests, but for the purposes of administrative convenience and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to provide management services to certain other Debtors and Reorganized Debtors, to use certain funds and assets as set forth in the Plan to make distributions and satisfy certain obligations of certain other Debtors and Reorganized Debtors to the holders of certain Allowed Claims.  For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor.

H.    *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.    *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article 0 of the Plan.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by

modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims and Interests*

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.   The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and is within the range of reasonableness.   Subject to ARTICLE VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final.

B.      *Restructuring Transactions*

Following the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, shall take all actions set forth in the Restructuring Steps Memorandum and may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan and the Restructuring Support Agreement, which transactions may include, as applicable:  (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution or other certificates or documentation for other transactions as described in clause (a), pursuant to applicable state law; (d) the execution and delivery of the New Shareholders Agreement and the New Organizational Documents and any certificates or articles of incorporation, bylaws, or such other applicable formation, organizational, governance, or constitutive documents (if any) of each Reorganized Debtor (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable), and the issuance, distribution, reservation, or dilution, as applicable, of the New Common Stock, as set forth herein; (e) the execution and delivery of the Exit Facility Documents and the Take-Back Term Loan Credit Agreement (in both cases, including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable); (f) the execution and delivery of the New Warrant Agreement, and the issuance and distribution of the New Warrants; (g) the adoption of the Management Incentive Plan and the issuance and reservation of equity thereunder to the participants in the Management Incentive Plan on the terms and conditions set by the Reorganized Clover Board after the Effective Date; and (h) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Restructuring Transactions.

C.      *Sources of Consideration for Plan Distributions*

The Debtors shall fund distributions under the Plan, as applicable, with:  (a) the New Common Stock; (b) the New Warrants; (c) the Take-Back Term Loan Facility; (d) the Exit Facility; and (e) the Debtors' Cash on hand.   Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.   The issuance, distribution, or authorization, as applicable, of certain securities

17

in connection with the Plan, including the New Common Stock and the New Warrants, will be exempt from SEC registration, as described more fully in Article IV.E below.

1.     Issuance and Distribution of the New Common Stock

On the Effective Date, the New Common Stock shall be issued and distributed to the Entities entitled to receive the New Common Stock pursuant to the Plan in accordance with the Restructuring Steps Memorandum.  The issuance of New Common Stock by the Reorganized Debtors shall be authorized without the need for any further corporate action and without any action by the Holders of Claims or other parties in interest.  All of the New Common Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance, as applicable, and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, as applicable, including the New Shareholders Agreement and the New Organizational Documents, which terms and conditions shall bind each Entity receiving such distribution of the New Common Stock.  Any Entity's acceptance of New Common Stock shall be deemed as its agreement to the New Organizational Documents and the New Shareholders Agreement, as the same may be amended or modified from time to time following the Effective Date in accordance with their respective terms. The New Common Stock will not be registered on any exchange as of the Effective Date and shall not meet the eligibility requirements of the Depository Trust Company.

2.     Issuance of New Warrants

On the Effective Date, Reorganized Clover will issue the New Warrants only to the extent required to provide for distributions to Holders of applicable Existing Equity Interests, as contemplated by this Plan and as set forth and governed in all respects by the New Warrant Agreement.  All of the New Warrants issued pursuant to the Plan shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable, validly issued, fully paid, and non-assessable.  Each distribution and issuance referred to in ARTICLE VI hereof shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance without the need for execution by any party thereto other than the applicable Reorganized Debtor(s).

The New Warrants shall be governed by the New Warrant Agreement.

3.     Take-Back Term Loan Facility

On the Effective Date, the Reorganized Debtors shall enter into the Take-Back Term Loan Facility, the terms of which will be set forth in the Take-Back Term Loan Facility Documents.

Confirmation of the Plan shall be deemed approval of the Take-Back Term Loan Facility and the Take-Back Term Loan Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtors to enter into and execute the Take-Back Term Loan Facility Documents and such other documents as may be required to effectuate the treatment afforded by the Take-Back Term Loan Facility.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Take-Back Term Loan Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Take-Back Term Loan Facility Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Take-Back Term Loan Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary

to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.  In order to effect efficient distributions of the Take-Back Term Loans, the Term Loan Agent shall have reasonable discretion to impose a halt on assignments of Term Loans as of a date no earlier than three days before the anticipated Effective Date, which date shall be subject to the reasonable consent of the Required Consenting Term Loan Lenders.

4.      Exit Facility

To the extent the Debtors obtain the Exit Facility, on and after the Effective Date, the Exit Facility Documents shall constitute legal, valid, and binding obligations of the Reorganized Debtors and be enforceable in accordance with their respective terms.  The terms and conditions of the Exit Facility Credit Agreement shall bind Reorganized Clover and each other Entity that enters into such Exit Facility Credit Agreement as a guarantor.  Any Entity's entry into the Exit Facility Credit Agreement shall be deemed as its agreement to the terms of such Exit Facility Credit Agreement, as amended or modified from time to time following the Effective Date in accordance with its terms.

Confirmation shall be deemed approval of the Exit Facility Documents (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and, to the extent not approved by the Bankruptcy Court previously, the Reorganized Debtors will be authorized to execute and deliver those documents necessary or appropriate to obtain the Exit Facility, including the Exit Facility Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit Facility.

On the Effective Date, all of the Claims, Liens, and security interests to be granted in accordance with the terms of the Exit Facility Documents (a) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents, (b) shall be deemed automatically attached and perfected on the Effective Date, subject only to such liens and security interests as may be permitted under the Exit Facility Documents, and (c) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

5.      Cash on Hand

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand to fund distributions to certain Holders of Claims, including the payment of Allowed General Unsecured Claims as set forth in Article III of the Plan.

D.      *New Shareholders Agreement*

On the Effective Date, Reorganized Clover shall enter into and deliver the New Shareholders Agreement to each Holder of New Common Stock, and such parties shall be bound thereby, in each case, without the need for execution by any party thereto other than Reorganized Clover, *provided* that Reorganized Clover shall be authorized to require each such Holder that receives New Common Stock on the Effective Date to execute and deliver its signature page to the New Shareholders Agreement as a condition to receiving its distribution of New Common Stock thereunder.

E.      *Exemption from Registration Requirements*

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any Securities pursuant to and under the Plan, including the New Common Stock and the New Warrants, is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or

local law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  The shares of New Common Stock and the New Warrants to be issued under the Plan (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) subject to the terms of the New Shareholders Agreement, are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within ninety (90) days of such transfer, and (iii) is not an Entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code.

F.       *Corporate Existence*

Except as otherwise provided in the Plan, the Plan Supplement, or pursuant to the Restructuring Steps Memorandum or Restructuring Transactions, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

G.       *Corporate Action*

On or before the Effective Date, as applicable, all actions contemplated under the Plan or the Plan Supplement shall be deemed authorized and approved in all respects, including:  (a) adoption or assumption, as applicable, of the agreements with existing management; (b) selection of the directors, managers, and officers for the Reorganized Debtors; (c) implementation of the Restructuring Transactions; (d) the issuance and distribution of the New Common Stock and New Warrants, as applicable; (e) the applicable Reorganized Debtors' entry into the Take-Back Term Loan Facility; (f) the applicable Reorganized Debtors' entry into the Exit Facility Documents, if applicable; and (g) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, as applicable, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors, as applicable.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the Exit Facility Documents (if applicable), the Take-Back Term Loan Facility Documents, the Restructuring Steps Memorandum, and the New Shareholders Agreement, and any and all other agreements, documents, securities, and instruments relating to the foregoing and the Restructuring Transactions.  The authorizations and approvals contemplated by this Article IV.G shall be effective notwithstanding any requirements under non-bankruptcy law.

H.       *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan or the Plan Supplement, or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Debtor's Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing obligations under the Exit Facility Documents, the Take-Back Term Loan Facility Documents (in each case), and the Liens securing obligations on account of Other Secured Claims that are Reinstated pursuant to the Plan, if any).  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

I.        *Cancellation of Notes, Instruments, Certificates, and Other Documents*

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims shall be cancelled, and the obligations of the Debtors or the Reorganized Debtors and any non-Debtor Affiliates thereunder or in any way related thereto shall be discharged and deemed satisfied in full, and the Term Loan Agent shall be released from all duties thereunder; *provided*, *however*, that notwithstanding Confirmation or the occurrence of the Effective Date, any credit document or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of (a) allowing Holders of Allowed Claims to receive distributions under the Plan, (b) allowing and preserving the rights of the Term Loan Agent to make distributions pursuant to the Plan, (c) preserving the Term Loan Agent's rights to compensation and indemnification as against any money or property distributable to the Term Loan Lenders and the Holders of Term Loan Secured Claims, including permitting the Term Loan Agent to maintain, enforce, and exercise its charging liens against such distributions, (d) preserving all rights, including rights of enforcement, of the Term Loan Agent against any Person other than any of the Released Parties (including the Debtors), including with respect to indemnification or contribution from the Term Loan Lenders and Holders of Term Loan Secured Claims, pursuant and subject to the terms of the Term Loan Credit Agreement, (e) permitting the Term Loan Agent to enforce any obligation (if any) owed to the Term Loan Agent under the Plan, (f) permitting the Term Loan Agent to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, (g) permitting the Term Loan Agent and the Term Loan Lenders to assert any rights with respect to the obligations under the Term Loan Credit Agreement, and (h) permitting the Term Loan Agent to perform any functions that are necessary to effectuate the foregoing; *provided*, *further*, *however*, that (1) the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in the Plan, and (2) except as otherwise provided in the Plan, the terms and provisions of the Plan shall not modify any existing contract or agreement that would in any way be inconsistent with distributions under the Plan.  The Term Loan Agent shall be discharged and shall have no further obligation or liability except as provided in the Plan and Confirmation Order, and after the performance by the Term Loan Agent and its representatives and professionals of any obligations and duties required under or related to the Plan or Confirmation Order, the Term Loan Agent shall be relieved of and released from any obligations and duties arising thereunder.  The fees, expenses, and costs of the Term Loan Agent, including fees, expenses, and costs of its professionals incurred after the Effective Date in connection with the Term Loan Credit Agreement and reasonable and documented costs and expenses associated with effectuating distributions pursuant to the Plan will be paid by the Reorganized Debtors in the ordinary course.

J.        *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors and managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Support Agreement, the Take-Back Term Loan Facility Documents, the Exit Facility Documents, the New Organizational Documents, the New Shareholders Agreement, the New Warrant Agreement, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

K.        *Exemption from Certain Taxes and Fees*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to:  (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other Interest in the Debtors or the Reorganized Debtors, including the Exit Facility, the Take-Back Term Loan Facility (in each case), the New Common Stock, and the New Warrants; (b) the Restructuring Transactions; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; (e) the grant of collateral as security for the Take-Back Term Loan Facility or Exit Facility, as applicable; or (f) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection

21

with any transaction arising out of, contemplated by, or in any way related to the Plan, in each case shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

L.    *New Organizational Documents*

The New Organizational Documents shall, among other things:  (a)  authorize the issuance, distribution, and reservation of the New Common Stock and the New Warrants to the Entities entitled to receive such Interests under the Plan; and (b) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, prohibit the issuance of non-voting equity Securities.

On or immediately before the Effective Date, Clover or Reorganized Clover, as applicable, will file its New Organizational Documents with the applicable Secretary of State and/or other applicable authorities in its state of incorporation or formation in accordance with the applicable laws of their respective state of incorporation or formation, to the extent required for such New Organizational Documents to become effective.  After the Effective Date, Reorganized Clover may amend and restate its formation, organizational, and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of such documents.

M.    *Directors and Officers*

As of the Effective Date, the terms of the current members of the boards of directors of the Debtors shall have expired, and the officers of the Reorganized Debtors shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent known and determined, on or prior to the Effective Date, the number and identity of the members of the Reorganized Clover Board shall be determined by the Required Consenting Term Loan Lenders in accordance with the Plan, the Restructuring Support Agreement and/or the applicable New Organizational Documents.

On the Effective Date, the officers and overall management structure of Reorganized Clover, and all officers and management decisions with respect to Reorganized Clover (and/or any of its direct or indirect subsidiaries), compensation arrangements, and affiliate transactions shall only be subject to the approval of the Reorganized Clover Board.

From and after the Effective Date, each director, officer, or manager of the Reorganized Debtors shall be appointed and serve pursuant to the terms of their respective charters and bylaws or other formation and constituent documents, including the New Shareholders Agreement and the New Organizational Documents, and applicable laws of the respective Reorganized Debtor's jurisdiction of formation.  To the extent that any such director or officer of the Reorganized Debtors is an "insider" under the Bankruptcy Code, the Debtors will disclose the nature of any compensation to be paid to such director or officer.

N.    *Management Incentive Plan*

Within ninety (90) days of the Effective Date, the Reorganized Clover Board shall make a determination with respect to adoption of the Management Incentive Plan.  For the avoidance of doubt, the terms and conditions of the Management Incentive Plan (including any related agreements, policies, programs, other arrangements, and the Management Incentive Plan participants) shall be determined solely by the Reorganized Clover Board after the Effective Date and shall be consistent in all respects with the Restructuring Support Agreement.

*O.        Preservation of Causes of Action*

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to ARTICLE VIII of the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in any Definitive Documentation or other disclosure included in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to ARTICLE VIII of the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this ARTICLE IV.O include any claim or Cause of Action with respect to, or against, a Released Party.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action preserved pursuant to the first paragraph of this ARTICLE IV.O that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.  The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The applicable Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

*P.        Release of Avoidance Actions*

On the Effective Date, the Debtors, on behalf of themselves and their Estates, shall release any and all Avoidance Actions, and the Debtors, the Reorganized Debtors, and any of their successors or assigns, and any Entity acting on behalf of the Debtors or the Reorganized Debtors shall be deemed to have waived the right to pursue any and all Avoidance Actions, except for Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A.        Assumption of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts and Unexpired Leases shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, and regardless of whether such Executory Contract or Unexpired Lease is identified on the Assumed Executory Contract and Unexpired Lease List, unless such Executory Contract and Unexpired Lease:  (a) was assumed or rejected previously by the Debtors; (b) previously expired or terminated pursuant to its own terms; (c) is the subject of a motion to reject filed on or before the Effective Date; or (d) is identified on the Rejected Executory Contract and Unexpired Lease List.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumption, assumption and assignment, or rejection, as applicable, of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Lease List, and the Rejected Executory Contract and Unexpired Leases List, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise

indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List and the Assumed Executory Contract and Unexpired Lease List at any time through and including thirty (30) days after the Effective Date.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Solicitation Agent and served on the Reorganized Debtors no later than thirty (30) days after the effective date of such rejection.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Solicitation Agent within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.G of the Plan, notwithstanding anything in a Proof of Claim to the contrary.**

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim pursuant to Article 0 of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

C.      *Cure of Defaults and Objections to Cure and Assumption*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

In the event of a dispute regarding: (a) the amount of any payments to cure such a default; (b) the ability of the Reorganized Debtors or any assignee to provide adequate assurance of future performance under the Executory Contract or Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following either (1) the entry of a Final Order or orders resolving the dispute and approving the assumption or (2) the settlement of the dispute between the parties which may be entered into without further order of the Bankruptcy Court.

24

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  For the avoidance of doubt, assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not override or otherwise release any indemnification obligations in such Executory Contract or Unexpired Lease. **Any Proof of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

D.      *Insurance Policies*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, the Debtors shall be deemed to have assumed all insurance policies, as well as any agreements, documents, and instruments relating to such insurance policies or coverage of all insured Claims.  Except as set forth in Article V.F of the Plan, nothing in this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (a) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (b) alters or modifies the duty, if any, that the insurers or third party administrators pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor.  For the avoidance of doubt, insurers and third party administrators shall not need to nor be required to file or serve a cure objection or a request, application, claim, Proof of Claim, or motion for payment and shall not be subject to any claims bar date or similar deadline governing cure amounts or Claims.

E.      *Indemnification Obligations*

All indemnification obligations in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be assumed and remain in full force and effect after the Effective Date, and shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose by the Reorganized Debtors, as applicable.

F.      *Director, Officer, Manager, and Employee Liability Insurance*

The Reorganized Debtors shall purchase and maintain new D&O liability insurance policies for directors, officers, employees, attorneys, or other professionals and agents of the Reorganized Debtors on terms and conditions acceptable to the Required Consenting Term Loan Lenders.

G.      *Employee and Retiree Benefits*

Except as otherwise provided in the Plan, on and after the Effective Date, subject to any Final Order and, without limiting any authority provided to the Reorganized Clover Board under the Debtors' respective formation and constituent documents, the Reorganized Debtors shall:  (a) amend, adopt, assume, and/or honor in the ordinary course of business any contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for, among other things, compensation, including any incentive plans, retention plans, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity from and after the Petition Date; and (b) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order; *provided* that the consummation of the transactions contemplated in the Plan shall not constitute a "change in control" with respect to any of the foregoing arrangements.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and

after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

H.       *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

I.       *Reservation of Rights*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Reorganized Debtors, as applicable, shall have thirty (30) calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date.

J.       *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

K.       *Contracts and Leases Entered Into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business.

**ARTICLE VI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

A.       *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim or Interest is not an Allowed Claim or Interest on the Effective Date, on the date that such Claim becomes an Allowed Claim or Interest), each Holder of an Allowed Claim and Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Interests in each applicable Class and in the manner provided in the Plan. If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Interests, distributions on account of any such Disputed Claims or Interests shall be made pursuant to the provisions set forth in Article VII. Except as otherwise provided in the Plan, Holders of Claims and Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date. The Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

B.    *Distribution Agent*

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Distribution Agent on the Effective Date.  The Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

C.    *Rights and Powers of Distribution Agent*

1.    Powers of the Distribution Agent

The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

2.    Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Distribution Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable, actual, and documented attorney and/or other professional fees and expenses) made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

D.    *Delivery of Distributions*

1.    Delivery of Distributions in General

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Reorganized Debtors or the Distribution Agent, as appropriate:  (a) to the signatory set forth on any Proof of Claim or Proof of Interest filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim or Proof of Interest is filed or if the Debtors have not been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Distribution Agent, as appropriate, after the date of any related Proof of Claim or Proof of Interest; or (c) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf.  Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for fraud, gross negligence, or willful misconduct.  In order to effect efficient distributions of the Take-Back Term Loans, the Term Loan Agent shall have reasonable discretion to impose a halt on assignments of Term Loans as of a date no earlier than three days before the anticipated Effective Date, which date shall be subject to the reasonable consent of the Required Consenting Term Loan Lenders.

The amount of any reasonable fees and out-of-pocket expenses incurred by the Term Loan Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable, actual, and documented attorney and/or other professional fees and expenses) made by the Term Loan Agent in connection with effectuating distributions under the Plan shall be paid in Cash by the Reorganized Debtors.

2.    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, that such distributions shall

27

be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the later of (a) the Effective Date and (b) the date of the distribution. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged of and forever barred.

3.        No Fractional Distributions

No fractional shares of the New Common Stock or New Warrants shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an applicable Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock or New Warrants that is not a whole number, the actual distribution of shares of New Common Stock or New Warrants shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Common Stock or New Warrants shall be adjusted as necessary to account for the foregoing rounding.

4.        Minimum Distributions

Notwithstanding anything herein to the contrary, the Reorganized Debtors and Distribution Agent shall not be required to make distributions or payments of less than $50 (whether by Cash or otherwise).

E.        *Manner of Payment*

1.        All distributions of the New Common Stock and New Warrants to the Holders of the applicable Allowed Claims under the Plan shall be made by the Distribution Agent on behalf of the Debtors or Reorganized Debtors, as applicable.

2.        All distributions of Cash to the Holders of the applicable Allowed Claims under the Plan shall be made by the Distribution Agent on behalf of the applicable Debtor or Reorganized Debtor.

3.        At the option of the Distribution Agent, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.        *Compliance Matters*

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

G.        *No Postpetition or Default Interest on Claims*

Unless otherwise specifically provided for in the Plan or any final order of the Bankruptcy Court (including without limitation the Confirmation Order and Cash Collateral Orders), (a) postpetition and/or default interest shall not accrue or be paid on any Claims and (b) no Holder of a Claim shall be entitled to: (1) interest accruing on or after the Petition Date on any such Claim; or (2) interest at the contract default rate, as applicable.

H.       *Allocation Between Principal and Accrued Interest*

Except as otherwise provided in the Plan, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, on such Allowed Claim accrued through the Petition Date.

I.       *Setoffs and Recoupment*

Unless otherwise provided in the Plan or the Confirmation Order, each Debtor and each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against or recoup any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled as of the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or Reorganized Debtor of any such claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder.  In no event shall any Holder of Claims be entitled to set off or recoup any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff or recoupment on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff or recoupment pursuant to section 553 of the Bankruptcy Code or otherwise.

J.       *Claims Paid or Payable by Third Parties*

1.       Claims Paid by Third Parties

A Claim shall be reduced in full or in part, as applicable, and such Claim shall be disallowed in full or in part, as applicable, without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full or in part on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  To the extent that a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall repay, return, or deliver any distribution held by or transferred to the Holder to the applicable Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

2.       Claims Payable by Third Parties

The availability, if any, of insurance policy proceeds for the satisfaction of an Allowed Claim shall be determined by the terms of the insurance policies of the Debtors or Reorganized Debtors, as applicable.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon any such insurer's agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Solicitation Agent without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.       Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of an applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

# ARTICLE VII.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

A.    *Disputed Claims Process*

Holders of Claims and Interests need not file a Proof of Claim or Proof of Interest, as applicable, with the Bankruptcy Court and shall be subject to the Bankruptcy Court process only to the extent provided in the Plan, except to the extent a Claim arises on account of rejection of an Executory Contract or Unexpired Lease in accordance with Article V.B hereof.  On and after the Effective Date, except as otherwise provided in the Plan, all Allowed Claims shall be paid pursuant to the Plan in the ordinary course of business of the Reorganized Debtors and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced.  Other than Claims arising from the rejection of an Executory Contract or Unexpired Lease, if the Debtors or the Reorganized Debtors dispute any Claim or Interest, such dispute shall be determined, resolved, or adjudicated, as the case may be, in a manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced, and all parties shall retain any and all rights, claims, causes of action, defenses, and remedies that such parties had immediately prior to or arising after the Petition Date.  Solely to the extent that an Entity is required to file a Proof of Claim and the Debtors or the Reorganized Debtors, as applicable, do not determine, and without the need for notice to or action, order, or approval of the Bankruptcy Court, that the Claim subject to such Proof of Claim is Allowed, such Claim shall be Disputed unless Allowed or disallowed by a Final Order or as otherwise set forth in this Article VII of the Plan.  For the avoidance of doubt, there is no requirement to file a Proof of Claim or Proof of Interest (or move the Bankruptcy Court for allowance) to be an Allowed Claim or Allowed Interest, as applicable, under the Plan.  Notwithstanding the foregoing, Entities must file cure objections as set forth in Article V.C hereof to the extent such Entity disputes the amount of the cure set forth in the Assumed Executory Contract and Unexpired Lease List.  **All Proofs of Claim required to be filed by the Plan that are filed after the date that they are required to be filed pursuant to the Plan shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.    *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority to:  (a) file, withdraw, or litigate to judgment, objections to Claims or Interests; (b) settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.O of the Plan.

C.    *Estimation of Claims and Interests*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.      *Adjustment to Claims Without Objection*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *No Distributions Pending Allowance*

Notwithstanding any other provision hereof, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Disputed Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest.

F.      *Distributions After Allowance*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

G.      *No Interest*

Interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

B.      *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Debtor Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and

31

Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or noncontingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.     *Release of Liens*

**Except (a) with respect to the Liens securing (1) the Exit Facility, (2) the Take-Back Term Loan Facility, (3) Other Secured Claims that are Reinstated pursuant to the Plan, and (4) obligations pursuant to Executory Contracts and Unexpired Leases assumed pursuant to the Plan, or (b) as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates and, subject to the consummation of the applicable distributions contemplated in the Plan, shall be fully released and discharged, at the sole cost of and expense of the Reorganized Debtors, and the Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.**

D.     *Releases by the Debtors*

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:**

**(a)     the Debtors, the Debtors' restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement;**

**(b)     any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, including any Claims (whether direct or derivative), obligations, rights, suits, damages, Causes of Action (whether direct or derivative), remedies, and liabilities whatsoever based on or relating to, or in any manner arising from, in whole or in part the negotiation, formulation, or preparation of the Imaging Sale and Imaging Sale Definitive Agreement; *provided* that if the closing of the Imaging Sale has occurred, the Debtors, the Reorganized Debtors, and their Estates acknowledge (i) the granting, effectiveness, and enforceability of the Imaging Sale Releases and (ii) that the Imaging Sale Released Claims shall not be preserved or retained, whether pursuant to section 1123(b)(3)(B) of the Bankruptcy Code or otherwise;**

**(c)     the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan,**

including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

(d)     any other act or omission, transaction, agreement, event, or other occurrence, in each case relating to any of the foregoing (a), (b), or (c), taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in any Definitive Documentation or other document or disclosure included with or contained in the Plan Supplement) executed to implement the Plan.

E.     *Releases by Holders of Claims and Interests of the Debtors*

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

(a)     the Debtors, the Debtors' restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement;

(b)     any transaction that is part of the Restructuring Transactions, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the order confirming the plan in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, including any Claims (whether direct or derivative), obligations, rights, suits, damages, Causes of Action (whether direct or derivative), remedies, and liabilities whatsoever based on or relating to, or in any manner arising from, in whole or in part the negotiation, formulation, or preparation of the Imaging Sale and Imaging Sale Definitive Agreement; *provided* that if the closing of the Imaging Sale has occurred, each Releasing Party acknowledges (i) the granting, effectiveness, and enforceability of the Imaging Sale Releases and (ii) that the Imaging Sale Released Claims shall not be preserved or retained, whether pursuant to section 1123(b)(3)(B) of the Bankruptcy Code or otherwise;

(c)     the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

(d)     any other act or omission, transaction, agreement, event, or other occurrence, in each case relating to any of the foregoing (a), (b), or (c), taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in any Definitive Documentation or other document or disclosure included with or contained in the Plan Supplement) executed to implement the Plan.

F.     *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested

33

**by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and, upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

G.      *Injunction*

**Except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan, shall be discharged pursuant to the Plan, or are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Released Parties:  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.**

H.      *Protection Against Discriminatory Treatment*

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.      *Recoupment*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

*J.*      *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent, or (b) the relevant Holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

*K.*      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

*L.*      *Document Retention*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

*A.*      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

1.      the Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably acceptable to the Required Consenting Term Loan Lenders and the Term Loan Agent, and the Confirmation Order shall not be stayed, modified, or vacated and shall not be subject to any pending appeal, and the appeals period for the Confirmation Order shall have expired; *provided* that the requirement that the Confirmation Order not be subject to any pending appeal and the appeals period for the Confirmation Order shall have expired or have been waived by the Required Consenting Term Loan Lenders;

2.      if applicable, the Exit Facility shall have closed and be in full force and effect;

3.      the Restructuring Support Agreement shall continue to be in full force and effect;

4.      all agreements or other arrangements by and among the Debtors and any of the Sponsors or their respective Affiliates or related parties shall be terminated with no consideration payable in connection therewith as of the Effective Date;

5.      the Debtors shall have paid or reimbursed all reasonable and documented fees and out-of-pocket expenses of the Term Loan Lenders (as applicable) in connection with the Restructuring Transactions, including the reasonable and documented fees and expenses of the Ad Hoc Group Professionals;

6.      the Professional Fee Escrow Amount shall have been deposited into the Professional Fee Escrow Account pending approval of the Professional Fee Claims by the Bankruptcy Court;

7.      each document or agreement constituting the Definitive Documentation shall be in form and substance consistent with the Restructuring Support Agreement and the Restructuring Term Sheet, including the Definitive Documentation Consent Rights;

8.      all governmental approvals and consents that are legally required for the consummation of the Restructuring shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, shall have expired;

9.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan; and

10.      the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan, shall have been filed and shall be in form and substance consistent with the approval rights set forth in the Restructuring Support Agreement.

B.      *Waiver of Conditions Precedent*

The Debtors, with the consent of the Required Consenting Term Loan Lenders (not to be unreasonably delayed, conditioned, or withheld), may waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

C.      *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, with respect to any of the Debtors, shall be deemed to occur on the Effective Date with respect to such Debtor.

D.      *Effect of Non-Occurrence of Conditions to Consummation*

If the Effective Date does not occur with respect to any of the Debtors, the Plan shall be null and void in all respects with respect to such Debtor, and nothing contained in the Plan or the Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or Claims against or Interests in such Debtors; (b) prejudice in any manner the rights of such Debtors, any Holders of a Claim or Interest, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by such Debtors, any Holders, or any other Entity in any respect.

### ARTICLE X.
### MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification of Plan*

Subject to the limitations contained in the Plan and the Restructuring Support Agreement, the Debtors, with the consent of the Required Consenting Term Loan Lenders, reserve the right to modify the Plan prior to Confirmation and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

*B.*        *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

*C.*        *Revocation or Withdrawal of Plan*

Subject to the terms of the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if the Confirmation Date or the Effective Date does not occur, then:  (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (c) nothing contained in the Plan shall (1) constitute a waiver or release of any Claims, Interests, or Causes of Action, (2) prejudice in any manner the rights of any Debtor or any other Entity, or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.        allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.        decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.        resolve any matters related to Executory Contracts or Unexpired Leases, including:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.        ensure that distributions to Holders of Allowed Claims and Interests (as applicable) are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.        adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.        enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

7.        enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.        grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.        adjudicate, decide, or resolve any and all matters related to the Restructuring Transactions;

10.       adjudicate, decide, or resolve any and all matters related to enforcement of the Restructuring Support Agreement;

11.       issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.       resolve any cases, controversies, suits, disputes, Causes of Action, or any other matters that may arise in connection with the Consummation, interpretation, or enforcement of the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Transactions, or any Entity's obligations incurred in connection with the foregoing, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Transactions;

13.       hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including:  (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI.J.1 of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and, subject to any applicable forum selection clauses, contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

14.       enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.       consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

16.       hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

17.       enter an order or Final Decree concluding or closing the Chapter 11 Cases;

18.       enforce all orders previously entered by the Bankruptcy Court; and

19.       hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.       *Immediate Binding Effect*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Definitive Documentation (including any such Definitive Documentation included in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity

acquiring property under the Plan, and any and all non-Debtors to Executory Contracts and Unexpired Leases with the Debtors.

B.      **Additional Documents**

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the Restructuring Support Agreement.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      **Statutory Fees**

All fees payable pursuant to section 1930(a) of the Judicial Code, including fees and expenses payable to the U.S. Trustee, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, will be paid by each of the applicable Reorganized Debtors for each quarter (including any fraction thereof) until the applicable Chapter 11 Case of such Reorganized Debtor is converted, dismissed, or closed, whichever occurs first.

D.      **Reservation of Rights**

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court has entered the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

E.      **Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

F.      **Service of Documents**

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

**If to the Debtors or Reorganized Debtors:**

Clover Technologies Group, LLC
5850 Granite Parkway., Suite 720,
Plano, Texas 75024
Attention:  Richard X. Fischer
Email: Rich.Fischer@cloverwireless.com

With copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York, 10022
Facsimile:  (212) 446-4900
Attention:  Joshua A. Sussberg, P.C., Matthew C. Fagen, Francis Petrie, and Gary Kavarsky
Email:  joshua.sussberg@kirkland.com
        matthew.fagen@kirkland.com
        francis.petrie@kirkland.com
        gary.kavarsky@kirkland.com

-and-

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attention:  Dan Latona
Email:  dan.latona@kirkland.com

-and-

Klehr Harrison Harvey Branzburg LLP
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone: (302) 426-1189
Facsimile:  (302) 426-9193
Attention:  Domenic E. Pacitti and Michael W. Yurkewicz
Email:  dpacitti@klehr.com
        myurkewicz@klehr.com

-and-

Klehr Harrison Harvey Branzburg LLP
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone: (215) 569-3007
Facsimile:  (215) 568-6603
Attention:  Morton R. Branzburg
Email:  mbranzburg@klehr.com

**If to the Consenting Term Loan Lenders:**

To each Consenting Term Loan Lender at the addresses or e-mail addresses set forth in the Restructuring Support Agreement the Consenting Term Loan Lender's signature page to the Restructuring Support Agreement (or to the signature page to a Joinder or Transfer Agreement in the case of any Consenting Term Loan Lenders that becomes a party thereto after the Restructuring Support Agreement effective date).

With copies to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166
Attention:  Scott J. Greenberg, Michael J. Cohen, Steven A. Domanowski, and Matthew P. Porcelli

Email:  sgreenberg@gibsondunn.com
mcohen@gibsondunn.com
sdomanowski@gibsondunn.com
mporcelli@gibsondunn.com

-and-

Pachulski, Stang, Ziehl & Jones LLP
919 North Market Street, 17th Floor
Wilmington, DE 19801
Telephone: (302)-652-4100
Facsimile: (302)-652-4400
Attention:  Laura Davis Jones
Email: Ljones@pszjlaw.com

**If to the Consenting Sponsors:**

To each Consenting Sponsor at the addresses or e-mail addresses set forth below the Consenting Sponsor's signature page to the Restructuring Support Agreement.

With copies to:

Golden Gate Capital
One Embarcadero Center, 39th Floor
San Francisco, California 94111
Attention: Stephen Oetgen
Email: soetgen@goldengatecap.com

After the Effective Date, the Reorganized Debtors shall have the authority to send a notice to Entities that continue to receive documents pursuant to Bankruptcy Rule 2002 requiring such Entity to file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

G.     *Entire Agreement*

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, the Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

H.     *Plan Supplement Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website https://cases.stretto.com/Clover or the Bankruptcy Court's website at www.del.uscourts.gov/bankruptcy.  Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such exhibit or document in the Plan Supplement shall control.  The documents in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

41

I.        *Non-Severability*

Except as set forth in Article VIII of the Plan, the provisions of the Plan, including its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan is:  (a) valid and enforceable pursuant to its terms; (b) integral to the Plan; and (c) non-severable and mutually dependent.

J.        *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, the Consenting Term Loan Lenders, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, no such parties, individuals, or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

K.        *Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, the Restructuring Support Agreement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

L.        *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

Dated:  December 17, 2019

Respectfully submitted,

By:     */s/ Andrew Buck*
Name:    Andrew Buck
Title:    Chief Financial Officer, Clover Wireless LLC

**Exhibit B**

**Corporate Structure of the Debtors**



**Notes**

[1] – Ownership is 100% unless otherwise indicated.

**Exhibit C**

**Restructuring Support Agreement**

**EXECUTION VERSION**

**4L HOLDINGS CORPORATION,** *ET AL.***,**

<u>**AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT**</u>

**December 10, 2019**

**THIS AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT AND THE DOCUMENTS ATTACHED HERETO COLLECTIVELY DESCRIBE A PROPOSED RESTRUCTURING OF THE COMPANY PARTIES THAT WILL BE EFFECTUATED EITHER THROUGH FILING CHAPTER 11 CASES IN THE BANKRUPTCY COURT OR PURSUANT TO AN OUT-OF-COURT EXCHANGE.**

**THIS AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF THE COMPANY PARTIES. ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

**THIS AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES THERETO. ACCORDINGLY, THIS AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.**

**THIS AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.**

This AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 16.02, this "**A&R Agreement**") dated as of December 9, 2019 (the "**Execution Date**") is entered into by and among the following parties, each in the capacity set forth on its signature page to this A&R Agreement (each of the following described in sub-clauses (i) through (iii) of this preamble, collectively, the "**Parties**"):[1]

    i.      4L Holdings Corporation, a company incorporated under the Laws of Delaware ("**4L Holdings**"), and each of the affiliates and direct and indirect subsidiaries of 4L Holdings listed on **Schedule 1** attached to the Original RSA (as defined below) (together with 4L Holdings, collectively, the "**Company Parties**");

    ii.     the undersigned and non-Affiliated holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold the Term Loans, that have executed and delivered counterpart signature pages to the Original RSA, a Joinder, or a Transfer Agreement to counsel to the Company Parties and Gibson Dunn (the "**Consenting Term Loan Lenders**"); and

    iii.    the undersigned and non-Affiliated holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold Existing Interests in 4L Ultimate Topco Holdings Corporation, that have executed and delivered counterpart signature pages to the Original RSA, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the "**Consenting Sponsors**" and together with the Consenting Term Loan Lenders, the "**Consenting Stakeholders**").

## *RECITALS*

**WHEREAS,** the Parties entered in that certain Restructuring Support Agreement dated as of November 21, 2019 (as amended, the "**Original RSA**");

**WHEREAS,** the undersigned Consenting Term Loan Lenders constitute the Required Consenting Term Loan Lenders (as defined below);

**WHEREAS,** in accordance with Section 13 of the Original RSA, the Company Parties and Required Consenting Lenders (as defined below) desire to amend and restate the Original RSA consistent with the terms and conditions set forth herein;

**WHEREAS**, certain of the Company Parties have entered into the Imaging Sale Definitive Agreement, pursuant to which Buyer (as defined in the Imaging Sale Definitive Agreement) will purchase certain of the Company Parties' assets from the Company Parties, which Imaging Sale Definitive Agreement contemplates that the Closing (as defined in the Imaging Sale Definitive Agreement) of the Imaging Sale will occur prior to the Effective Date;

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this A&R Agreement have the meanings ascribed to them in Section 1.

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this A&R Agreement, and as specified in the term sheet attached as **Exhibit A** hereto (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, the "**Restructuring Term Sheet**") and the exhibits thereto (the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions in accordance with the terms set forth in this A&R Agreement by either (i) an out-of-court transaction (the "**Out-of-Court Exchange**") or (ii) commencing voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "**Chapter 11 Cases**"), in either case, in accordance with the terms and conditions set forth herein and in the Restructuring Term Sheet; and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this A&R Agreement and the Restructuring Term Sheet.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## AMENDED AND RESTATED AGREEMENT

**Section 1.**   *Definitions and Interpretation*.

1.01.   <u>Definitions</u>.  The following terms shall have the following definitions:

"**4L Holdings**" has the meaning set forth in the preamble to this A&R Agreement.

"**Affiliate**" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

"**A&R Agreement**" has the meaning set forth in the preamble to this A&R Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 16.02 (including the Restructuring Term Sheet).

"**Amendment Effective Date**" means the date on which (a) the Company Parties and (b) the Required Consenting Term Loan Lenders have each executed and delivered a signature page to this A&R Agreement, or affirmed in writing that their signature pages to the Original RSA shall constitute an executed and delivered signature page to this A&R Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Amendment Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any plan, inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt

investment, equity investment, liquidation, asset sale, share issuance, tender offer, recapitalization, plan of reorganization, share exchange, business combination, joint venture, provision of financing, or similar transaction involving any one or more Company Parties, or any Affiliates of the Company Parties, or the debt, equity, or other interests in any one or more Company Parties or any Affiliates of the Company Parties, in each case other than the Restructuring Transactions.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware administering the Chapter 11 Cases.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Causes of Action**" means any action, Claim, cause of action, controversy, demand, right, action, lien, indemnity, Interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or noncontingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this A&R Agreement.

"**Claim**" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

"**Company**" means 4L Holdings and all of its Affiliates.

"**Company Parties**" has the meaning set forth in the preamble to this A&R Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with the proposed Restructuring Transactions.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code, which Confirmation Order shall be in accordance with this A&R Agreement and the Definitive Documents.

"**Consenting Term Loan Lenders**" has the meaning set forth in the preamble to this A&R Agreement.

"**Consenting Sponsors**" has the meaning set forth in the preamble to this A&R Agreement.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this A&R Agreement.

4

"**Consenting Term Loan Lender Fees and Expenses**" has the meaning set forth in Section 16.22.

"**Consenting Term Loan Lender Releasing Parties**" has the meaning set forth in Section 14.01(a).

"**Consenting Term Loan Lender Released Parties**" has the meaning set forth in Section 14.01(b).

"**Definitive Documents**" has the meaning set forth in Section 2.02, which Definitive Documents shall be in accordance with this A&R Agreement.

"**Disclosed Letters**" has the meaning set forth in Section 3.01(b)(v).

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan, which Disclosure Statement shall be in accordance with this A&R Agreement and the Definitive Documents.

"**Disclosure Statement Order**" means the order of the Bankruptcy Court approving the Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code and modification of the automatic stay to permit the Consenting Stakeholders to provide any notices, including notices of termination, with respect to this A&R Agreement in accordance with the terms hereof or thereof, which Disclosure Statement Order will be in accordance with this A&R Agreement and the Definitive Documents.

"**Effective Date**" means the date on which all conditions to consummation of the Plan or the Out-of-Court Exchange (as applicable), have been satisfied in full or waived, in accordance with the terms of the Plan or the Out-of-Court Exchange (as applicable), and the Plan or Out-of-Court Exchange (as applicable) becomes effective.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Execution Date**" has the meaning set forth in the preamble to this A&R Agreement.

"**Existing Common Stock**" means the common stock issued by 4L Ultimate Topco Holdings Corporation.

"**Existing Interests**" means the Interests in 4L Ultimate Topco Holdings Corporation arising from or related to the Existing Common Stock, including, for the avoidance of doubt, the Existing Common Stock.

"**Exit Credit Agreement**" means a credit agreement governing the Exit Financing (as such term is defined in the Restructuring Term Sheet), in form and substance acceptable to the Required Consenting Term Loan Lenders.

"**Final Order**" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (A) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or motion for new trial, stay, reargument, or rehearing shall then be pending or (B) if an appeal, writ of certiorari, new trial, stay, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such order, shall not cause an order not to be a Final Order.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine, in consultation with the Required Consenting Stakeholders and subject to the reasonable consent of the Required Consenting Term Loan Lenders, are necessary or desirable to file.

"**Gibson Dunn**" means Gibson, Dunn & Crutcher LLP, counsel to certain of the Consenting Term Loan Lenders.

"**Greenhill**" means Greenhill & Co., LLC, financial advisor to certain of the Consenting Term Loan Lenders.

"**Imaging Sale**" means the sale of the business, assets, liabilities, and equity interests owned by Clover Technologies Group, LLC and related to the Imaging business.

"**Imaging Sale Buyer**" means the "Buyer" as defined in the Imaging Sale Definitive Agreement.

"**Imaging Sale Definitive Agreement**" means that certain Purchase and Sale Agreement by and among the Imaging Sale Buyer, Clover Imaging Holdings, LLC, Clover Technologies Group, LLC, 4L Ultimate Topco Corporation, 4L Holdings, and 4L Technologies Inc., as from time to time amended, modified, supplemented, or restated, including any exhibits or schedules thereto (including the Lender Group Release and the Seller Group Release).

"**Imaging Sale Effective Date**" means the "Closing Date" as such term is defined in the Imaging Sale Definitive Agreement.

"**Imaging Sale Released Claims**" means those claims and Causes of Action to be released pursuant to the Imaging Sale Releases, including any claims (whether direct or derivative), obligations, rights, suits, damages, causes of action (whether direct or derivative), remedies, and liabilities whatsoever based on or relating to, or in any manner arising from, in whole or in part

the negotiation, formulation, or preparation of the Imaging Sale and Imaging Sale Definitive Agreement.

"**Imaging Sale Releases**" means the Lender Group Release and the Seller Group Release (each as defined in the Imaging Sale Definitive Agreement).

"**Insolvency Proceeding**" means any corporate action, legal proceedings, or other procedure or step taken in any jurisdiction in relation to:

(a)  the suspension of payments, a moratorium of any indebtedness, winding-up, bankruptcy, liquidation, dissolution, administration, receivership, administrative receivership, judicial composition, or reorganisation (by way of voluntary arrangement, scheme or otherwise) of any member of the Consolidated Group, including under the Bankruptcy Code;

(b)  a composition, conciliation, compromise, or arrangement with the creditors generally of any member of the Consolidated Group or an assignment by any member of the Consolidated Group of its assets for the benefit of its creditors generally or any member of the Consolidated Group becoming subject to a distribution of its assets;

(c)  the appointment of a liquidator, receiver, administrator, administrative receiver, compulsory manager, or other similar officer in respect of any member of the Consolidated Group or any of its assets;

(d)  enforcement of any security over any assets of any member of the Consolidated Group; or

(e)  any procedure or step in any jurisdiction analogous to those set out in the preceding sub-paragraphs (a) to (d).

"**Interest**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Joinder**" means a joinder to this A&R Agreement substantially in the form attached hereto as **Exhibit B**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Milestones**" means the milestones set forth in the Restructuring Term Sheet.

7

"**New Common Stock**" means the common stock of Reorganized Clover.

"**Original RSA**" has the meaning set forth in the preamble to this A&R Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 16.02 thereof (including the Restructuring Term Sheet attached thereto).

"**Original RSA Effective Date**" has the meaning assigned to the term "Agreement Effective Date" under the Original RSA.

"**Outside Date**" means (i) if the Restructuring Transactions are implemented through the Chapter 11 Cases, the date that is 65 days after the Petition Date or (ii) if the Restructuring Transactions are implemented through the Out-of-Court Exchange, February 21, 2020.

"**Parties**" has the meaning set forth in the preamble to this A&R Agreement.

"**Permitted Transfer**" means a Transfer of any Term Loan Claims that meets the requirements of Section 9.01.

"**Permitted Transferee**" means each transferee of any Term Loan Claims who meets the requirements of Section 9.01.

"**Petition Date**" means the date on which the Company Parties commence the Chapter 11 Cases in accordance with this A&R Agreement and the Definitive Documents.

"**Plan**" means the joint chapter 11 plan of reorganization filed by the Company Parties in the Chapter 11 Cases to implement the Restructuring Transactions in accordance with this A&R Agreement and the Definitive Documents.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Company Parties with the Bankruptcy Court in accordance with this A&R Agreement and the Definitive Documents.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Term Loan Claims (or enter with customers into long and short positions in Term Loan Claims), in its capacity as a dealer or market maker in Term Loan Claims and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).  For the avoidance of doubt, none of the Consenting Term Loan Lenders represented by Gibson Dunn are Qualified Marketmakers.

"**Release Revocation Notice**" has the meaning set forth in Section 15.01(a).

"**Releasing Parties**" has the meaning set forth in Section 14.01(b).

"**Reorganized Clover**" means 4L Holdings, as reorganized pursuant to and under the Restructuring Transactions or any successor thereto.

"**Required Consenting Term Loan Lenders**" means, as of the relevant date, one or more Consenting Term Loan Lenders that individually or collectively hold more than 50% of the aggregate outstanding principal amount of Term Loans that are held by all such Consenting Term Loan Lenders represented by Gibson Dunn.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this A&R Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this A&R Agreement.

"**Revocation Cure Period**" has the meaning set forth in Section 15.01(a).

"**Rules**" means Rule 501(a) of the Securities Act.

"**SEC**" means the Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Seller-Agent Agreement**" means that certain Seller-Agent Agreement to be executed between 4L Holdings Corporation, certain of its affiliates and subsidiaries, and Wilmington Savings Fund Society, FSB as administrative agent, as from time to time amended, modified, supplemented, or restated, which shall be in form and substance reasonably acceptable to the Required Consenting Term Loan Lenders.

"**Shareholder Agreement**" means a shareholder agreement governing the shares of Reorganized Clover, in form and substance acceptable to the Required Consenting Term Loan Lenders.

"**Solicitation Materials**" means all solicitation materials in respect of the Out-of-Court Exchange and/or the Plan together with the Disclosure Statement, which Solicitation Materials shall be in accordance with this A&R Agreement and the Definitive Documents.

"**Sponsor Consent Right**" means each Consenting Sponsor's right to consent or approve any of the Definitive Documents (or any amendments, modifications, or supplements to the Definitive Documents) and shall apply solely to the extent any Definitive Document (i) modifies or affects the release, exculpation, injunction, or indemnification provisions related to such Consenting Sponsor as identified in the Restructuring Term Sheet and this A&R Agreement and implemented pursuant to the Plan or the Out-of-Court Exchange (as applicable), (ii) adversely affects the rights or obligations of such Consenting Sponsor pursuant to or identified in this A&R Agreement and implemented pursuant to the Plan or the Out-of-Court Exchange (as applicable), or (iii) modifies the form of recovery of such Consenting Sponsor pursuant to the Restructuring Term Sheet or Plan or the terms of the New Warrants; provided that any ruling by a Court of competent jurisdiction permitting a holder of Company Claims or Interests other than a Consenting Stakeholder to opt out of releases in the Plan shall not give rise to any consent right.

"**Sponsor Released Parties**" has the meaning set forth in Section 14.01(a).

9

"**Sponsor Releasing Parties**" has the meaning set forth in Section 14.01(b).

"**Teleplan**" means AMS Acquisition B.V., a private limited liability incorporated under the laws of the Netherlands.

"**Teleplan Acquisition**" means that certain acquisition wherein 4L Ultimate Topco Corporation or certain of its subsidiaries contemplate consummating an acquisition of Teleplan.

"**Teleplan Acquisition Definitive Agreement**" means that certain Agreement for Purchase and Sale of All the Issued Shares in AMS Acquisition B.V. by and among AMS Holding B.V. as seller and Valu Tech Outsourcing, LLC as purchaser, and 4L Holdings Corporation as guarantor, dated as of November 14, 2019, as from time to time amended, modified, supplemented, or restated.

"**Term Loan**" has the meaning assigned to the term "Term Loans" under the Term Loan Credit Agreement.

"**Term Loan Agent**" means Wilmington Savings Fund Society, FSB, in its capacity as Administrative Agent under the Term Loan Credit Agreement.

"**Term Loan Claims**" means any Claim derived from, based upon, or secured by the Term Loan Documents.

"**Term Loan Credit Agreement**" means any that certain Credit Agreement, dated as of May 8, 2014 (as amended, supplemented, or modified from time to time) among certain of the Company Parties, as borrower, the Term Loan Agent, as administrative agent for the lenders party thereto from time to time, and the Term Loan Lenders.

"**Term Loan Lenders**" has the meaning assigned to the term "Term Lender" under the Term Loan Credit Agreement.

"**Termination Date**" means the date on which termination of this A&R Agreement as to a Party is effective in accordance with Sections 12.01, 12.02, 12.03, 12.04, or 12.05.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this A&R Agreement and substantially in the form attached hereto as **Exhibit C**.

1.02.   Interpretation. For purposes of this A&R Agreement:

(a)   in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

10

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, amended and restated, supplemented, or otherwise modified or replaced from time to time in accordance with this A&R Agreement; <u>provided</u> that any capitalized terms herein which are defined with reference to another agreement are defined with reference to such other agreement as of the date of this A&R Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(d)    unless otherwise specified, all references herein to "Sections" are references to Sections of this A&R Agreement;

(e)    the words "herein," "hereof," and "hereto" refer to this A&R Agreement in its entirety rather than to any particular portion of this A&R Agreement;

(f)    captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this A&R Agreement;

(g)    references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company laws;

(h)    the use of "include" or "including" is without limitation, whether stated or not;

(i)    the phrase "counsel to the Consenting Stakeholders" refers in this A&R Agreement to each counsel specified in Section 16.10 other than counsel to the Company Parties; and

(j)    the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

**Section 2.**    *Effectiveness of this A&R Agreement*.  This A&R Agreement shall become effective and binding upon each of the Parties according to its terms as of 12:00 a.m., prevailing Eastern Standard Time, on the Amendment Effective Date, which is the date on which:

(a)    each of the Company Parties shall have executed and delivered counterpart signature pages of this A&R Agreement to counsel to each of the Parties;

(b)    the Required Consenting Term Loan Lenders have each executed and delivered a signature page to this A&R Agreement, or affirmed in writing that their signature pages to the Original RSA shall constitute an executed and delivered signature page to this A&R Agreement; <u>provided</u>, <u>however</u>, that signature pages executed by Consenting Stakeholders shall (i) be treated in accordance with Section 16.21 and (ii) be delivered to other Consenting Stakeholders in a redacted form that removes the details of such Consenting Stakeholders' holdings of Term Loan Claims; and

11

(c)     counsel to the Company Parties shall have given notice to counsel to the Consenting Stakeholders in the manner set forth in Section 16.10 (by email or otherwise) hereof that the other conditions to the Amendment Effective Date set forth in this Section 2 have occurred.

2.02.   <u>Definitive Documents</u>.   The documents related to or otherwise utilized to implement or effectuate the Restructuring Transactions (collectively, the "**<u>Definitive Documents</u>**") shall include, among others:

(a)     the First Day Pleadings and all orders sought pursuant thereto;

(b)     the Plan;

(c)     the Plan Supplement;

(d)     the Disclosure Statement;

(e)     the Solicitation Materials;

(f)     the Exit Credit Agreement;

(g)     the Shareholder Agreement;

(h)     the Out-of-Court Exchange Documents;

(i)     the Imaging Sale Definitive Agreement;

(j)     the Teleplan Acquisition Definitive Agreement;

(k)     the motion seeking to schedule a combined hearing to consider approval of the Disclosure Statement and confirmation of the Plan (including all exhibits, appendices, supplements, and related documents);

(l)     any orders relating to the use of cash collateral (including any exhibits, schedules, amendments, modifications, or supplements thereto, or any order authorizing the incurrence of credit pursuant to section 364 of the Bankruptcy Code);

(m)     the Confirmation Order;

(n)     any other exhibits, schedules, amendments, modifications, supplements or other documents and/or agreements relating to any of the foregoing or to the Teleplan Acquisition Definitive Agreement;

(o)     such other definitive documentation relating to a recapitalization or restructuring of the Company Parties as is necessary or desirable to consummate the Restructuring Transactions; and

(p)     any and all deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments, or other documents related to the Restructuring Transactions (including any exhibits, amendments, modifications or supplements made from time to time thereto).

2.03.   <u>Consent Rights Regarding Definitive Documents</u>.   Each of the Definitive Documents shall be consistent in all respects with the terms and conditions set forth in this A&R Agreement, and shall otherwise be in form and substance reasonably acceptable to the Company Parties, the Required Consenting Term Lenders, and the Consenting Sponsors (solely to the extent required under the Sponsor Consent Right).

**Section 3.     *Commitments of the Consenting Stakeholders*.**

3.01.   <u>General Commitments, Forbearances, and Waivers</u>.

(a)     During the Agreement Effective Period, each Consenting Stakeholder agrees in respect of all of its Term Loan Claims and Existing Interests, as applicable, pursuant to this A&R Agreement to use commercially reasonable efforts to:

(i)     support and cooperate with the Company Parties to take all commercially reasonable actions necessary to consummate the Restructuring Transactions in accordance with the (x) Plan and/or the Out-of-Court Exchange Documents, and (y) terms and conditions of this A&R Agreement, and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate), in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(ii)     in the case of the Consenting Term Loan Lenders, not, and shall not direct any other person to, exercise any right or remedy for the enforcement, collection, or recovery of any of the Term Loan Claims against the Company Parties other than in accordance with this A&R Agreement and the Definitive Documents;

(iii)     in the case of the Consenting Term Loan Lenders, give any notice, order, instruction, or direction to the applicable Term Loan Agent necessary to give effect to the Restructuring Transactions, so long as the Consenting Term Loan Lenders are not required to incur any out-of-pocket costs or provide any indemnity in connection therewith;

(iv)     negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents to which it is required to be a party;

(v)     (i) support and cooperate with the Company Parties to consummate the Restructuring Transactions, the Imaging Sale, and the Teleplan Acquisition in accordance with this A&R Agreement and the applicable Definitive Documents and (ii) with respect to the Consenting Sponsors only, not receive, and not cause any of its Affiliates (including GGC Administration, LLC ("**GGC**")) to receive any payments in connection with the Imaging Sale, the Teleplan Acquisition, or at the closing of either of the foregoing transactions;

13

(vi)     in the case of the Consenting Sponsors, not prevent any Company Party from complying with its obligations under this A&R Agreement, the Imaging Sale Definitive Agreement, the Teleplan Acquisition Definitive Agreement, and each of the Definitive Documents;

(vii)     support the Restructuring Transactions, the Teleplan Acquisition, and the Imaging Sale, and to act in good faith and take any and all actions necessary to consummate the Restructuring Transactions, the Teleplan Acquisition, and the Imaging Sale in a timely manner, including by (x) negotiating and consulting in good faith with the Company Parties regarding the terms and conditions of the Definitive Documents to which it is a party, (y) entering into and performing under the terms of each of the Definitive Documents, and (z) agreeing to support any and all release, exculpation, and/or indemnity provision contained within any of the Definitive Documents, solely to the extent that any such release, exculpation, and/or indemnity provision is consistent with the release, exculpation, and/or indemnity provisions in this A&R Agreement and the Restructuring Term Sheet;

(viii)     to the extent any legal or structural impediment that would prevent, hinder, or delay the consummation of the Restructuring Transactions, the Imaging Sale, or the Teleplan Acquisition (as applicable), negotiate in good faith appropriate additional or alternative provisions to address any such impediment; provided that the economic outcome for the Consenting Term Loan Lenders, the anticipated timing of the closing, and other material terms of this A&R Agreement must be substantially preserved in any such alternate provisions;

(ix)     refrain from directly or indirectly seeking, supporting, negotiating, engaging in any discussions relating to, or soliciting any Alternative Restructuring Proposal;

(x)     in the case of the Consenting Sponsors, subject to and upon the occurrence of the Effective Date, waive all Claims against the Company Parties; and

(xi)     in the case of the Consenting Sponsors, not (x) pledge, encumber, assign, sell, or otherwise transfer, offer, or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, directly or indirectly, any portion of its right, title, or interests in any of its shares, stock, or other interests in any Company Party or any subsidiary thereof, in each case, other than direct or indirect transfers of interests in the Consenting Sponsors, (y) acquire any outstanding indebtedness of any Company Party or any subsidiary thereof, or (z) make any worthless stock deduction for any tax year ending on or prior to the Plan Effective Date, in the case of each of (x), (y), and (z), to the extent such pledge, encumbrance, assignment, sale, acquisition, declaration of worthlessness or other transaction or event may impair or adversely affect any of the tax attributes of the Company Parties or any of their subsidiaries (including under section 108 or 382 of the Internal Revenue Code of 1986 (as amended)).

(b)     During the Agreement Effective Period, each Consenting Stakeholder agrees in respect of all of its Term Loan Claims and Existing Interests, as applicable, pursuant to this A&R Agreement, that it shall not directly or indirectly:

(i)     object to, delay, impede, or take any action that is reasonably likely to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

14

(ii)    propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii)    file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this A&R Agreement or the Plan;

(iv)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to this A&R Agreement, any of the Restructuring Transactions, or the Chapter 11 Cases contemplated herein against the Company Parties or the other Parties other than to enforce this A&R Agreement or any Definitive Document, to effectuate the Restructuring Transactions in accordance therewith, or as otherwise permitted under this A&R Agreement;

(v)    object to, delay, or impede (A) the payment of reasonable and documented fees and expenses incurred under any engagement letters or reimbursement letters for any professional advisors to the Company Parties or Consenting Term Loan Lenders in existence as of the Amendment Effective Date to the extent that copies of such engagement or reimbursement letters have been provided to the Consenting Stakeholders at least two (2) days prior to the Amendment Effective Date and have not thereafter been modified (such engagement and reimbursement letters, the "**Disclosed Letters**") or (B) orders of the Bankruptcy Court approving and authorizing (1) the retention of any such advisors by the Company Parties in accordance with the Disclosed Letters and (2) the payment of reasonable and documented fees and expenses incurred under the Disclosed Letters, provided, however, that notwithstanding anything to the contrary herein, any incremental incentive or transaction fees set forth in the Disclosed Letters that are payable based on consummation of a Restructuring without the commencement of one or more chapter 11 cases shall be subject to the written consent of the Required Consenting Term Loan Lenders; and

(vi)    object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or, interfere with the automatic stay arising under section 362 of the Bankruptcy Code; provided, however, that nothing in this A&R Agreement shall limit the right of any party hereto to exercise any right or remedy provided under this A&R Agreement, the Confirmation Order or any other Definitive Document.

**Section 4.    *Additional Provisions Regarding the Consenting Stakeholders' Commitments*.** Notwithstanding anything contained in this A&R Agreement, and notwithstanding any delivery of a consent or vote to accept the Plan and/or the Out-of-Court Exchange (as applicable) by any Consenting Stakeholder, or any acceptance of the Plan and/or the Out-of-Court Exchange (as applicable) by any class of creditors, nothing in this A&R Agreement shall:

(a)    be construed to prohibit any Consenting Stakeholder from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this A&R Agreement;

(b)    be construed to prohibit any Consenting Stakeholder from appearing as a party in interest in any matter to be adjudicated in a Chapter 11 Case, so long as such appearance and the positions advocated in connection therewith are not materially inconsistent with this A&R

15

Agreement and are not for the purpose of delaying, interfering, impeding, or taking any other action to delay, interfere, or impede, directly or indirectly, the Restructuring Transactions;

(c)    affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest;

(d)    impair or waive the rights of any Consenting Stakeholder to assert or raise any objection not prohibited under this A&R Agreement;

(e)    prevent any Consenting Stakeholder from enforcing this A&R Agreement;

(f)    obligate a Consenting Stakeholder to deliver a vote to support the Plan and/or the Out-of-Court Exchange (as applicable) or prohibit a Consenting Stakeholder from withdrawing such vote, in each case from and after the Termination Date (other than a Termination Date as a result of the occurrence of the Effective Date); provided that, upon the withdrawal of any such vote after the Termination Date (other than a Termination Date as a result of the occurrence of the Effective Date), such vote shall be deemed void *ab initio*, and such Consenting Stakeholder shall have the opportunity to change its vote;

(g)    (i) prevent any Consenting Stakeholder from taking any action that is required by applicable Law, (ii) require any Consenting Stakeholder to take any action that is prohibited by applicable Law or to waive or forego the benefit of any applicable legal privilege, or (iii) incur any expenses, liabilities, or other obligations, or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations; provided, however, that if any Consenting Stakeholder proposes to take any action that is otherwise materially inconsistent with this A&R Agreement in order to comply with applicable Law, such Consenting Stakeholder shall provide at least three (3) Business Days' advance notice to the Company Parties to the extent the provision of notice is practicable under the circumstances;

(h)    prevent any Consenting Stakeholder by reason of this A&R Agreement or the Restructuring Transactions from making, seeking, or receiving any regulatory filings, notifications, consents, determinations, authorizations, permits, approvals, licenses, or the like; or

(i)    prohibit any Consenting Stakeholder from taking any action that is not inconsistent with this A&R Agreement.

**Section 5.    *Commitments of the Company Parties*.**

5.01.    Affirmative Commitments.    Except as set forth in Section 6, during the Agreement Effective Period, the Company Parties shall:

(a)    support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this A&R Agreement, including by timely complying with the Milestones;

(b)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, support and take all steps reasonably necessary and desirable to address and resolve any such impediment;

(c)     use commercially reasonable efforts to obtain any and all required governmental, regulatory (including self-regulatory), and/or third-party approvals for the Restructuring Transactions;

(d)     negotiate in good faith and execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this A&R Agreement;

(e)     actively oppose and object to the efforts of any person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions (including, if applicable, the filing of timely filed objections or written responses) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring Transactions;

(f)     consult and negotiate in good faith with the Consenting Stakeholders and their advisors regarding the execution and implementation of the Restructuring Transactions;

(g)     upon reasonable request of the Consenting Stakeholders, inform the advisors to the Consenting Stakeholders as to (i) the status and progress of the Restructuring Transactions, including progress in relation to the negotiations of the Definitive Documents, (ii) the status and progress of the Teleplan Acquisition (including efforts to replace the Teleplan Factoring Facility) and the Imaging Sale, and (iii) the status of obtaining any necessary or desirable authorizations (including any consents) from each Consenting Stakeholder, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body, or any stock exchange;

(h)     inform counsel to the Consenting Stakeholders as soon as reasonably practicable after becoming aware of:  (i) any event or circumstance that has occurred, or that is reasonably likely to occur (and if it did so occur), that would permit any Party to terminate, or that would result in the termination of, this A&R Agreement; (ii) any matter or circumstance that they know, or suspect is likely, to be a material impediment to the implementation or consummation of the Restructuring Transactions; (iii) any notice of any commencement of any material involuntary Insolvency Proceedings, legal suit for payment of debt, or securement of security from or by any person in respect of any Company Party or any subsidiary or affiliate of a Company Party; (iv) a breach of this A&R Agreement (including a breach by any Company Party); and (v) any representation or statement made or deemed to be made by any of them under this A&R Agreement that is or proves to have been materially incorrect or misleading in any respect when made or deemed to be made;

(i)     use commercially reasonable efforts to maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized;

(j)     not (i) operate their business outside the ordinary course, taking into account the Restructuring Transactions, without the consent of the Required Consenting Term Loan Lenders

17

(not to be unreasonably withheld) or (ii) transfer any asset or right of the Company Parties or any asset or right used in the business of the Company Parties to any person or entity outside the ordinary course of business without the consent of the Required Consenting Term Loan Lenders (not to be unreasonably withheld);

(k)　on or after the date hereof, not engage in any material merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness, or other similar transaction outside of the ordinary course of business other than the Restructuring Transactions or the closing of the Imaging Sale or Teleplan Acquisition;

(l)　provide the Consenting Term Loan Lenders with reasonable access to information regarding the operations of the Company and keep the advisors to the Consenting Term Loan Lenders informed regarding the status of the Teleplan Acquisition and Imaging Sale on a reasonably frequent basis, including through conference calls no less than once per week, to the extent requested, until the respective closing date of each such transaction;

(m)　use commercially reasonable efforts to (i) provide counsel for the Consenting Stakeholders a reasonable opportunity to review draft copies of all First Day Pleadings and second day motions and proposed orders and, (ii) to the extent reasonably practicable, provide counsel for the Consenting Stakeholders a reasonable opportunity to review and provide comments on draft copies of all other substantive documents that the Company Parties intend to file with the Bankruptcy Court;

(n)　remit, (i) upon closing of the Imaging Sale, the Estimated Closing Cash Payment (as such term is defined in the Imaging Sale Definitive Agreement), and (ii) the Positive Adjustment Amount (as such term is defined in the Imaging Sale Definitive Agreement), if any, when payable under the Imaging Sale Definitive Agreement, in each case to the Administrative Agent for distribution to the Lenders and otherwise cooperate with the Administrative Agent and comply with the Seller-Agent Agreement in connection therewith;

(o)　cause Clover Technologies Group, LLC to provide a pledge of 65% of the voting stock or interests (as applicable) in Teleplan in connection with the Teleplan Acquisition no later than five (5) Business Days after the consummation of the Teleplan Acquisition;

(p)　pay the Consenting Term Loan Lender Fees and Expenses;

(q)　upon execution of the Imaging Sale Definitive Agreement, execute the Seller-Agent Agreement; and

(r)　disclose, and make generally available to the public, all "Cleansing Material (as such term is defined in an applicable Confidentiality Agreement) to the extent required under any Confidentiality Agreement with any Consenting Term Loan Lender, and in accordance with the Milestones and the applicable Confidentiality Agreements.

5.02.　<u>Negative Commitments</u>.  Except as set forth in Section 6, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

18

(a)  object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)  take any action that is inconsistent with, or is intended to frustrate or impede approval, implementation, and consummation of the Restructuring Transactions described in this A&R Agreement and the Definitive Documents;

(c)  modify either the Plan or the Out-of-Court Exchange Documents, in whole or in part, in a manner that is not materially consistent with this A&R Agreement and the Definitive Documents;

(d)  file any motion, pleading, or other Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this A&R Agreement and the Definitive Documents;

(e)  (i) make or declare any dividends, distributions, or other payments on account of its equity or membership interests, as applicable (other than as set forth in the Restructuring Term Sheet), (ii) directly or indirectly make or procure any payments to the Sponsors or GGC or any of their respective Affiliates or reimburse any professional fees incurred by any of the Sponsors or GGC or any of their respective Affiliates (other than as set forth in the Restructuring Term Sheet or to pay for services provided directly to the Company Parties by third parties pursuant to contracts with the Sponsors, GGC, or any of their respective affiliates, which contracts are in place as of the date of this A&R Agreement), or (iii) make any transfers (whether by dividend, distribution, or otherwise) to any direct or indirect parent entity or shareholder of the Company or GGC or any of their respective Affiliates (other than as set forth in the Restructuring Term Sheet); or

(f)  amend, modify, or supplement the Imaging Sale Definitive Agreement or Teleplan Acquisition Definitive Agreement, except in accordance with this A&R Agreement.

**Section 6.**   *Additional Provisions Regarding Company Parties' Commitments*.

6.01.  Notwithstanding anything to the contrary in this A&R Agreement, nothing in this A&R Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law; provided, however, that to the extent that any such action or inaction is materially inconsistent with this A&R Agreement or would be deemed to constitute a breach hereunder, including a determination to pursue an Alternative Restructuring Proposal, the Company Parties shall provide the Consenting Stakeholders with at least one (1) Business Day's advance written notice prior to when it or they intend to take such action or inaction.

6.02.  Notwithstanding anything to the contrary in this A&R Agreement but subject to Section 6.01 of this A&R Agreement, each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or

representatives shall not solicit any Alternative Restructuring Proposals; _provided that_ such Parties shall have the rights to:  (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims or Existing Interests against a Company Party (including any Consenting Stakeholder), any other party in interest (including, if applicable, in the Chapter 11 Cases (including any official committee and the United States Trustee)), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals.  At all times prior to the date on which the Company Parties enter into a definitive agreement in respect of an Alternative Restructuring Proposal, the Company Parties shall provide Gibson Dunn and Greenhill with reasonably prompt updates on the status of any discussions regarding an Alternative Restructuring Proposal (including without limitation any financing proposals) and a copy of any written offer or proposal for such Alternative Restructuring Proposal (including without limitation any financing proposals) within two (2) Business Days of the Company Parties' or their advisors' receipt of such offer or proposal.

6.03.   Nothing in this A&R Agreement shall:  (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this A&R Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this A&R Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this A&R Agreement.

**Section 7.**   *Voting and Motions.*

7.01.   Consenting Term Loan Lender Voting and Motions.

If the Chapter 11 Cases are commenced:

(a)   During the Agreement Effective Period, each Consenting Term Loan Lender that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting Term Loan Lender of the Solicitation Materials:

(i)   timely vote (or cause to be timely voted) each of its Term Loan Claims to accept the Plan by delivering its duly executed and completed ballot accepting the Plan following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)   to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iii)   not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (a)(i) and (ii) above; _provided_, _however_, that nothing in this A&R Agreement shall prevent any Party from

20

withholding, amending, or revoking (or causing the same) its timely consent or vote with respect to the Plan if this A&R Agreement has been terminated in accordance with its terms with respect to such Party.

Notwithstanding any other provision of this A&R Agreement, including this Section 7.01, nothing in this A&R Agreement shall require any Consenting Term Loan Lender to (i) incur any material expenses, liabilities, or other obligations, or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to any Consenting Term Loan Lender or its Affiliates other than as expressly provided in this A&R Agreement (including the Restructuring Term Sheet) or (ii) provide any information that it determines, in its sole discretion, to be sensitive or confidential.

(b)    During the Agreement Effective Period, each Consenting Term Loan Lender, in respect of each of its Term Loan Claims, will support, and will not directly or indirectly object to, delay, impede, or take any other action reasonably likely to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is explicitly contemplated by and in accordance with this A&R Agreement.

7.02.    <u>Consenting Sponsor Voting and Covenants</u>.

(a)    If the Chapter 11 Cases are commenced, during the Agreement Effective Period, each Consenting Sponsor that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting Sponsor of the Solicitation Materials:

(i)    timely vote (or cause to be timely voted) each of its Existing Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)    to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election;

(iii)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (a)(i) and (ii) above; <u>provided</u>, <u>however</u>, that nothing in this A&R Agreement shall prevent any Party from withholding, amending, or revoking (or causing the same) its timely consent or vote with respect to the Plan if this A&R Agreement has been terminated in accordance with its terms with respect to such Party; and

Notwithstanding any other provision of this A&R Agreement, including this Section 7.02, nothing in this A&R Agreement shall require any Consenting Sponsor to (A) incur any material expenses, liabilities, or other obligations, or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to any Consenting Sponsor or its Affiliates other than as expressly provided in this A&R Agreement (including the Restructuring Term Sheet) or (B) provide any information that it determines, in its sole discretion, to be sensitive or confidential.

21

*Transfer of Interests and Securities.*

8.01.    After the Amendment Effective Date, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Claims or Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless either:  (i) the transferee executes and delivers to counsel to the Company Parties and Gibson Dunn, at or before the time of the proposed Transfer, a Transfer Agreement; or (ii) the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer (including the amount and type of Claims or Interests Transferred) to counsel to the Company Parties and Gibson Dunn at or before the time of the proposed Transfer.

8.02.    Upon compliance with the requirements of Section 8.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this A&R Agreement to the extent of the rights and obligations in respect of such transferred Claim or Interest, except as provided under Section 16.17 of this A&R Agreement.   Any Transfer in violation of Section 8.01 shall be void *ab initio*.

8.03.    This   Agreement   shall   in   no   way   be   construed   to   preclude   the Consenting Stakeholders from acquiring additional Claims or Interests; <u>provided</u>, <u>however</u>, that (a) such additional Claims or Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this A&R Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Claims or Interests acquired) to counsel to the Company Parties and Gibson Dunn within five (5) Business Days of such acquisition.

8.04.    This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Claims or Interests.   Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this A&R Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreement.

8.05.    Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Claims or Interests with the purpose and intent of acting as a Qualified Marketmaker for such Claims or Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Claims or Interests if:  (a) such Qualified Marketmaker subsequently transfers such Claims or Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee under Section 8.01; and (c) the Transfer otherwise is a Permitted Transfer under Section 8.01.  To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title, or interests in Claims or Interests that the Qualified Marketmaker acquires from a holder of the

Claims or Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

8.06.    Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 9.**    *Representations and Warranties of Consenting Stakeholders.*    Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this A&R Agreement and as of the Effective Date:

(a)    it is the beneficial or record owner of the face amount of the Term Loan Claims and Existing Interests, as applicable, or is the nominee, investment manager, or advisor for beneficial holders of the Term Loan Claims and Existing Interests, as applicable, reflected in, and it is not the beneficial or record owner of any Term Loan Claims or Existing Interests, as applicable, other than those reflected in such Consenting Stakeholder's signature page to this A&R Agreement, a Joinder, or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8);

(b)    it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Term Loan Claims and Existing Interests, as applicable;

(c)    such Term Loan Claims and Existing Interests, as applicable, are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this A&R Agreement at the time such obligations are required to be performed; and

(d)    it has the full power to vote, approve changes to, and transfer all of its Term Loan Claims and Existing Interests, as applicable, referable to it as contemplated by this A&R Agreement subject to applicable Law.

**Section 10.**    *Representations and Warranties of Company Parties*.    Each Company Party severally, and not jointly, represents and warrants that as of the date such Company Party executes and delivers this A&R Agreement and as of the Effective Date:

(a)    to the best of its knowledge having made all reasonable inquiries, no order has been made, petition presented, or resolution passed for the winding up of or appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager, or other similar officer in respect of it or any other Company Party or affiliate or subsidiary of any Company Party, and no analogous procedure has been commenced in any jurisdiction; provided, however, that this Section 11 does not apply to any proceeding commenced in connection with filing the Chapter 11 Cases;

(b)    within the 120 days preceding the execution of this A&R Agreement, no Company Party has made any dividend, distribution, or other payment (other than ordinary course expense

23

reimbursement) to any Sponsor or GGC or any of their respective Affiliates on account of its equity, other than as has been disclosed in writing to the advisors for the Consenting Term Loan Lenders prior to the execution of this A&R Agreement; and

(c)       except as expressly provided for in this A&R Agreement, it has not entered into any arrangement (including with any individual creditor thereunder, irrespective of whether it is or is to become a Consenting Stakeholder) on terms that are not reflected in the Restructuring Term Sheet.

**Section 11.**     *Mutual Representations, Warranties, and Covenants; Further Assurances*. Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this A&R Agreement:

(a)       it is validly existing and in good standing (or the equivalent thereof) under the Laws of the jurisdiction of its organization, and this A&R Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)       except as expressly provided in this A&R Agreement, the Plan, the Out-of-Court Exchange Documents, the Restructuring Term Sheet, and the Bankruptcy Code (or as reasonably determined by the Company Parties and the Required Consenting Term Loan Lenders upon advice of counsel), no consent or approval is required by a governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange, third party, or any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this A&R Agreement other than any such consent or approval which has been obtained, provided, or otherwise satisfied prior to the Amendment Effective Date and which consent or approval has not been subsequently revoked;

(c)       the entry into and performance by it of, and the transactions contemplated by, this A&R Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)       except as expressly provided in this A&R Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this A&R Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this A&R Agreement; and

(e)       except as expressly provided by this A&R Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this A&R Agreement that have not been disclosed to all Parties to this A&R Agreement.

**Section 12.**     *Termination Events*.

12.01.  <u>Consenting Term Loan Lender Termination Events</u>.  This Agreement may be terminated as to all Parties by the Required Consenting Term Loan Lenders, by the delivery to the

Company Parties of a written notice in accordance with Section 16.10 hereof, upon the occurrence and continuation of any of the following events, in each case, other than as contemplated by the Restructuring Transactions:

(a)     the (i) breach (other than an immaterial breach) in any respect by a Company Party of any of the undertakings, representations, warranties, or covenants of the Company Parties set forth in this A&R Agreement or (ii) failure of the Company Parties to act in a manner materially consistent with this A&R Agreement, which breach or failure remains uncured (to the extent curable) for five (5) Business Days after the Required Consenting Term Loan Lenders transmit a written notice to the Company Parties in accordance with Section 16.10 hereof identifying such breach;

(b)     the making public, modification, amendment, or filing of any of the Definitive Documents without the consent of the applicable Required Consenting Term Loan Lenders in accordance with this A&R Agreement;

(c)     any Company Party's (i) withdrawal of the Plan or Out-of-court Exchange (unless the Out-of-Court Exchange is withdrawn substantially contemporaneously with the commencement of the Chapter 11 Cases in accordance with the Restructuring Term Sheet), (ii) public announcement of its intention not to support the Restructuring Transactions, or (iii) filing, public announcement, or execution of a definitive written agreement with respect to an Alternative Restructuring Proposal;

(d)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions, including the Plan and/or the Out-of-Court Exchange (as applicable), and (ii) either (A) such ruling, judgment, or order has been issued at the request of the Company Parties in contravention of any obligations set forth in this A&R Agreement or (B) remains in effect for five (5) days after such terminating Required Consenting Stakeholders transmit a written notice in accordance with Section 16.10 hereof detailing any such issuance; provided that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this A&R Agreement;

(e)     the failure to meet a Milestone, which has not been waived or extended in a manner consistent with this A&R Agreement;

(f)     the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Term Loan Lenders), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee under section 1104 of the Bankruptcy Code in one or more of the Chapter 11 Cases of a Company Party, (iii) dismissing one or more of the Chapter 11 Cases, (iv) terminating exclusivity under Bankruptcy Code section 1121, or (v) rejecting this A&R Agreement;

(g)      if any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, except as contemplated by this A&R Agreement, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the preceding subsection (i), (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official with respect to any Company Party or for a substantial part of such Company Party's assets, (iv) makes a general assignment or arrangement for the benefit of creditors, or (v) takes any corporate action for the purpose of authorizing any of the foregoing;

(h)      an order is entered by the Bankruptcy Court granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of the Company Parties or that would materially and adversely affect any Company Party's ability to operate its business in the ordinary course;

(i)      upon the delivery of notice by the Company Parties pursuant to Section 6.01;

(j)      failure by the Company Parties to pay the fees and expenses set forth in Section 16.22 of this A&R Agreement as and when required, subject to applicable Law; provided, however, that the Effective Date shall not occur until and unless the fees and expenses set forth in Section 16.22 have been paid in full;

(k)      any Company Party files any motion or pleading with the Bankruptcy Court that is not consistent in all material respects with this A&R Agreement and such motion has not been withdrawn within five (5) Business Days of receipt by the Company Parties of written notice from the Required Consenting Term Loan Lenders that such motion or pleading is inconsistent with this A&R Agreement.

12.02.   <u>Company Party Termination Events</u>.  Any Company Party may terminate this A&R Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 16.10 hereof upon the occurrence of any of the following events:

(a)      the breach (other than an immaterial breach) by Consenting Stakeholders holding an amount of Term Loans that would result in non-breaching Consenting Stakeholders holding less than two-thirds (66.7%) of the aggregate principal amount of the Term Loans of their undertakings, representations, warranties, or covenants set forth in this A&R Agreement that remains uncured for a period of five (5) Business Days after the receipt by the Company Parties of notice of such breach;

(b)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for five (5) Business Days after such terminating Company Party transmits a written notice in accordance with Section 16.10 hereof detailing any such issuance; provided that this termination

right shall not apply to or be exercised to the extent a Company Party sought or requested such ruling or order in contravention of any obligation or restriction set out in this A&R Agreement; or

      (c)      two (2) Business Days after the delivery of notice by the Company Parties pursuant to Section 6.01.

      12.03.   <u>Consenting Sponsor Termination Events</u>.  This Agreement may be terminated as to only the Consenting Sponsors, by the delivery by the Consenting Sponsors to the Company Parties of a written notice in accordance with Section 16.10 hereof, upon the occurrence and continuation of any of the following events, in each case, other than as contemplated by the Restructuring Transactions:

      (a)      the (i) breach (other than an immaterial breach) in any respect by a Company Party of any of the undertakings, representations, warranties, or covenants of the Company Parties set forth in this A&R Agreement or (ii) failure of the Company Parties to act in a manner materially consistent with this A&R Agreement, which breach or failure remains uncured (to the extent curable) for five (5) Business Days after the Consenting Sponsors transmit a written notice to the Company Parties in accordance with Section 16.10 hereof identifying such breach;

      (b)      the making public, modification, amendment, or filing of any of the Definitive Documents that is not consistent with the Sponsor Consent Right;

      (c)      any Company Party's (i) withdrawal of the Plan and/or Out-of-Court Exchange (unless the Out-of-Court Exchange is withdrawn substantially contemporaneously with the commencement of the Chapter 11 Cases in accordance with the Restructuring Term Sheet), (ii) public announcement of its intention not to support the Restructuring Transactions, or (iii) filing, public announcement, or execution of a definitive written agreement with respect to an Alternative Restructuring Proposal;

      (d)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions, including the Plan and/or the Out-of-Court Exchange (as applicable), and (ii) either (A) such ruling, judgment, or order has been issued at the request of the Company Parties in contravention of any obligations set forth in this A&R Agreement or (B) remains in effect for five (5) days after such terminating Required Consenting Stakeholders transmit a written notice in accordance with Section 16.10 hereof detailing any such issuance; <u>provided</u> that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this A&R Agreement;

      (e)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Consenting Sponsors, not to be unreasonably withheld), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee under section 1104 of the Bankruptcy Code in one or more of the Chapter 11 Cases of a Company Party, (iii) dismissing one or more of the

Chapter 11 Cases, (iv) terminating exclusivity under Bankruptcy Code section 1121, or (v) rejecting this A&R Agreement;

(f)    if any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, except as contemplated by this A&R Agreement, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the preceding subsection (i), (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official with respect to any Company Party or for a substantial part of such Company Party's assets, (iv) makes a general assignment or arrangement for the benefit of creditors, or (v) takes any corporate action for the purpose of authorizing any of the foregoing;

(g)    upon the delivery of notice by the Company Parties pursuant to Section 6.01; or

(h)    the Company Parties file any motion or pleading with the Bankruptcy Court that does not comply with the Sponsor Consent Right and such motion has not been withdrawn within five (5) Business Days of receipt by the Company Parties of written notice from the Consenting Sponsors that such motion or pleading is inconsistent with this A&R Agreement.

12.04.    <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following: (a) the Required Consenting Term Loan Lenders; (b) the Consenting Sponsors; and (c) each Company Party.

12.05.    <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice immediately upon consummation of the Plan or the Out-of-Court Exchange on the Effective Date.

12.06.    <u>Effect of Termination</u>.

(a)    Except as set forth in Section 16.17, upon the occurrence of a Termination Date as to a Party, this A&R Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this A&R Agreement and shall have the rights and remedies that it would have had, had it not entered into this A&R Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this A&R Agreement, including with respect to any and all Claims or Causes of Action. Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by the Bankruptcy Court, any and all consents, agreements, undertakings, tenders, waivers, forbearances, ballots, and votes delivered by a Party subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this A&R Agreement or otherwise. Notwithstanding anything to the contrary in this A&R Agreement, the foregoing shall not be

28

construed to prohibit a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this A&R Agreement that arose or existed before a Termination Date.  Except as expressly provided in this A&R Agreement, nothing herein is intended to, or does, in any manner, waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and preserve its rights (including rights under this A&R Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this A&R Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder.  No purported termination of this A&R Agreement shall be effective under this Section 12.06 or otherwise if the Party seeking to terminate this A&R Agreement is in material breach of this A&R Agreement, except a termination pursuant to Section 12.02(c).  Nothing in this Section 12.06 shall restrict any Company Party's right to terminate this A&R Agreement in accordance with Section 12.02(c).  For the avoidance of doubt, the automatic stay arising pursuant to section 362 of the Bankruptcy Code shall be deemed waived or modified for purposes of delivering any notices or exercising any rights hereunder.

(b)     Notwithstanding anything to the contrary in this A&R Agreement, in the event that the Consenting Sponsors terminate this A&R Agreement, the Required Consenting Term Loan Lenders and Company Parties shall have the option (which shall be delivered in writing to the Company Parties or Consenting Term Loan Lenders, as applicable, including via e-mail) to (i) determine that the Consenting Term Loan Lenders or Company Parties will continue remaining Parties to this A&R Agreement in pursuit and support of the Plan and/or the Out-of-Court Exchange (as applicable) and the Restructuring Transactions, or (ii) terminate this A&R Agreement in accordance with Sections 12.01 or 12.02, as applicable.  For the avoidance of doubt, upon termination of this A&R Agreement by the Consenting Sponsors, any releases of the Consenting Sponsors granted or provided for under this A&R Agreement shall terminate without requiring any further action by the Company Parties or Consenting Term Loan Lenders and regardless of whether the Required Consenting Term Loan Lenders exercise the continuation option in this Section 12.06(b).

**Section 13.     *Amendments and Waivers*.**

(a)     This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this A&R Agreement may be waived, in any manner except in accordance with this Section 13.

(b)     This Agreement may be modified, amended, or supplemented, or a condition or requirement of this A&R Agreement may be waived, in a writing signed by (i) each Company Party (ii) the Required Consenting Term Loan Lenders; and (iii) solely with respect to any modification, amendment, supplement, or waiver that adversely affects the rights, obligations, or treatment of the Consenting Sponsors under this A&R Agreement, the Consenting Sponsors; provided, however, that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate (as compared to other Consenting Stakeholders holding claims or interests within the same class as provided for in the Restructuring Term Sheet), and adverse effect on any of the Term Loan Claims or Existing Interests held by such Consenting Stakeholder(s), as

applicable, then the consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver or supplement; and provided, further, that, solely with respect to modifications, amendments, or waivers of any Milestone, the written approval required by this Section 13 may be in the form of an email from the Required Consenting Term Loan Lenders' counsel (at the direction of the Required Consenting Term Loan Lenders) to the Company Parties' counsel confirming such amendment or modification.

(c)     Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 13 shall be ineffective and void *ab initio*.

(d)     The waiver by any Party of a breach of any provision of this A&R Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this A&R Agreement shall operate as a waiver of any such right, power or remedy or any provision of this A&R Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this A&R Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 14.     *Releases*.**

14.01.  Releases.

(a)     On the Original RSA Effective Date and subject in all respects to Section 15 hereof, each Consenting Term Loan Lender, on behalf of itself and its predecessors, successors and assigns, subsidiaries and affiliates that it has express written authority to bind, managed accounts or funds, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, in each case in their capacity as such (collectively, the "**Consenting Term Loan Lender Releasing Parties**"), expressly and generally releases, acquits, and discharges (i) the Consenting Sponsors, (ii) the Consenting Sponsors' respective predecessors, successors and assigns, subsidiaries, affiliates (in each case of the foregoing, except the Company Parties), managed accounts or funds or investment vehicles, and each of such entities' respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals of the Consenting Sponsors, and (iii) the current and former directors of the Company Parties, in each case with respect to the foregoing (i), (ii), and (iii), in their capacity as such (collectively, the "**Sponsor Released Parties**"), from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Company Parties, any claims asserted or assertable on behalf of any holder of any claim against or interest in the Company Parties and any claims asserted or assertable on behalf of any other entity, whether known or unknown, foreseen or unforeseen, matured or unmatured, in law, equity, contract, tort, or otherwise, by statute or otherwise, that any of the

30

Consenting Term Loan Lender Releasing Parties (whether individually or collectively) ever had, now has, or may have, based on or relating to, or in any manner arising from, in whole or in part, (a) the Company Parties, the Company Parties' restructuring efforts, intercompany transactions, (b) the Restructuring Transactions and any matters resolved, satisfied, and/or settled through the Restructuring Transactions and this A&R Agreement, including the negotiation, formulation, or preparation of the Restructuring Transactions and this A&R Agreement, and the negotiation, formulation, or preparation of the Teleplan Acquisition and the Imaging Sale, in each case, arising on or before the execution of this A&R Agreement, and (c) any other act or omission, transaction, agreement, event, or other occurrence, in each case relating to any of the foregoing (a) or (b) taking place on or before the execution of this A&R Agreement.

(b)     On the Original RSA Effective Date and subject in all respects to Section 15 hereof, each of the Sponsor Released Parties, on behalf of itself and its predecessors, successors and assigns, subsidiaries and affiliates that it has express written authority to bind (in each case of the foregoing, except the Company), managed accounts or funds or investment vehicles, and each of such entities' respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, in each case in their capacity as such (collectively, the "**Sponsor Releasing Parties**" and together with the Consenting Term Loan Lender Releasing Parties, the "**Releasing Parties**"), expressly and generally releases, acquits, and discharges (i) the other applicable Sponsor Released Parties, (ii) each Consenting Term Loan Lender and the Term Loan Agent, and (iii) each Consenting Term Loan Lender's and the Term Loan Agent's respective predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, and each of such entities' respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals of the Term Loan Agent and each Consenting Term Loan Lender, in each case with respect to the foregoing (i) through (iii), in their capacity as such ((ii) and (iii) of the foregoing, collectively, the "**Consenting Term Loan Lender Released Parties**"), from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Company, any claims asserted or assertable on behalf of any holder of any claim against or interest in the Company and any claims asserted or assertable on behalf of any other entity, whether known or unknown, foreseen or unforeseen, matured or unmatured, in law, equity, contract, tort, or otherwise, by statute or otherwise, that any of the Sponsor Releasing Parties (whether individually or collectively) ever had, now have, or may have, based on or relating to, or in any manner arising from, in whole or in part, (a) the Company Parties, the Company Parties' restructuring efforts, intercompany transactions, (b) the Restructuring Transactions and any matters resolved, satisfied, and/or settled through the Restructuring Transactions and this A&R Agreement, including the negotiation, formulation, or preparation of the Restructuring Transactions and this A&R Agreement, and the negotiation, formulation, or preparation of the Teleplan Acquisition and the Imaging Sale, in each case, arising on or before the execution of this A&R Agreement, and (c) any other act or omission, transaction, agreement, event, or other occurrence, in each case relating to any of the foregoing (a) or (b) taking place on or before the execution of this A&R Agreement.

31

(c)      Subject to Section 14.01(g) and Section 15 hereof, each of the Releasing Parties knowingly grants this Release notwithstanding that each Releasing Party may hereafter discover facts in addition to, or different from, those which either such Releasing Party now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and each Releasing Party expressly waives any and all rights that such Releasing Party may have under any statue or common law principle that would limit the effect of the Release to those claims actually known or suspected to exist as or before the Original RSA Effective Date.

(d)      Subject to Section 14.01(g) and Section 15 hereof, in connection with their agreement to the foregoing Release, each of the Releasing Parties knowingly and voluntarily waive and relinquish any and all provisions, rights, and benefits conferred by any law of the United States or any state or territory of the United States, or principle of common law, which governs or limits a person's release of unknown claims, comparable or equivalent to California Civil Code § 1542, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

(e)      Each of the Releasing Parties hereby represents and warrants that it has access to adequate information regarding the terms of this A&R Agreement, the scope and effect of the Release, and all other matters encompassed by this A&R Agreement, to make an informed and knowledgeable decision with regard to entering into this A&R Agreement.  Each of the Releasing Parties further represents and warrants that it has not relied upon any other Party in deciding to enter into this A&R Agreement and has instead made its own independent analysis and decision to enter into this A&R Agreement.

(f)      Solely in the event the Imaging Sale is consummated, the Disclosure Statement, Plan, and Confirmation Order shall contain language reasonably acceptable to the Imaging Sale Buyer (i) acknowledging the granting, effectiveness, and enforceability of the Imaging Sale Releases and (ii) providing that the Imaging Sale Released Claims shall not be preserved or retained, whether pursuant to section 1123(b)(3)(B) of the Bankruptcy Code or otherwise.

(g)      Notwithstanding anything to the contrary in this Section 14 or the Restructuring Term Sheet, the releases set forth herein shall not release (i) any obligations of any party or entity under this A&R Agreement, the Plan, any Definitive Document, the Imaging Sale Definitive Agreement, or the Teleplan Acquisition Definitive Agreement, or (ii) any claim related to any act or omission that is not actually known by the applicable Releasing Party as of the execution of this A&R Agreement that is determined in a final order of a court of competent jurisdiction to have constituted actual fraud or willful misconduct.

**Section 15.**      ***Revocation of Release***.

15.01.   <u>Revocation of Release</u>.

(a)     Subject to Section 15.03 hereof, a Release provided in Section 14 hereof shall be deemed revoked if any Party receives a notice from any other Party (each, a "**Release Revocation Notice**") of the occurrence of a Release Revocation Event (as defined herein) and the recipient(s) of the Release Revocation Notice fails to cure such Release Revocation Event within five (5) business days of receipt of such Release Revocation Notice (the "**Revocation Cure Period**") or such Release Revocation Notice is not otherwise rescinded; provided that in the event the recipient(s) of a Release Revocation Notice disputes either the occurrence of a Release Revocation Event or the failure of the recipient(s) to cure the Release Revocation Event within the Revocation Cure Period, such recipient(s) shall have seven (7) business days from the expiration of the Revocation Cure Period to seek a determination by the Bankruptcy Court or such other court of competent jurisdiction having jurisdiction over such claim in accordance with this A&R Agreement as to whether a Release Revocation Event occurred and was not cured within the Revocation Cure Period.

15.02.  <u>Release Revocation Event</u>.   For purposes of this A&R Agreement, a "**Release Revocation Event**" means any of the following:

(a)     a breach by any Party (other than the Party seeking to revoke the Release) of any material representation, warranty, covenant, or other provision of this A&R Agreement that gives rise to a termination right under this A&R Agreement;

(b)     this A&R Agreement is terminated with respect to any of the Company Parties, including as a result of a Company Party's determination pursuant to Section 6.01 hereof;

(c)     any Consenting Term Loan Lender brings an action or claim that has been released pursuant to Section 14 against any Imaging Sale Sponsor Released Party or Teleplan Acquisition Sponsor Released Party; or

(d)     any Sponsor Released Party brings an action or claim that has been released pursuant to Section 14 against any Consenting Term Loan Lender Released Party.

(e)     Notwithstanding anything herein to the contrary, neither the subsequent revocation of a Release, the subsequent occurrence of a Release Revocation Event, nor the subsequent issuance of a Release Revocation Notice shall in any way operate to revoke any release by any Party of any Causes of Action or any claim, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever that are released through the Imaging Sale Releases (which shall be effective upon the Imaging Sale Effective Date).

(f)     Notwithstanding the foregoing subsections (a) and (b) of this Section 15.02, if the economic outcome for the Required Consenting Term Loan Lenders, the timing of the effective date of the Plan, and all other material terms as contemplated herein are substantially preserved, and the Company Parties and Consenting Term Loan Lenders did not suffer any material loss or expend material out-of-pocket costs in connection with the events or circumstances giving rise to the Release Revocation Event, the foregoing subsections (a) and (b) shall not constitute a Release Revocation Event.

15.03.  <u>Effect of Revocation of Release</u>.

(a)     Revocation of a Release as a result of a Release Revocation Event as contemplated in subsections (b), (c), and (d) of this Section 15.03 shall result in a full and complete restoration of any and all claims, liabilities, and causes of action subject to such Release, and such Release shall be void *ab initio*, in each case, to the extent contemplated in subsections (a), (b), (c), and (d) of this Section 15.03.

(b)     In the case of a Release Revocation Event under subsection (a) of Section 15.02 hereof, if the breaching Party is a Sponsor Released Party, the Release in Section 14.01(a) hereof shall be revoked with respect to all of the Sponsor Released Parties (and such Sponsor Released Parties shall no longer have the benefit of such Release), and if the breaching Party is a Consenting Term Loan Lender, the Releases in Section 14.01(b) hereof shall be revoked solely with respect to such breaching Consenting Term Loan Lender and its respective Consenting Term Loan Lender Released Parties (and such Consenting Term Loan Lender Released Parties shall no longer have the benefit of such Release).  Other than as set forth in this subsection (b) of Section 15.03 hereof, the revocation of any Release under subsection (a) of Section 15.01 hereof shall not operate as a revocation or, nor otherwise impair or affect, any other Release.

(c)     In the case of a Release Revocation Event under subsection (b) or (d) of Section 15.02 hereof, the Releases in Sections 14.01(a) hereof shall be revoked in their entireties.

(d)     In the case of a Release Revocation Event under subsection (c) of Section 15.02 hereof, the Releases granted by the Sponsor Releasing Parties in Section 14.01(b) hereof shall be revoked in their entirety.

**Section 16.     *Miscellaneous*.**

16.01.  <u>Acknowledgement</u>.     Notwithstanding any other provision herein, this A&R Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

16.02.  <u>Exhibits Incorporated by Reference; Conflicts</u>.     Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this A&R Agreement, and all references to this A&R Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this A&R Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this A&R Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

16.03.  <u>Further Assurances</u>.  Subject to the other terms of this A&R Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable; <u>provided</u> <u>however</u> that this Section 15.03 shall not limit the right of any party hereto to

exercise any right or remedy provided for in this A&R Agreement (including the approval rights set forth in Section 2.03).

16.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this A&R Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

16.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Notwithstanding the foregoing consent to jurisdiction in either a state or federal court of competent jurisdiction in the State and County of New York, upon the commencement of the Chapter 11 Cases, each of the Parties hereby agrees that, if the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this A&R Agreement. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this A&R Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this A&R Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

16.06.  <u>TRIAL BY JURY WAIVER</u>.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

16.07.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this A&R Agreement, each individual executing this A&R Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this A&R Agreement on behalf of said Party.

16.08.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this A&R Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this A&R Agreement and continue to be represented by counsel.

16.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as

applicable.  Aside from the Imaging Sale Buyer (which shall be deemed a third-party beneficiary of this A&R Agreement solely as to Sections 14.01(f) and 15.02(e) and solely in the event that the Imaging Sale is consummated), there are no third-party beneficiaries under this A&R Agreement, and the rights or obligations of any Party under this A&R Agreement may not be assigned, delegated, or transferred to any other person or entity.  Notwithstanding anything to the contrary in this A&R Agreement, solely in the event that the Imaging Sale is consummated, the provisions of Sections 14.01(f) and 15.02(e) shall inure to the benefit of the Clover Imaging Buyer and Norwest Equity Partners, each of whom is intended to be a third-party beneficiary thereof.

16.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to a Company Party, to:

Clover Technologies Group, LLC
2700 West Higgins Road, Suite 100
Hoffman Estates, Illinois 60169
Attention:  Richard Fischer
E-mail address:  rfischer@clovertech.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 1002,2
Attention:  Joshua Sussberg, P.C., Matthew Fagen, Francis Petrie, and Gary Kavarsky
E-mail address:  joshua.sussberg@kirkland.com, matthew.fagen@kirkland.com, francis.petrie@kirkland.com, and gary.kavarsky@kirkland.com

-and-

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attention:  Dan Latona
E-mail address:  dan.latona@kirkland.com

(b)     if to a Consenting Term Loan Lender, to each Consenting Term Loan Lender at the addresses or e-mail addresses set forth below the Consenting Term Loan Lender's signature page to this A&R Agreement (or to the signature page to a Joinder or Transfer Agreement in the case of any Consenting Term Loan Lender that becomes a party hereto after the Original RSA Effective Date):

with a copy to (which shall not constitute notice):

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166
Attention:  Scott J. Greenberg, Michael J. Cohen, Steven A. Domanowski, and
Matthew P. Porcelli
E-mail address:  sgreenberg@gibsondunn.com, mcohen@gibsondunn.com,
sdomanowski@gibsondunn.com, and mporcelli@gibsondunn.com

(c)     if to a Consenting Sponsor, at the addresses or e-mail addresses set forth below the Consenting Sponsor's signature page to this A&R Agreement:

with a copy to (which shall not constitute notice):

Golden Gate Capital
One Embarcadero Center, 39th Floor
San Francisco, California 94111
Attention:  Stephen Oetgen
E-mail address:  soetgen@goldengatecap.com

Any notice given by delivery, mail, or courier shall be effective when received.

16.11.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder hereby confirms that its decision to execute this A&R Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

16.12.  <u>Enforceability of Agreement</u>.  The Parties hereby acknowledge and agree:  (a) that the provision of any notice or exercise of termination rights under this A&R Agreement is not prohibited by the automatic stay provisions of the Bankruptcy Code; (b) that they waive any right to assert that the exercise of any notice or termination rights under this A&R Agreement is subject to the automatic stay provisions of the Bankruptcy Code and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising notice and termination rights under this A&R Agreement, to the extent the Bankruptcy Court determines that such relief is required; (c) that they shall not take a position to the contrary of this Section 15.12 in the Bankruptcy Court or any other court of competent jurisdiction; and (d) they will not initiate, or assert in, any litigation or other legal proceeding that this Section 15.12 is illegal, invalid, or unenforceable, in whole or in part.

16.13.  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this A&R Agreement is terminated for any reason other than pursuant to Section 12.05 hereof, the Parties fully reserve any and all of their rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this A&R Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this A&R Agreement.

37

16.14.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this A&R Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

16.15.  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this A&R Agreement are, in all respects, several and not joint.

16.16.  <u>Severability and Construction</u>.  If any provision of this A&R Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this A&R Agreement for each Party remain valid, binding, and enforceable.

16.17.  <u>Survival</u>.  Notwithstanding (a) any Transfer of any Term Loan Claims in accordance with Section 9 or (b) the termination of this A&R Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 12.06, Section 16 (except for Section 16.22 with respect to fees and expenses incurred after the termination of this A&R Agreement (other than with respect to fees and expenses incurred after the termination of this A&R Agreement due to the consummation of the Plan or the Out-of-Court Exchange on the Effective Date)), and any Confidentiality Agreement shall survive such Transfer and/or termination and shall continue in full force and effect.

16.18.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this A&R Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

16.19.  <u>Capacities of Consenting Stakeholders</u>.  Each Consenting Stakeholder has entered into this agreement on account of all Term Loan Claims and Existing Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this A&R Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this A&R Agreement with respect to all such Term Loan Claims and Existing Interests, as applicable.

16.20.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this A&R Agreement, pursuant to Section 14 or otherwise, including a written approval by the Company Parties, the Required Consenting Term Loan Lenders, or the Consenting Sponsors, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

16.21. <u>Confidentiality and Publicity</u>.  Other than as may be required by applicable Law and regulation or by any governmental or regulatory authority, no Party shall disclose to any person (including, for the avoidance of doubt, any other Consenting Stakeholder), other than legal, accounting, financial, and other advisors to the Company Parties and Consenting Term Loan Lenders (who are under obligations of confidentiality to the Company Parties with respect to such disclosure, and, with respect to the advisors to the Company Parties, whose compliance with such obligations the Company Parties shall be responsible for), the name of, or the principal amount or percentage of the Term Loan Claims held by, any Consenting Stakeholder or any of its respective subsidiaries (including, for the avoidance of doubt, any Term Loan Claims acquired pursuant to any Transfer); <u>provided</u>, <u>however</u>, that the Company Parties shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, any class of the Term Loan Claims held by the Consenting Stakeholders collectively; and, <u>provided</u>, <u>further</u>, that if requested by the Bankruptcy Court, the Company Parties may disclose the names of any Consenting Stakeholder (at the institution level) at a hearing in connection with the Chapter 11 Cases, but not the principal amount or percentage of the Term Loan Claims held by any such Consenting Term Loan Lender or any of its respective subsidiaries (including, for the avoidance of doubt, any Term Loan Claims acquired pursuant to any Transfer).  Notwithstanding the foregoing, the Consenting Stakeholders hereby consent to the disclosure of the fact that the Company Parties executed this A&R Agreement and the  terms, and contents thereof this A&R Agreement by the Company Parties in the Definitive Documents or as otherwise required by law or regulation; <u>provided</u>, <u>however</u>, that (i) if any of the Company Parties determines that it is required by the Definitive Documents or otherwise required by law or regulation to attach a copy of this A&R Agreement, any Joinder or Transfer Agreement to any Definitive Documents or any other filing or similar document relating to the transactions contemplated hereby, it will redact any reference to or identifying information concerning a specific Consenting Stakeholder and such Consenting Stakeholder's holdings (including before filing any pleading with the Bankruptcy Court) and (ii) if disclosure of additional identifying information of any Consenting Stakeholders is required by applicable Law, advance notice of the intent to disclose such information, if permitted by applicable Law, shall be given by the disclosing Party to each Consenting Stakeholder (who shall have the right to seek a protective order prior to disclosure).  The Company Parties further agree that such information shall be redacted from "closing sets" or other representations of the fully executed Agreement, any Joinder or Transfer Agreement.  Notwithstanding the foregoing, the Company Parties will submit to counsel for the Consenting Stakeholders all press releases, public filings, public announcements, or other communications with any news media, in each case, to be made by the Company Parties relating to this A&R Agreement or the transactions contemplated hereby and any amendments thereof at least two (2) Business Days (it being understood that such period may be shortened to the extent there are exigent circumstances that require such public communication to be made to comply with applicable Law) in advance of release, will take such counsel's view with respect to such communications into account and shall not disseminate to any news media any press releases, public filings, public announcements, or other communications relating to this A&R Agreement or the transactions contemplated hereby and any amendments thereof without first receiving the prior written consent of the Required Consenting Term Loan Lenders, with such consent not to be unreasonably delayed, conditioned, or withheld.  Nothing contained herein shall be deemed to waive, amend or modify the terms of any Confidentiality Agreement.

16.22.  Fees and Expenses.  Regardless of whether the Restructuring Transactions are consummated, the Company Parties shall promptly pay in cash all reasonable and documented fees and expenses of (i) (a) Gibson Dunn, as counsel to the Consenting Term Loan Lenders, and (b) Greenhill, as financial advisor to the Consenting Term Loan Lenders and (ii) any consultants or other professionals retained by the Consenting Term Loan Lenders represented by Gibson Dunn in connection with the Company Parties or the Restructuring Transactions with the consent of the Company Parties (not to be unreasonably withheld), in each case, in accordance with the engagement letters of such consultant or professional signed by the Company Parties, including, without limitation, any completion fees contemplated therein, and in each case, without further order of, or application to, the Bankruptcy Court but such consultant or professionals (collectively, the "**Consenting Term Loan Lender Fees and Expenses**"); provided, however, that simultaneously with the execution of this A&R Agreement, the Company Parties shall pay all such unpaid Consenting Term Loan Lender Fees and Expenses incurred at any time prior to the Amendment Effective Date.

16.23.  Relationship Among Parties.  Notwithstanding anything to the contrary herein, the duties and obligations of the Consenting Stakeholders under this A&R Agreement shall be several, not joint.  None of the Consenting Stakeholders shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to each other, any Consenting Stakeholder, any Company Party, or any of the Company Party's respective creditors or other stakeholders, and there are no commitments among or between the Consenting Stakeholders, in each case except as expressly set forth in this A&R Agreement.  It is understood and agreed that any Consenting Stakeholder may trade in any debt or equity securities of any Company Parties without the consent of the Company or any Consenting Stakeholder, subject to Section 9 of this A&R Agreement and applicable securities laws.  No prior history, pattern or practice of sharing confidence among or between any of the Consenting Stakeholders, and/or the Company Parties shall in any way affect or negate this understanding and agreement. The Parties have no agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any securities of any of the Company Parties and do not constitute a "group" within the meaning of Section 13(d)(3) of the Exchange Act or Rule 13d-5 promulgated thereunder.  For the avoidance of doubt: (a) each Consenting Stakeholder is entering into this A&R Agreement directly with the Company and not with any other Consenting Stakeholder;  and (b) no Consenting Stakeholder shall, nor shall any action taken by a Consenting Stakeholder pursuant to this A&R Agreement, be deemed to be acting in concert or as any group with any other Consenting Stakeholder with respect to the obligations under this A&R Agreement nor shall this A&R Agreement create a presumption that the Consenting Stakeholders are in any way acting as a group.   All rights under this A&R Agreement are separately granted to each Consenting Stakeholder by the Company and vice versa, and the use of a single document is for the convenience of the Company. The decision to commit to enter into the transactions contemplated by this A&R Agreement has been made independently.

16.24.  Damages.  Notwithstanding anything to the contrary in this A&R Agreement, none of the Parties shall claim or seek to recover from any other Party on the basis of anything in this A&R Agreement any punitive, special, indirect or consequential damages or damages for lost profits.

**Section 17.**    *Fiduciary Duties.*  Notwithstanding any other provision in this A&R Agreement to the contrary, nothing in this A&R Agreement shall require the Company, nor any board of directors or managers of the Company or any Company Party, to take or refrain from taking any action pursuant to this A&R Agreement (including, without limitation, terminating this A&R Agreement pursuant to Section 12.02(c) hereof), to the extent the respective board of directors or mangers reasonably determines in good faith, based on the written advice of external counsel (including counsel to the Company), that taking, or refraining from taking, such action, as applicable, would be inconsistent with its fiduciary obligations under applicable Law, and any such action or inaction pursuant to such exercise of fiduciary duties (including, without limitation, terminating this A&R Agreement pursuant to Section 12.02(c) hereof) shall not be deemed to constitute a breach of this A&R Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed this A&R Agreement on the day and year first above written.

[*Signature Pages Follow*]

[Signature Pages Intentionally Omitted]

## EXHIBIT A

**Amended and Restated Restructuring Term Sheet**

**EXECUTION VERSION**

# 4L TECHNOLOGIES

# RESTRUCTURING TERM SHEET

This term sheet (this "**Term Sheet**") summarizes certain terms and conditions (and does not purport to summarize all of the terms and conditions) of the proposed restructuring described below (the "**Restructuring**").  This Term Sheet is presented for discussion purposes only, does not constitute a commitment to provide, accept, or consent to any financing or otherwise create any implied or express legally binding or enforceable obligation on any party (or any affiliates of a party), at law or in equity, to negotiate or enter into definitive documentation related to the Restructuring or to negotiate in good faith or otherwise.

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER TO SELL OR BUY, OR THE SOLICITATION OF AN OFFER TO SELL OR BUY ANY SECURITIES OR A SOLICITATION OR ACCEPTANCE OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE (AS DEFINED BELOW), IT BEING UNDERSTOOD THAT ANY SUCH OFFER OR SOLICITATION WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE LAW.**

Without limiting the generality of the foregoing, this Term Sheet and the undertakings contemplated herein are subject in all respects to the negotiation, execution and delivery of definitive documentation in form and substance consistent with this Term Sheet and otherwise acceptable to the Company Parties and the Consenting Stakeholders as well as the satisfactory completion of due diligence (including, without limitation, with respect to the tax implications of the Restructuring).

This Term Sheet, together with the associated amended and restated restructuring support agreement by and among the Company Parties, the Consenting Term Loan Lenders signatories thereto, and the Consenting Sponsors (each as defined below) signatory thereto dated as of December 10, 2019 (the "**A&R Restructuring Support Agreement**") is provided as part of a settlement proposal in furtherance of settlement discussions and is entitled to protection from any use or disclosure to any party or person pursuant to Federal Rule of Evidence 408 and any applicable statutes, doctrines or rules protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions.[1]

| Restructuring Terms | |
|---|---|
| **Overview of the Restructuring** | This Term Sheet contemplates the restructuring of 4L Holdings Corporation, a Delaware corporation (the "**Company**"), and certain of its subsidiaries identified on Annex 1 attached to this Term Sheet (each a "**Company Party**," and collectively, the "**Company Parties**").  The restructuring will be consummated |

---

[1]    Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the A&R Restructuring Support Agreement.

pursuant to either (a) an out-of-court exchange transaction (the "**Out-of-Court Exchange**") pursuant to definitive documents in form and substance acceptable to the Required Consenting Lenders (as defined below) (the "**Out-of-Court Exchange Documents**"); or (b) voluntary cases (the "**Chapter 11 Cases**") commenced by the Company Parties under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), which may be pursuant to a "prepackaged"[2] chapter 11 plan of reorganization (together with all exhibits, annexes and schedules thereto, as each may be amended, restated, amended and restated, supplemented or otherwise modified in accordance with its terms, the "**Plan**") to be confirmed by the Bankruptcy Court.

To effectuate the Restructuring, certain parties, including: (i) the Company Parties, (ii) certain term lenders (the "**Lenders**") under that certain Credit Agreement dated as of May 8, 2014, among 4L Holdings Corporation, as holdings, Clover Technologies Group, LLC and 4L Technologies Inc., as borrowers, the lenders party thereto, and Wilmington Savings Fund Society, FSB as administrative agent (as successor to Bank of America, N.A.) (the "**Agent**," and together with the Lenders, the "**Secured Parties**"), as amended through the date hereof (the "**Credit Agreement**," and the term loans thereunder, the "**Term Loans**") (those Lenders that are signatories to the Original RSA are referred to as the "**Consenting Lenders**"), and (iii) certain of the Company's current equity holders listed on **Exhibit 1** hereto collectively holding 72.8% of the Company's equity (all equity holders, the "**Sponsors**", and such Sponsors that executed the Original RSA, the "**Consenting Sponsors**" and, together with the Consenting Lenders, the "**Consenting Stakeholders**"), entered into the Original RSA, and the Company Parties and Required Consenting Lenders entered into the A&R Restructuring Support Agreement.

On the effective date of the Restructuring (the "**Effective Date**"):

(a) the Obligations under the Credit Agreement (the "**Secured Credit Agreement Claims**") shall be deemed Allowed[3] in

---

[2]    Implementation, subject to cost-benefit analysis, including with respect to potential contract and lease rejections, unsecured claims analysis, tax considerations, etc.  Advisors to work together and prioritize this analysis.

[3]    "**Allowed**" means, with respect to any claim or interest:  (a) a claim or interest as to which no objection has been filed and that is evidenced by a proof of claim or interest, as applicable, timely filed by the applicable bar date, if any, or that is not required to be evidenced by a filed proof of claim or interest, as applicable, under the Plan, the Bankruptcy Code, or a final order; (b) a claim or interest that is scheduled by the Company as neither disputed, contingent, nor unliquidated, and as for which no proof of claim or interest, as applicable, has been timely filed; or (c) a claim or interest that is Allowed (i) pursuant to the Plan, (ii) in any stipulation that is approved by the

full, and each Lender will receive its pro rata share of and interest in:

(i)  Under the Chapter 11 Cases, 100%, or under the Out-of-Court Exchange, 80% of the common stock in Reorganized Clover (each of the Company Parties, as reorganized, a "**Reorganized Clover Entity**"; such common stock, the "**New Common Stock**") (subject in each case to dilution from the Management Incentive Plan (as defined below) and the Warrants (as defined below));

(ii)  Under the Out-of-Court Exchange, a commitment payment of 20% of the New Common Stock (subject to dilution from the Management Incentive Plan (as defined below) and the Warrants (as defined below); *provided that* such payment shall only be available to Lenders that execute and deliver all necessary acceptances and consents to the Plan and Out-of-Court Exchange by no later than 14 days after the commencement of the Plan Solicitation (as defined below);

(iii)  Term loans under the Take-Back Term Loan Facility (as defined below); and

(iv)  100% of Excess Cash to the extent not distributed to the Lenders in connection with the consummation of the Imaging Sale;[4] and

---

Bankruptcy Court, or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith.  Except as otherwise specified in the Plan or any final order of the Bankruptcy Court, the amount of an Allowed claim shall not include interest or other charges on such claim from and after the Petition Date.  No claim of any entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such entity pays in full the amount that it owes such debtor or reorganized debtor, as applicable.

[4]  "**Excess Cash**" means the sum of: (a) to the extent the Imaging Sale is consummated, all net cash proceeds generated therefrom, subject to achieving the minimum cash balance levels in clause (b) of this sentence; and, as applicable, (b) all balance sheet cash in excess of (i) with respect to Imaging business, all $6.8 million of foreign cash plus $7.5 million of domestic cash, (ii) with respect to the Wireless business, consolidated cash of $7.5 million ($5.0 million to the extent the Imaging Sale is not consummated), (iii) with respect to the Teleplan business, consolidated cash of €7.5 million (€5.0 million to the extent the Imaging Sale is not consummated), (iv) post-closing peak usage needs to be determined by the Company Parties and Required Consenting Lenders in good faith (and the determination thereof shall not include customer prepayments), and (v) tax leakage (whether due to withholding tax, income tax, or other tax considerations) and repatriation costs, with the Company Parties and Required Consenting Lenders to discuss in good faith whether to instead leave cash subject to such tax leakage and repatriation costs on the balance sheet; *provided that* (y) the Imaging business shall have access to the New Senior Secured Credit Facility (as defined herein) for post-closing working capital needs; and (z) the repatriation of any foreign cash shall be subject to any non-tax limitations on the ability to repatriate such cash, *provided that* the determination of such limitations shall be made by the Company Parties in good faith and in consultation with the Consenting Lenders; *provided, further, that* (y) and

|  | (b) in exchange for: (i) the full cancellation of all existing securities issued by the Company Parties or their parent entities (the "**Existing Equity Interests**"); (ii) the waiver of all unsecured claims held by the Consenting Sponsors (including any amounts due and payable before the Company's entry into the Imaging Sale Definitive Agreement; and (iii) for other valuable consideration rendered to the Company, the Sponsors shall receive warrants for 5.0% of the New Common Stock (subject to dilution from the Management Incentive Plan (as defined below)) with a five year tenor (the "**Warrants**") and at an aggregate equity value strike price equal to the sum of the (i) principal amount of the Obligations under the Credit Agreement plus (ii) accrued interest (including accrued default interest through the Effective Date) minus (iii) net cash proceeds generated from the Imaging Sale that are used to pay down the Term Loan minus (iv) the principal amount of the Take-Back Term Loan Facility minus (v) 100% of Excess Cash to the extent not distributed to the Lenders in connection with the consummation of the Imaging Sale (collectively, the "**Initial Warrant Strike Price**"). The aggregate Initial Warrant Strike Price shall be subject to any applicable customary anti-dilution adjustment and shall be stated on a per-Warrant basis within each Warrant. The Initial Warrant Strike Price shall accrue interest at the contract rate after the Effective Date. To the extent that Reorganized Clover makes a distribution/dividend payment on account of the New Common Stock issued in exchange for the Secured Credit Agreement Claims, this distribution will reduce the Initial Warrant Strike Price (as then adjusted pursuant to customary anti-dilution provisions), on a dollar for dollar basis for each share into which such Warrant is then convertible (after taking into account any applicable customary anti-dilution adjustments) and change the warrant strike price ("**Future Warrant Strike Price**"). The Future Warrant Strike Price will accrue interest at the contract rate and will be adjusted (by deducting) additional distributions/dividends to the extent made; The Warrants shall be entitled to Black Scholes protection for the first thirty (30) months of the Warrants' tenor. |
|---|---|
| **Company Transactions** | The Company, pursuant to the terms and conditions of the Credit Agreement and in consultation with the Required Consenting |

---

(z) shall be subject to the Company Parties' and Required Consenting Lenders' mutual understanding of the quantum of capital impacted thereby.

Lenders:[5]  (a) may determine to sell its Imaging business (the "**Imaging Sale**"); pursuant to the Imaging SPA (as defined below) and (b) has committed to acquire AMS Holding B.V., a private limited liability company incorporated under the laws of the Netherlands ("**Teleplan**") pursuant to a share purchase agreement (the "**Teleplan SPA**") in form and substance acceptable to the Required Consenting Lenders (the "**Teleplan Acquisition**").

For the avoidance of doubt, to the extent the Imaging Sale is consummated prior to the commencement (if applicable) of the Chapter 11 Cases, the net cash proceeds generated therefrom (taking into account post-closing capital requirements of the Teleplan business, tax leakage and other similar considerations) shall be used to pay down the Secured Credit Agreement Claims on the closing date of the Imaging Sale in accordance with the terms of that certain Seller Agent Agreement dated as of November 14, 2019, between 4L Holdings Corporation, certain of its affiliates and subsidiaries, and Wilmington Savings Fund Society, FSB as administrative agent.

The Company Parties shall take all commercially reasonably necessary action to ensure that all Property (other than Excluded Property (as defined in the Credit Agreement)), of any Domestic Subsidiary (as defined in the Credit Agreement) (other than Excluded Subsidiaries (as defined in the Credit Agreement)) acquired in connection with the Teleplan Acquisition, becomes Collateral (as defined in the Credit Agreement) promptly following closing (and in any event within 60 days of closing or such longer period as determined by the Agent in its sole discretion), subject to documentation in form and substance reasonably acceptable to the Required Consenting Lenders, provided that within five (5) business days of the closing of the Teleplan Acquisition, the Company Parties shall take all commercially reasonably necessary action to ensure that at least 65% of the stock of AMS Acquisition, B.V. becomes Collateral, subject to documentation in form and substance reasonably acceptable to the Required Consenting Lenders.

To the extent the Company, in consultation with the Required Consenting Lenders, determines to move forward with the Imaging Sale, the Imaging Sale shall be consummated no later than January 8, 2020 (the "**Imaging Sale Milestone Date**").  For the avoidance of doubt, the Imaging Sale Milestone Date shall be a Milestone; *provided*, *however*, that the Company Parties shall

---

[5]  "**Required Consenting Lenders**" means, at the relevant time, Consenting Lenders whose Term Loans represent more than 50 percent in amount of the aggregate Term Loans held by the Consenting Lenders.

|  | use commercially reasonable efforts to consummate the Imaging Sale prior to December 17, 2019 or as soon as reasonably practicable thereafter. |
|  | In the event the Imaging Sale is not consummated, as discussed further in this Term Sheet, the Company Parties will separate the entities containing the Imaging business and the Wireless business in a tax-efficient manner (provided that the entities will share a single capital structure) and subject to the consent of the Required Consenting Lenders. |

| **Use of Cash Collateral and Adequate Protection** ||
|---|---|
| **Generally** | Prior to the filing of the Chapter 11 Cases, the Company Parties and Consenting Lenders shall negotiate terms for the consensual use of cash collateral, which terms, for the avoidance of doubt, shall be memorialized in each of the Cash Collateral Orders (as defined below) and shall include customary terms and conditions related to the adequate protection to be provided to the Secured Parties (as further set forth herein). |
| **Cash Collateral Orders** | The Company Parties shall seek, and the Consenting Lenders and the Sponsors shall support, entry of interim (the "**Interim Cash Collateral Order**") and final orders (the "**Final Cash Collateral Order**" and, together with the Interim Cash Collateral Order, the "**Cash Collateral Orders**") authorizing the Company Parties to use cash collateral during the Chapter 11 Cases, in each case, in form and substance acceptable to the Required Consenting Lenders. |
| **Adequate Protection** | The Cash Collateral Orders shall provide, among other things, the Lenders with adequate protection in form and substance acceptable to the Company Parties and Required Consenting Lenders, including without limitation: (a) current cash payment of interest and expenses under the Credit Agreement; (b) the provision of replacement liens to the extent of any diminution in value of the collateral (the "**Prepetition Collateral**") securing the Secured Credit Agreement Claims (as defined herein) ("**Diminution in Value**"); (c) first-priority liens on unencumbered assets for the Secured Parties to the extent of any Diminution in Value; (d) reimbursement of the reasonable and documented fees and expenses of the Lenders (including, without limitation, the fees and expenses of the Ad Hoc Group Professionals (as defined herein)); and (e) superpriority administrative expense claims pursuant to section 507(b) of the Bankruptcy Code to the extent of any Diminution in Value, provided, however, that such adequate protection shall be subject |

6

|  | to customary limitations for controlled foreign corporation and non-U.S. tax considerations. |
|---|---|
| **Cash Collateral Budget** | The use of cash collateral in the Chapter 11 Cases shall be subject to the budget for the use of cash collateral (the "**Cash Collateral Budget**"), which shall be in form and substance acceptable to the Required Consenting Lenders, and shall contain, among other things, a weekly cash flow reporting requirement.  In addition, any revisions or modifications to the Cash Collateral Order, the Cash Collateral Budget, the A&R Restructuring Support Agreement, or this Term Sheet shall be subject to the consent of, and in form and substance acceptable to, the Required Consenting Lenders. |
| **Right to Credit Bid** | Subject to entry of the Final Cash Collateral Order, the Lenders shall have the right to credit bid as part of any asset sale process or plan sponsorship process, and shall have the right to credit bid the full amount of their claims during any sale of the Company's assets (in whole or in part), including without limitation sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code; *provided that* such relief will be binding on the Debtors' chapter 11 estates and all parties in interest upon entry of the Final Cash Collateral Order. |
| **Stipulations** | The Cash Collateral Orders shall contain stipulations as to, among other things, the amount and priority of the secured indebtedness under the Credit Agreement, which shall be subject to a customary challenge period, *provided that* such challenge period must terminate no later than three days before the date of the hearing at which the Bankruptcy Court shall consider confirmation of the Plan. |
| **Waivers** | The Final Cash Collateral Order shall contain:  (a) a waiver of the "equities of the case" exception to section 552(b) of the Bankruptcy Code; (b) a waiver of the ability to surcharge the Prepetition Collateral, including under section 506(c) of the Bankruptcy Code; and (c) a waiver of the equitable doctrine of "marshaling" with respect to the Prepetition Collateral; *provided that* the Interim Cash Collateral Order shall also contain clause (c), in each case in favor of the Lenders. |
| **Proof of Claim** | The Lenders will not be required to file a proof of claim in connection with the Chapter 11 Cases. |
| **Reporting and Financial Covenants** | The use of cash collateral shall be subject to the following covenants: |

(a) **Budget Variance Covenant**

    (i)    As of the end of every one week period commencing (i) with respect to the Debtors collectively (the "**Debtor Group**") on the second full week following the Petition Date (as defined below) and (ii) with respect to the Debtors' non-Debtor affiliates collectively (the "**Non-Debtor Group**") on the fourth full week following the Petition Date, as it pertains to the Debtor Group and Non-Debtor Group, with each such collective group measured separately (A) the sum of actual cash receipts during the applicable Test Period (as defined below) shall not be less than 85% of the projected "cash receipts" for such Test Period as set forth in the Cash Collateral Budget and (B) the sum of the Debtor Group's or the Non-Debtor Group's (as applicable) actual operating cash disbursements during such Test Period shall not exceed 110% of the projected "operating cash disbursements" (which shall in each case include capital expenditures and exclude restructuring related expenditures) for such Test Period as set forth in the Cash Collateral Budget. Beginning on the fourth full week following the Petition Date, the thresholds above shall be 90% with respect to (A) and 110% with respect to (B). For each of the foregoing, variance testing will be done, to the extent relevant, on a segment basis bifurcating the Imaging business from the Wireless business (the latter also encompassing the Teleplan business to the extent the Teleplan Acquisition closes prior to the Petition Date).[6]

(b) **Test Period**

    (i)    Actual cash receipts and operating cash disbursements shall be calculated on a cumulative basis commencing with the first full week after the Petition Date (as defined below).

(c) **Cash Transfers to Non-Debtors**

Transfers of cash from any Debtor to any member of the Non-Debtor Group shall be prohibited unless expressly authorized under the Cash Collateral Budget.

(d) **Critical Vendor Payments**

---

[6]    The Debtors and their non-Debtor affiliates will be forecasted separately in terms of receipts and disbursements.

| | The amount of critical vendor payments for which the Company Parties may seek authority shall be subject to the consent of the Required Consenting Lenders. |
|---|---|
| **Treatment of Claims and Interests Pursuant to the Plan (If Applicable)** ||
| **Administrative, Priority and Tax Claims** | On or as soon as practicable after the later to occur of (i) the Effective Date and (ii) the date such claim becomes Allowed (or as otherwise set forth in the Plan), each holder of an administrative, priority or priority tax claim will, with the reasonable consent of the Required Consenting Lenders, either be satisfied in full, in cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| **Secured Credit Agreement Claims** | The Secured Credit Agreement Claims shall be deemed Allowed in full and, on the Effective Date, each Lender will receive its pro rata share of: <br><br>(a) 100% of the New Common Stock (subject to dilution for the Management Incentive Plan and the Warrants); <br><br>(b) term loans under the Take-Back Term Loan Facility (as defined below); and <br><br>(c) 100% of Excess Cash to the extent not distributed to the Lender in connection with the consummation of the Imaging Sale. |
| **Other Secured Claims[7]** | In full and final satisfaction of each Allowed Other Secured Claim against the Company Parties, each holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such claims, either (a) payment in full in cash, (b) delivery of the collateral securing any such claim and payment of any interest required under section 506(b) of the Bankruptcy Code, (c) reinstatement of such claim under section 1124 of the Bankruptcy Code, (d) other treatment rendering such claim unimpaired or (e) the indubitable equivalent of such claim, *provided that* the Company Parties' selection of treatment for each individual claim shall be subject to the reasonable consent of the Required Consenting Lenders. |
| **General Unsecured Claims[8]** | Allowed general unsecured claims shall receive payment in full in cash, reinstatement of such Claims, or such other treatment |

---

[7] "**Other Secured Claim**" means any secured claim against the Company, including any secured tax claims (to the extent applicable), other than a Secured Credit Agreement Claim.

[8] Treatment of General Unsecured Claims subject to cost-benefit analysis and further analysis by the Company's advisors and GD/GH. Company Parties' advisors to provide a list of contracts and leases to be rejected, as well as an estimate of all unsecured claims, including the portion of such claims that would be treated as critical vendor claims under a Plan.

9

|  | that leaves such Claims unimpaired; *provided that* subject to, and upon the occurrence of, the Effective Date, the Sponsors, in their capacities as such, shall be deemed to have waived all General Unsecured Claims held thereby (including any claims for accrued and unpaid management fees payable by the Company). |
|---|---|
|  | Holders of such unsecured claims will not be required to file any proof of claim in the Chapter 11 Cases. |
| **Existing Equity Interests** | On the Effective Date, in exchange for:  (a) the full cancellation of all Existing Equity Interests; (b) waiving entitlement to General Unsecured Claims; and (c) substantial value provided to the Company, the Sponsors shall receive the Warrants. |
| **Intercompany Claims** | Unless otherwise provided for under the Plan, on the Effective Date, intercompany claims shall be reinstated, compromised, cancelled, setoff, contributed or distributed, or otherwise addressed at the election of the Company Parties or the Debtors, subject to the reasonable consent of the Required Consenting Lenders, such that intercompany claims are treated in a tax-efficient manner. |
| **Intercompany Interests** | Equity interests in any Company Party held by another Company Party will be preserved or reinstated on the Effective Date. |
| **Voting Rights** | The Lenders and holders of Existing Equity Interests will be the only holders of claims or interests entitled to vote to accept or reject the Plan.  All other holders of claims or interests will be deemed to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code. |
| **Other Restructuring Terms and Transactions** ||
| **New Senior Secured Credit Facility** | The Company Parties shall use commercially reasonable efforts to obtain a senior secured revolving credit facility or delayed draw term loan facility in form and substance acceptable to the Required Consenting Lenders (the "**New Senior Secured Credit Facility**" or the "**Exit Financing**")[9] prior to the Effective Date. The liens securing the New Senior Secured Credit Facility shall be senior to the liens securing the Take-Back Term Loan Facility. |
|  | Binding commitments, if obtained, from the applicable lenders for the New Senior Secured Credit Facility shall be obtained by the Company Parties, in consultation with the Required Consenting Lenders, on or prior to the Exit Financing Commitment Deadline (as defined below), *provided that* if the |

---

[9]   Sizing of New Senior Secured Credit Facility to be subject to ongoing advisor discussions; intent is to raise a facility for working capital needs, which may constitute or include an ABL facility if the collateral supports such a facility.  If Imaging Sale does not close, Consenting Lenders want the Exit Facility in place to support both businesses.

|  | New Senior Secured Credit Facility is provided by (i) any affiliate of any Company Party or (ii) any existing lender of the Company, the Consenting Lenders shall have the right to participate in the facility on a pro rata basis. |
|  | The Company Parties shall use commercially reasonable efforts to obtain the New Senior Secured Credit Facility for the Wireless business prior to the Effective Date. |
| **Take-Back Term Loan Facility** | On the Effective Date, the Company shall enter into a new take-back term loan facility with the Lenders (the "**Take-Back Term Loan Facility**"), which shall be in the Applicable Amount (as defined below) and include but not be limited to the following terms:<br><br>• Interest rate: L + 750 bps (1% LIBOR floor)<br><br>• Maturity: 4 years<br><br>• Amortization: 1.0% first year, 2.0% second year, and 5.0% thereafter, in each case, per annum, payable quarterly in arrears on the first business day of each fiscal quarter<br><br>• ECF Sweep: 50%<br><br>• Rating: Company Parties shall use commercially reasonable efforts to obtain a credit rating from each of Standard & Poor's Ratings Services ("**S&P**") and Moody's Investors Services, Inc. ("**Moody's**") for the Take-Back Term Loan Facility and a corporate family rating (with no requirement for a specific rating) for the Borrower from each of S&P and Moody's<br><br>• All Credit Parties (as defined in the Credit Agreement) as obligors, subject to customary carveouts to be agreed<br><br>• Secured by a senior lien on substantially all assets of the Credit Parties (as defined in the Credit Agreement), subject to customary carveouts to be agreed, provided that such lien shall be subordinated to the liens securing the New Senior Secured Credit Facility and Post-Sale Teleplan Factoring Facility (if any)<br><br>• No financial maintenance covenants<br><br>"**Applicable Amount**" means:[10] |

---

[10]    NTD – Revised debt levels to be discussed.

| | |
|---|---|
| | (a) If both the Imaging Sale and Teleplan Acquisition are consummated, $80 million;[11] |
| | (b) If the Imaging Sale is not consummated and the Teleplan Acquisition is consummated, $230 million.[12] |
| | In the event that the Imaging Sale is not consummated, in connection with the Restructuring, the Company Parties shall separate the entities containing the Company's Imaging and Wireless businesses on the Effective Date (the "**Separation**"), with the operating companies for each business line rolling up to the same single holding or intermediate holding company that shall be the Borrower under the Take Back Term Loan Facility, and the New Common Stock contemplated hereunder to comprise the issuance and distribution of common stock by such holding company or intermediate holding company. The Take-Back Term Loan Facility shall be a single facility, with all operating companies as obligors and pledgors, and with the loans under the Take-Back Term Loan Facility incurred by a holding or intermediate holding company. |
| **Teleplan Factoring Facility** | The Company Parties shall use commercially reasonable efforts to either (i) enter into an agreement with Teleplan's existing factoring lenders (the "**Teleplan Factoring Lenders**"), in form and substance acceptable to the Required Consenting Lenders, to extend the maturity of Teleplan's existing factoring facility (the "**Teleplan Factoring Facility**") to a date acceptable to the Required Consenting Lenders, or (ii) receive binding commitments or enter into definitive documents with respect to one or more vendor financing facilities or factoring arrangements as a replacement for a portion or all of the Teleplan Factoring Facility pursuant to documents in form and substance acceptable to the Required Consenting Lenders (the "**Post-Sale Teleplan Factoring Facility**"), as a replacement for the Teleplan Factoring Facility; provided that, any documentation memorializing the Post-Sale Teleplan Factoring Facility shall not permit the acceleration of the Post-Sale Teleplan Factoring Facility as a result of the Restructuring. |

---

[11]    The allocation of the Take-Back Term Loan Facility with respect to the Teleplan business shall be reduced on a dollar-for-dollar basis by the funded amount of the Post-Sale Teleplan Factoring Facility (if any).

[12]    In this scenario, the capital structure for the Wireless business may require additional new money financing or capital contributions, which may be funded by the Consenting Lenders on terms and structure to be discussed.

| | |
|---|---|
| **Milestones**[13] | In addition to the Imaging Sale Milestone Date, the following shall be Milestones under the A&R Restructuring Support Agreement. |
| | (a) On or prior to November 22, 2019, the Company Parties shall either (i) sign definitive documentation for the Imaging Sale pursuant to and in accordance with definitive documents in form and substance acceptable to the Required Consenting Lenders (the "**Imaging SPA**"), or (ii) confirm to the Consenting Lenders that the Company Parties will not execute the Imaging SPA or close the Imaging Sale (the delivery of such confirmation or the termination of the executed Imaging SPA (if any) according to its terms, the "**Imaging Sale Abandonment**"); [14] |
| | (b) On or prior to November 26, 2019, the Company Parties shall hold a conference call to provide the advisors to the Consenting Lenders with all material updates on their contact with the Teleplan Customers. |
| | (c) On or prior to November 27, 2019, the Company Parties shall produce to the Ad Hoc Group Professionals (on behalf of and for further delivery to the Consenting Lenders) a teaser, process letter, contact log, and non-disclosure agreement with respect to the Exit Financing, in each case in a form acceptable to the Required Consenting Lenders, and shall commence solicitation of non-binding indications of interest ("**Exit Financing IOIs**") to provide the Exit Financing in a manner reasonably satisfactory to Greenhill & Co., LLC ("**Greenhill**"); |
| | (d) On or prior to November 27, 2019, the Company Parties shall deliver to the Consenting Lenders working drafts of the First Day Pleadings, the Plan, the disclosure statement in support of the Plan (the "**Disclosure Statement**"), which shall be in form and substance reasonably acceptable to the Required Consenting Lenders on or prior to the commencement of Plan Solicitation or the Petition Date, as applicable; |
| | (e) On or prior to December 3, 2019, the Company Parties shall have contacted each of the Teleplan Customers in connection with its customer due diligence process; the "**Teleplan** |

---

[13]   All Milestones under this Term Sheet (including the Imaging Sale Milestone Date) shall be enforceable through the A&R Restructuring Support Agreement.  Company must provide information that can be shared with clients (subject to confidentiality considerations), provide regular updates on the Teleplan Acquisition process and give advisors comfort that the Teleplan team is making progress toward closing.

[14]   In the event of the Imaging Sale Abandonment, the Exit Financing shall be structured to support both the wireless and imaging businesses.

**Customers**" are those seven customers out of the top ten Teleplan customers based on last-twelve-month revenues through June 30, 2019, which seven customers are determined in the discretion of the Company Parties to have the most strategic importance to the Company Parties following the consummation of the Teleplan Acquisition.

(f) On or prior to December 4, 2019 (but not earlier than December 3, 2019), the Company Parties shall provide written notice to the Consenting Lenders either (i) confirming that there are no material issues (including without limitation any issues that would provide any party to the Teleplan Acquisition Definitive Agreement with the ability to terminate such agreement) regarding the Teleplan Customers, or (ii) providing a detailed description of any such issues.

(g) On or prior to 5:00 P.M. (Eastern Standard Time) on December 3, 2019, the Company Parties shall disclose, and make generally available to the public, all "Cleansing Material" (as such term is defined in an applicable Confidentiality Agreement) to the extent required under any Confidentiality Agreement with any Consenting Term Loan Lender;

(h) The closing date of the Teleplan Acquisition (the "**Teleplan Acquisition Closing Date**") shall occur no later than December 9, 2019;

(i) On or prior to December 13, 2019, the Company Parties shall launch the solicitation of consents to the Out-of-Court Exchange and the Plan (the "**Plan Solicitation**"), pursuant to and in accordance with definitive documents in form and substance reasonably acceptable to the Required Consenting Lenders;

(j) On or prior to December 16, 2019, the Company Parties shall produce a confidential information memorandum to the Ad Hoc Group Professionals (on behalf of and for further delivery to the Consenting Lenders) with respect to the Exit Financing in a form acceptable to the Required Consenting Lenders;

(k) (i) If the Required Consenting Lenders and the Company Parties have agreed in writing to abandon the Out-of-Court Exchange, on or prior to December 18, 2019, the Company Parties shall commence the Chapter 11 Cases (the "**Petition Date**"), pursuant to definitive documents in form and substance reasonably acceptable to the Required Consenting Lenders, and (ii) if the Required Consenting Lenders and the

14

Company Parties have not so agreed, the Out-of-Court Exchange shall close on or prior to January 10, 2020;

(l) On or prior to January 8, 2020, the Company Parties shall have received at least one Exit Financing IOI;

(m) In the event the Company determines to move forward with the Imaging Sale, the Imaging Sale shall be consummated no later than the Imaging Sale Milestone Date (i.e., January 8, 2020) pursuant to and in accordance with definitive documents in form and substance acceptable to the Required Consenting Lenders, and the Required Consenting Lenders shall deliver the Lender Release (as defined in the Imaging Sale Definitive Agreement), which Lender Release shall be effective at the Closing (as defined in the Imaging Sale Definitive Agreement) of the Imaging Sale;

(n) In the event that the Imaging Sale is consummated by the Company Parties, the Company Parties and the purchaser of the Imaging business pursuant to the Imaging Sale shall enter into a transition services agreement by no later than the Imaging Sale Milestone Date, in form and substance acceptable to the Required Consenting Lenders;

(o) On or prior to the earlier of (i) January 27, 2020 and (ii) if the Chapter 11 Cases are commenced, the date of the Confirmation Hearing (as defined below) (the earlier of such dates, the "**Exit Financing Commitment Deadline**"), the Company Parties shall obtain binding commitments from the applicable lenders under the Exit Financing in form and substance reasonably acceptable to the Required Consenting Lenders;

(p) If the Chapter 11 Cases are commenced, on the Petition Date, the Company Parties shall file the Plan and the Disclosure Statement, votes for which shall have already been solicited in connection with the Plan Solicitation;

(q) If the Chapter 11 Cases are commenced, on the Petition Date, the Company Parties shall file a motion seeking entry of an order, among other things, scheduling a combined hearing (the "**Confirmation Hearing**") with respect to confirmation of the Plan and approval of the Disclosure Statement (the "**Prepack Scheduling Order**") in form and substance reasonably acceptable to the Required Consenting Lenders;

(r) If the Chapter 11 Cases are commenced, the Court shall enter the Interim Cash Collateral Order by no later than five (5) days following the Petition Date;

15

(s) If the Chapter 11 Cases are commenced, the Court shall enter the Prepack Scheduling Order by no later than five (5) days following the Petition Date;

(t) If the Chapter 11 Cases are commenced, the Court shall enter the Final Cash Collateral Order by no later than forty-five (45) days following the Petition Date;

(u) If the Chapter 11 Cases are commenced, the Court shall enter the order confirming the Plan (the "**Confirmation Order**") in form and substance reasonably acceptable to the Required Consenting Lenders no later than forty-five (45) days following the Petition Date;

(v) The Effective Date shall occur no later than the Outside Date; and

(w) If (i) the Company determines, in consultation with the Consenting Term Loan Lenders, it is necessary to file any of the entities acquired in connection with the Teleplan Acquisition, or (ii) if the Imaging Sale is not consummated prior to December 18, 2019, then the dates set forth in Milestones (j), (k)(i), (o), and all dates measured therefrom, shall automatically be extended by twenty-one (21) days.

For the avoidance of doubt, at any point subsequent to the execution of the Original RSA, the Company Parties and the Required Consenting Lenders may determine, together, to terminate any efforts to consummate the Out-of-Court Exchange, and the Company Parties shall commence the Chapter 11 Cases as soon as reasonably practicable thereafter (subject to and in accordance with the Milestones).

| | |
|---|---|
| **Management Incentive Plan** | The Company Parties and the Required Consenting Lenders shall negotiate in good faith to determine a mutually agreed-upon incentive program for the officers and other management of the Reorganized Clover Entities (the "**Management Incentive Plan**"), which may provide for equity-based incentive awards, issued at the applicable divisions or operating company levels, of up to 10%, which shall include options to purchase New Common Stock and which may include New Common Stock, options, warrants, and restricted stock units or other instruments. Within 90 days of its formation, the Company's initial board of directors shall make a determination on such plan and shall determine an appropriate vesting schedule, including whether such plan is time-based, performance-based, or a combination of the two. |
| **Board of Directors and Corporate Governance** | The number and identity of initial board of directors for the Company shall be determined by the Required Consenting |

16

| | Lenders. The board of directors shall include the CEO of the Company. |
| | Holders of New Common Stock shall be (or be deemed) parties to a shareholder agreement (the "**New Shareholders' Agreement**") in form and substance acceptable to the Required Consenting Lenders, subject to the consent rights set forth in the A&R Restructuring Support Agreement. |
| **Discharge, Release, Injunction, and Exculpation** | Certain matters with respect to release, discharge, injunction, and exculpation provisions in connection with the Restructuring are attached hereto as **Exhibit 2**. |
| **Avoidance Actions** | **The Company Parties shall waive any Causes of Action arising under sections 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code or any other state or federal law.** |
| **Indemnification** | Under the Restructuring, all indemnification obligations in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Company Parties, as applicable, shall be assumed and remain in full force and effect after the Effective Date, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose by the reorganized Company Parties, as applicable. |
| | The Reorganized Clover Entities shall purchase new D&O liability insurance policies for directors, officers, employees, attorneys, or other professionals and agents of the reorganized Company Parties on terms and conditions acceptable to the Required Consenting Lenders. |
| **Retention of Jurisdiction** | The Plan will provide for the retention of jurisdiction by the Bankruptcy Court for usual and customary matters. |
| **Tax Issues** | The terms of the Restructuring, including whether the Restructuring is structured as a taxable transaction (in whole or in part), shall be structured to preserve or otherwise maximize favorable tax attributes (including tax basis) of the Company Parties to the extent practicable and commercially reasonable as determined by the Company Parties, the Required Consenting Lenders, and the Consenting Sponsors. |
| **Exemption Under Section 1145 of the Bankruptcy Code** | The Plan and Confirmation Order, to the extent applicable, shall provide that the issuance of any securities thereunder, including the New Common Stock and the Warrants, will be exempt from |

17

| | |
|---|---|
| | securities laws in accordance with section 1145 of the Bankruptcy Code. |
| **Conditions to the Effective Date** | The following conditions precedent to the effectiveness of the Out-of-Court Exchange or the Plan as applicable, shall be satisfied or waived by the Required Consenting Lenders, and the Effective Date shall occur on the date upon which the last of such conditions are so satisfied and/or waived:<br><br>• To the extent the Chapter 11 Cases are commenced:<br><br>    ○ The Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably acceptable to the Required Consenting Lenders, and the Confirmation Order shall not be stayed, modified, or vacated and shall not be subject to any pending appeal, and the appeals period for the Confirmation Order shall have expired; *provided* that the requirement that the Confirmation Order not be subject to any pending appeal and the appeals period for the Confirmation Order shall have expired may be waived by any Consenting Term Loan Lender.<br><br>• Under the Out-of-Court Exchange:<br><br>    ○ The Required Consenting Lenders shall have consented in writing to any incremental incentive or transaction fees set forth in the Disclosed Letters that are payable based on consummation of a Restructuring without the commencement of one or more chapter 11 cases.<br><br>• Under either the Out-of-Court Exchange or the Chapter 11 Cases:<br>    ○ The Exit Financing shall have closed and be in full force and effect;<br><br>    ○ If applicable, the Imaging Sale and/or the Teleplan Acquisition and Post-Sale Teleplan Factoring Facility shall have closed;<br><br>    ○ The A&R Restructuring Support Agreement shall continue to be in full force and effect;<br><br>    ○ All agreements or other arrangements by and among the Company Parties and any of the Sponsors or their respective Affiliates or related parties shall be terminated with no consideration payable in connection therewith as of the Effective Date;<br><br>    ○ The Company Parties shall have paid or reimbursed all reasonable and documented fees and out-of- |

<table>
<tr>
<td></td>
<td>

pocket expenses of the Lenders (as applicable) in connection with the Restructuring, including the reasonable and documented fees and expenses of the Ad Hoc Group Professionals (as defined below);

o All of the Company Parties' reasonable and documented Professional Fee Claims shall have been paid in full or, in the event of the Chapter 11 Cases, amounts sufficient to pay such Professional Fee Claims after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval of the Professional Fee Claims by the Bankruptcy Court;

o Each document or agreement constituting the Definitive Documentation shall be in form and substance consistent with the A&R Restructuring Support Agreement and this Term Sheet, and reasonably acceptable to the Required Consenting Lenders;

o All governmental approvals and consents that are legally required for the consummation of the Restructuring shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, shall have expired; and

o Such other conditions precedent to the Effective Date, as are customary and otherwise reasonably requested by the Required Consenting Lenders and acceptable to the Company Parties.

</td>
</tr>
<tr>
<td><strong>Fees and Expenses of the Consenting Lenders</strong></td>
<td>The Company Parties shall pay or reimburse all reasonable documented fees and out-of-pocket expenses of the Consenting Lenders in connection with the Restructuring (including all prior restructuring proposals) on an ongoing basis and as of the Effective Date, including the reasonable and documented fees and expenses of Gibson, Dunn & Crutcher LLP, Greenhill, and one local counsel retained in connection with the Chapter 11 Cases, as applicable) (collectively, the "<strong><u>Ad Hoc Group Professionals</u></strong>"), regardless of whether the Effective Date ever occurs.</td>
</tr>
<tr>
<td><strong>Consent and Consultation Rights</strong></td>
<td>The consent and consultation rights over the Definitive Documents are as set forth in the A&R Restructuring Support Agreement. To the extent there is any inconsistency between the A&R Restructuring Support Agreement and this Term Sheet, the A&R Restructuring Support Agreement shall govern except with</td>
</tr>
</table>

19

| | respect to the conditions to the Effective Date, which shall be governed by this Term Sheet. |

EXECUTION VERSION

## Exhibit 1

## Consenting Sponsors

[Intentionally Omitted]

**EXECUTION VERSION**

**Exhibit 2**

**Discharge, Release, Injunction, and Exculpation Provisions**

**CHAPTER 11 CASES RELEASES**

The release, discharge, injunction, and exculpation provisions applicable to the Restructuring shall be set forth only in the Plan, substantially as set forth below:

| | |
|---|---|
| **Discharge of Claims and Termination of Interests** | Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Debtor Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring. |
| **Released Parties** | Collectively, and in each case in its capacity as such: (a) the Debtors and the Reorganized Debtors; (b) the Secured Parties; (c) the Agent, (d) the Sponsors; (e) with respect to each of the foregoing entities, each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, and funds; and (f) with respect to each of the foregoing Entities in clauses (a) through (e), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other |

| | professional advisors (with respect to clause (e), each solely in their capacity as such); *provided*, *however*, that any Holder of a Claim or Interest in a voting Class that objects to the Plan and votes to reject the Plan (and thereby opts out of the releases) shall not be a "Released Party." |
|---|---|
| **Releasing Parties** | Collectively, and in each case in its capacity as such: (a) the Debtors and the Reorganized Debtors; (b) the Consenting Lenders; (c) the Agent, (d) the Sponsors; (e) with respect to each of the foregoing entities in clauses (a) through (d), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, and funds; (f) with respect to each of the foregoing Entities in clauses (a) through (e), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (with respect to clause (e), each solely in their capacity as such); and (k) all Holders of Claims and Interests not described in the foregoing clauses (a) through (f); *provided*, *however*, that any Holder of a Claim or Interest that (1) votes to reject the Plan and (2) objects to the releases in the Plan, shall not be a "Releasing Party" for purposes of the Plan. |
| **Releases by the Debtors** | Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part: |
| | (a) the Debtors, the Debtors' restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Original RSA; |
| | (b) any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Original RSA, the Disclosure Statement, or the Plan; or |
| | (c) the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the |

<table>
<tr>
<td></td>
<td>

pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

(d) any other act or omission, transaction, agreement, event, or other occurrence, in each case relating to any of the foregoing (a), (b), or (c), taking place on or before the Effective Date.

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

</td>
</tr>
<tr>
<td>

**Releases by Holders of Claims and Interests of the Debtors**

</td>
<td>

**As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:**

(a) **the Debtors, the Debtors' restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Original RSA;**

(b) **any transaction that is part of the Restructuring, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the order confirming the Plan in lieu of such legal opinion) created or entered into in connection with the Original RSA, the Disclosure Statement, or the Plan;**

(c) **the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of confirmation of the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or**

(d) **any other act or omission, transaction, agreement, event, or other occurrence, in each case relating to any of the foregoing (a), (b), or (c), taking place on or before the Effective Date.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or**

</td>
</tr>
</table>

25

| | |
|---|---|
| | any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. |
| **Exculpated Parties** | Collectively, and in each case in its capacity as such:  (a) the Debtors and the Reorganized Debtors and (b) with respect to each of the foregoing entities, each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, and advisors. |
| **Exculpation** | Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Original RSA and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.   The Exculpated Parties have, and, upon completion of the Plan, shall be deemed to have participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. |
| **Injunctions** | Except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that have held, hold, or may hold claims or interests that have been released pursuant to the Plan, shall be discharged pursuant to the Plan, or are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Released Parties:  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or |

26

| | with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan. |
|---|---|

## EXHIBIT B

### Form of Joinder

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Amended and Restated Restructuring Support Agreement, dated as of _____ (the "**Agreement**")[1] by and among 4L Holdings Corporation ("**4L Holdings**") and its subsidiaries bound thereto and the Consenting Stakeholders and agrees to be bound by the terms and conditions thereof to the extent the other Parties are thereby bound, and shall be deemed a "Consenting Stakeholder" under the terms of the A&R Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the A&R Agreement and makes all representations and warranties contained therein as of the date hereof and any further date specified in the A&R Agreement.

Date Executed:

_____

Name:
Title:

Address:

E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| Term Loan Claims | |

---

[1] Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

## EXHIBIT C

### Provision for Transfer Agreement

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Amended and Restated Restructuring Support Agreement, dated as of _____ (the "**A&R Agreement**"),[2] by and among 4L Holdings Corporation ("**4L Holdings**") and its Affiliates and subsidiaries bound thereto and the Consenting Stakeholders, including the transferor to the Transferee of any Term Loan Claims (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" under the terms of the A&R Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the A&R Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____

Name:
Title:

Address:

E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| Term Loan Claims | |

---

[2]    Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

## SCHEDULE 1

**Affiliates and Subsidiaries**

4L Technologies Inc.

4L Topco Corporation (DE ) (F/K/A Clover Holdings Corporation)

4L Ultimate Topco Corporation (DE)

Cartridge Collect S.A.R.L.

CAU Real Estate Company, LLC

Clover Canada Holdings, Inc.

Clover Dataproducts of Ireland Limited

Clover Environmental Solutions GMBH

Clover Environmental Solutions Ltd.

Clover EU, LLC

Clover Germany GMBH

Clover Imaging Group, LLC

Clover Imaging Intermediate Holdings, LLC

Clover Imaging, LLC

Clover International Holdings LLC

Clover Ithaca Properties, LLC

Clover Mechanical, LLC

Clover Portugal, LDA

Clover Serbia D.O.O.

Clover Technologies Canada, ULC

Clover Technologies Group Australia Pty, Ltd.

Clover Technologies Group, LLC

Clover Vietnam Co., Ltd.

Clover Wireless Canada Inc.

Clover Wireless LLC

Clover Wireless UK Limited

Dataproducts USA LLC

DPC Direct S. DE R.L. DE C.V.

Image Warehouse, LLC

Latin Parts Acquisition - Florida, LLC

Latin Parts Acquisition Holdings, SRL

Latin Parts Chile SpA

Latin Parts Colombia S.A.S.

Latin Parts DO Brasil Ltda.

Latin Parts Ecuador

Latin Parts Holdings, LLC

Latin Parts Mexico S. De R.L De C.V.

Latin Parts S.A.C.

Latin Parts SRL

MSE EMEA B.V.

MSE Europe Holdings B.V.

MSE Technologies, LLC

Periplo Ltd.

Refurb Holdings, LLC

Tecnotoner Holdings, LLC

TRS AG

Valu Tech Outsourcing, LLC

Valuetech Outsourcing S.A. De C.V.

Valutech Direct S. DE R.L. C.V.

VT Trading Company Limited

**Exhibit D**

**Financial Projections**

# Financial Projections[1]

The financial projections for the Debtors are based on the Debtors' 2020–2023 business plan (the "Financial Projections") as informed by current and projected conditions in each of the Debtors' markets and businesses.

The Financial Projections were prepared by management with the assistance of the Debtors' advisors and are based upon a number of assumptions made by management with respect to the future performance of the Debtors' operations. Although management has prepared the Financial Projections in good faith and believes the assumptions to be reasonable, there can be no assurance that such assumptions will be realized. As described in detail in the Disclosure Statement, a variety of risk factors could affect the Debtors' financial results and must be considered. Accordingly, the Financial Projections should be reviewed in conjunction with a review of the risk factors set forth in Section VIII of the Disclosure Statement and the assumptions described herein, including all relevant qualifications and footnotes.

The Debtors believe that the Plan meets the feasibility requirements set forth in section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the planning and development of the Plan and for the purposes of determining whether the Plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

The Financial Projections were not prepared with a view toward compliance with published guidelines of the United States Securities and Exchange Commission or guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. An independent auditor has not examined, compiled, or performed any procedures with respect to the prospective financial information contained in this Exhibit and, accordingly, it does not express an opinion or any other form of assurance on such information or its achievability. The Debtors' independent auditor assumes no responsibility for, and denies any association with, the prospective financial information.

## Principal Assumptions for the Financial Projections

Jefferies relied on the Debtors' representation and warranty that the Financial Projections provided by the Debtors to Jefferies (1) have been prepared in good faith, (2) are based on fully disclosed assumptions which, in light of the circumstances under which they were made, are reasonable, (3) reflect the Debtors' best currently available estimates, and (4) reflect the good faith judgments of the Debtors. Jefferies does not offer an opinion as to the attainability of the Financial Projections. The future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors, and consequently are inherently difficult to project. The Reorganized Debtors' actual future results may differ materially from the Financial Projections and as a result, the actual total enterprise value of the

---

[1]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Disclosure Statement.

Reorganized Debtors may be significantly higher or lower than the estimated range herein. *See* Section VIII of the Disclosure Statement entitled "Risk Factors."

In deciding whether to vote to accept or reject the Plan, Holders of Claims entitled to vote to accept or reject the Plan must make their own determinations as to the reasonableness of such assumptions and the reliability of the Financial Projections. *See* Section VIII of the Disclosure Statement entitled "Risk Factors."

Under Accounting Standards Codification "ASC" 852, "Reorganizations," the Debtors note that the Financial Projections reflect the operational emergence from chapter 11 but not the impact of fresh start accounting that will likely be required upon the occurrence of the Effective Date. Fresh start accounting requires all assets, liabilities, and equity instruments to be valued at "fair value." The Financial Projections account for the reorganization and related transactions pursuant to the Plan. While the Debtors expect that they will be required to implement fresh start accounting upon emergence, they have not yet completed the work required to quantify the effect upon the Financial Projections, which effect could be material.

**Safe Harbor Under the Private Securities Litigation Reform Act of 1995**

The Financial Projections contain statements which constitute "forward-looking statements" within the meaning of the Securities Act and the Securities Exchange Act. Forward-looking statements in the Financial Projections include the intent, belief, or current expectations of the Debtors and management with respect to the timing of, completion of, and scope of the current restructuring, Plan, Debtors' business plan, and market conditions, and the Debtors' future liquidity, as well as the assumptions upon which such statements are based.

While the Debtors believe that the expectations are based upon reasonable assumptions within the bounds of their knowledge of their business and operations, parties-in-interest are cautioned that any such forward-looking statements are not guarantees of future performance, involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements.

**Select Risk Factors Related to the Financial Projections**

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond the Debtors' management team's control. Many factors could cause actual results, performance, or achievements to differ materially from any future results, performance, or achievements expressed or implied by these forward-looking statements. A description of the risk factors associated with the Plan, the Disclosure Statement, and the Financial Projections is included in Section VIII of the Disclosure Statement.

**General Assumptions and Methodology**

The Financial Projections, which are presented on a consolidated basis, include the Debtors' operations for fiscal years 2020–2023. The Financial Projections for 2020 were developed using a bottoms-up approach of the Debtors' five business segments. The Financial Projections for

2021–2023 are based on longer-term trend assumptions for revenue growth and profitability by business unit. Specific growth drivers, including new business initiatives, and productivity improvements have been incorporated. Furthermore, expansion into faster-growing product categories are embedded in the revenue and margin assumptions.

The Financial Projections consist of the following unaudited pro forma financial statements for each year in the Projection Period: (1) projected consolidated statements of operations, (2) projected consolidated balance sheets, and (3) projected consolidated statements of cash flows.

**Projected Consolidated Income Statement Assumptions**

Net Revenue:  Net revenue comprises all sales to clients in the Debtors' five segments: Wireless Services, Transformation / Trade In, LCD Buyer, ITAD and Teleplan.

Cost of Goods Sold:  Cost of Goods Sold consists of direct materials expense, freight, supplies, direct labor, shared production support and facility costs.

Selling, General & Administrative:  Selling, general and administrative costs consist of expenses related to operating each of the business units.  These costs primarily comprise personnel, administrative and IT spending.

Depreciation & Amortization:  Depreciation expense is related to information technology equipment and development and leasehold improvements.  Amortization expense is related to amortization payments made on the takeback debt issued in connection with the restructuring.

One-Time Costs:  One-time costs primarily consist of addbacks for non-recurring items such as severance and integration expenses as the Debtors' implement their business plan.

Interest Expense:  Interest expense is modeled on the takeback debt from the restructuring support agreement dated December 10, 2019 and assumes a facility of $80 million with an interest rate of L + 750.

Income Tax Expense:  Income tax expense is forecasted assuming a 28% all-in tax rate applied to EBITDA less tax depreciation, amortization and restructuring items.

Foreign Exchange and Cash Add-Backs:  Foreign Exchange and Cash Add-Backs includes severance and other one-time restructuring expenses.

**Projected Consolidated Cash Flow Statement and Balance Sheet Assumptions**

Changes in Working Capital:  Changes in working capital are expected to be tied to growth in the business and terms with customers and vendors are not expected to move significantly.

Other Adjustments: Other adjustments include changes in non-working capital assets and liabilities.

<u>Capital Expenditures:</u>   Capital expenditures ("<u>capex</u>") include the Debtors' forecasts of both maintenance and growth capex.  The maintenance capex includes spending related to the upkeep of existing systems and technology.  Growth capex includes technology spend related to improving the existing infrastructure as the Debtors' implement their business plan.

<u>Shareholders' Equity:</u> Does not reflect fresh start accounting adjustments.

<u>Accounts Receivable:</u> Assumes no overall change in terms with customers.

<u>Inventory:</u> Assumes no overall change in inventory management.

<u>Accounts Payable:</u> Assumes no overall change in terms with vendors.

## Financial Projections

| Projected Consolidated Statement of Operations | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Fiscal Year Ending December 31, 2019 | | | | | | | |
| | FY 2020E | | FY 2021E | | FY 2022E | | FY 2023E | |
| Net Revenue | $ | 525.0 | $ | 542.2 | $ | 569.3 | $ | 597.7 |
| Less: Total COGS | | (447.9) | | (453.0) | | (475.6) | | (499.4) |
| Gross Profit | $ | 77.0 | $ | 89.2 | $ | 93.6 | $ | 98.3 |
| Less: Total SG&A | | (32.4) | | (30.1) | | (31.6) | | (33.1) |
| EBITDA | $ | 44.6 | $ | 59.1 | $ | 62.1 | $ | 65.2 |
| Less: Income Tax Expense / Refund | | 0.2 | | (10.8) | | (11.9) | | (12.9) |
| Less: Interest Expense | | (6.7) | | (7.2) | | (7.0) | | (6.6) |
| Less: Depreciation | | (12.1) | | (12.1) | | (12.1) | | (12.1) |
| Less: Foreign Exchange and Cash Add-Backs | | (25.7) | | (1.3) | | (0.5) | | (0.5) |
| Net Income | $ | 0.3 | $ | 27.7 | $ | 30.6 | $ | 33.1 |

| Projected Consolidated Balance Sheet | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | FY 2020E | | FY 2021E | | FY 2022E | | FY 2023E |
| **Assets** | | | | | | | | |
| Cash and Cash Equivalents | $ | 35.1 | $ | 56.5 | $ | 84.7 | $ | 115.4 |
| Accounts Receivable | | 36.1 | | 36.6 | | 38.5 | | 40.4 |
| Inventory | | 38.4 | | 39.9 | | 41.8 | | 43.9 |
| Other Current Assets | | 11.7 | | 12.0 | | 12.6 | | 13.2 |
| Total Current Assets | $ | 121.3 | $ | 145.0 | $ | 177.7 | $ | 212.9 |
| | | | | | | | | |
| PP&E and Intangibles | $ | 24.7 | $ | 20.8 | $ | 16.9 | $ | 13.1 |
| Goodwill | | 70.4 | | 70.4 | | 70.4 | | 70.4 |
| Total Assets | $ | 216.4 | $ | 236.2 | $ | 265.0 | $ | 296.4 |
| | | | | | | | | |
| **Liabilities and Shareholder's Equity** | | | | | | | | |
| Accounts Payable | $ | 38.2 | $ | 31.7 | $ | 33.3 | $ | 34.9 |
| Accrued Liabilities and Other | | 12.3 | | 12.6 | | 13.2 | | 13.9 |
| Total Current Liabilities | $ | 50.6 | $ | 44.3 | $ | 46.5 | $ | 48.8 |
| | | | | | | | | |
| Long Term Debt and Other Liabilities | $ | 79.4 | $ | 77.8 | $ | 73.8 | $ | 69.8 |
| Total Liabilities | $ | 130.0 | $ | 122.1 | $ | 120.3 | $ | 118.6 |
| | | | | | | | | |
| Shareholder's Equity | $ | 86.4 | $ | 114.1 | $ | 144.7 | $ | 177.8 |
| | | | | | | | | |
| Total Liabilities and SE | $ | 216.4 | $ | 236.2 | $ | 265.0 | $ | 296.4 |

| Projected Consolidated Statement of Cash Flows | | | | | | | |
|---|---|---|---|---|---|---|---|
| | FY 2020E | | FY 2021E | | FY 2022E | | FY 2023E |
| **Operating Activities:** | | | | | | | |
| Net Income | $ | 0.3 | $ | 27.7 | $ | 30.6 | $ | 33.1 |
| (+) Depreciation | | 12.1 | | 12.1 | | 12.1 | | 12.1 |
| (+/-) Change in Net Working Capital | | (4.2) | | (8.6) | | (2.2) | | (2.3) |
| Cash From Operations | $ | 8.2 | $ | 31.2 | $ | 40.5 | $ | 42.9 |
| | | | | | | | |
| **Investing Activities:** | | | | | | | |
| (-) Capital Expenditures | $ | (8.2) | $ | (8.2) | $ | (8.2) | $ | (8.2) |
| Cash From Investing | $ | (8.2) | $ | (8.2) | $ | (8.2) | $ | (8.2) |
| | | | | | | | |
| **Financing Activities:** | | | | | | | |
| Other Debt Borrowing / (Repayment) | $ | (0.6) | $ | (1.6) | $ | (4.0) | $ | (4.0) |
| Cash From Financing | $ | (0.6) | $ | (1.6) | $ | (4.0) | $ | (4.0) |
| | | | | | | | |
| Beginning Cash Balance | $ | 35.8 | $ | 35.1 | $ | 56.5 | $ | 84.7 |
| (+) Net Cash Flow | $ | (0.7) | $ | 21.4 | $ | 28.2 | $ | 30.6 |
| Ending Cash Balance | $ | 35.1 | $ | 56.5 | $ | 84.7 | $ | 115.4 |

**Exhibit E**

**Valuation Analysis**

## Valuation Analysis[1]

THE INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN.  THE INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS OR ANY OF THEIR AFFILIATES.

Solely for the purposes of the Plan and the Disclosure Statement, Jefferies, as restructuring advisors to the Debtors, has estimated a range of total enterprise value (the "Enterprise Value") and implied equity value (the "Equity Value") for the Reorganized Debtors pro forma for the transactions contemplated by the Plan (the "Valuation Analysis").  The Valuation Analysis is based on financial and other information provided by the Debtors' management, as well as the Financial Projections, attached to this Disclosure Statement as **Exhibit D**, and information provided by other sources.  The Valuation Analysis is as of December 13, 2019, with an assumed Effective Date of December 31, 2019.  The valuation estimates set forth herein represent valuation analyses of the Reorganized Debtors generally based on the application of customary valuation techniques to the extent deemed appropriate by Jefferies.

In preparing the Valuation Analysis, Jefferies considered a variety of financial analyses, including (1) discounted cash flow analysis; (2) comparable companies analysis; and (3) precedent transaction analysis.  Jefferies deemed a precedent transaction analysis to be of limited relevance given the limited number of transactions that were available for review were either (a) not recent, and therefore, of limited relevance as the industry has evolved since those transactions occurred or (b) involved companies that do not compete in the electronics device remanufacturing industry.

Based on the aforementioned analyses, and other information described herein and solely for purposes of the Plan, the estimated range of Enterprise Value of the Reorganized Debtors, collectively, as of December 13, 2019, is approximately $226 million to approximately $302 million.

In addition, based on the estimated range of Enterprise Value of the Reorganized Debtors and other information described herein and solely for purposes of the Plan, Jefferies estimated a potential range of total Equity Value of the Reorganized Debtors, which consists of the Enterprise Value, less funded indebtedness plus excess balance sheet cash on the Effective Date.  Jefferies has assumed that the Reorganized Debtors **will** have, as of the Effective Date, indebtedness of $80 million and no excess cash.[2]  Therefore, Jefferies estimated that the potential range of Equity Value for the Reorganized Debtors is between approximately $146 million and approximately $222 million subject to dilution from the management incentive plan.

---

[1]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Disclosure Statement.

[2]   Excludes pro forma cash balance of $15.9 million, which is assumed to be part of working capital.

For purposes of the Valuation Analysis, Jefferies assumed that no material changes that would affect estimated value will occur between the date of filing of the Disclosure Statement and the Effective Date.  Jefferies' Valuation Analysis does not constitute an opinion as to the fairness from a financial point of view of the consideration to be received or paid under the Plan, of the terms and provisions of the Plan, or with respect to any other matters.

THE VALUATION ANALYSIS REFLECTS WORK PERFORMED BY JEFFERIES ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESSES AND ASSETS OF THE DEBTORS AVAILABLE TO JEFFERIES AS OF DECEMBER 13, 2019.  IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY HAVE AFFECTED OR MAY AFFECT JEFFERIES' CONCLUSIONS, JEFFERIES DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM THE VALUATION ANALYSIS AND DOES NOT INTEND TO DO SO.

JEFFERIES DID NOT INDEPENDENTLY VERIFY THE FINANCIAL PROJECTIONS OR OTHER INFORMATION THAT JEFFERIES USED IN THE VALUATION ANALYSIS, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS OR THEIR ASSETS WERE SOUGHT OR OBTAINED IN CONNECTION THEREWITH.  THE VALUATION ANALYSIS WAS DEVELOPED SOLELY FOR PURPOSES OF THE PLAN AND THE ANALYSIS OF POTENTIAL RELATIVE RECOVERIES TO CREDITORS THEREUNDER.  THE VALUATION ANALYSIS REFLECTS THE APPLICATION OF VARIOUS VALUATION TECHNIQUES, DOES NOT PURPORT TO BE AN OPINION, AND DOES NOT PURPORT TO REFLECT OR CONSTITUTE AN APPRAISAL, LIQUIDATION VALUE, OR ESTIMATE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH IN THE VALUATION ANALYSIS.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES THAT ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS.  AS A RESULT, THE VALUATION ANALYSIS IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, JEFFERIES, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY.  IN ADDITION, THE POTENTIAL VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT.  ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT IMMEDIATELY RATHER THAN HOLD THEIR INVESTMENT ON A LONG-TERM BASIS, THE POTENTIALLY DILUTIVE IMPACT OF CERTAIN EVENTS, INCLUDING THE

ISSUANCE OF EQUITY SECURITIES PURSUANT TO THE EMPLOYEE INCENTIVE PLAN AND OTHER FACTORS THAT GENERALLY INFLUENCE THE PRICES OF SECURITIES.

The Debtors' management team advised Jefferies that the Financial Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' best estimates and judgments as to the future operating and financial performance of the Reorganized Debtors.  If the business performs at levels below or above those set forth in the Financial Projections, such performance may have a materially negative or positive impact, respectively, on the valuation of the company and the Enterprise Value thereof.

In preparing the Valuation Analysis for the Reorganized Debtors, Jefferies: (1) reviewed certain historical financial information of the Debtors for recent years and interim periods; (2) discussed the Debtors' performance, future prospects, and industry observations with certain members of the Debtors' senior management; (3) considered certain economic and industry information relevant to the Debtors' operating businesses; (4) reviewed certain publicly available financial data for public companies that Jefferies deemed generally relevant in analyzing the value of the Reorganized Debtors; (5) reviewed certain publicly available data for, and considered the market values implied therefrom, precedent transactions involving companies comparable in certain respects to the Reorganized Debtors; (6) considered certain economic and industry information that Jefferies deemed generally relevant to the Reorganized Debtors.  Jefferies assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management and other parties as well as publicly available information.

The Valuation Analysis does not constitute a recommendation to any Holder of Allowed Claims or any other person as to how such person should vote or otherwise act with respect to the Plan. Jefferies has not been requested to, and does not express any view as to, the potential trading value of the Reorganized Debtors' securities on issuance or at any other time.

The Debtors have not determined whether the transaction will be consummated as a taxable transaction or a recapitalization or, if it is consummated as a reorganization, the extent to which any of the Debtors' tax attributes would survive.  Accordingly, Jefferies has assumed that none of the Debtors' existing tax attributes (such as net operating losses, capital losses, or carryforwards under section 163(j) of the Internal Revenue Code) will be preserved.  Additionally, Jefferies has not estimated any changes to protected tax depreciation or amortization that will result from the implementation of the restructuring.  Any changes to these assumptions, or a change in the structure utilized to consummate the reorganization, could materially impact the conclusions reached in the Valuation Analysis.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE VALUATION ANALYSIS PERFORMED BY JEFFERIES.  THE PREPARATION OF A VALUATION ANALYSIS INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ANALYSIS IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION.  THE VALUATION ANALYSIS

PERFORMED BY JEFFERIES IS NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE DESCRIBED HEREIN.

JEFFERIES IS ACTING AS FINANCIAL ADVISOR AND INVESTMENT BANKER TO THE DEBTORS AND HAS NOT AND WILL NOT BE RESPONSIBLE FOR, AND HAS NOT AND WILL NOT PROVIDE, ANY TAX, ACCOUNTING, ACTUARIAL, LEGAL, OR OTHER SPECIALIST ADVICE TO THE DEBTORS OR ANY OTHER PARTY IN CONNECTION WITH THE DEBTORS' CHAPTER 11 CASES, THE PLAN OR OTHERWISE.

**Exhibit F**

**Liquidation Analysis**

# LIQUIDATION ANALYSIS
## *In re* CLOVER TECHNOLOGIES GROUP, LLC, et al.

The Debtors[1] have prepared a hypothetical liquidation analysis (the "Liquidation Analysis") in connection with the Plan and Disclosure Statement for purposes of evaluating whether the Plan meets the "best interests test" under Section 1129(a)(7) of the Bankruptcy Code.  Section 1129(a)(7) of the Bankruptcy Code requires that with respect to each Impaired Class of claims and equity interests, each such holder either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date of the Plan, that is not less than the value such Holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code  ("Chapter 7").

A.      Best Interests Test

The "best interests test," accordingly, may require the Bankruptcy Court to determine what the holders of Allowed Claims and Interests in each Impaired Class would receive from a hypothetical liquidation of the Debtors' assets and properties in the context of a liquidation under Chapter 7.  To determine if a Plan is in the best interests of each Impaired Class, the value of the distributions from the proceeds of the hypothetical liquidation of the Debtors' assets and properties is then compared with the value offered to such Classes of Claims against and Interests in the Debtors pursuant to the Plan.

The Debtors believe that the Plan satisfies the "best interests test," and that the Holders of Allowed Claims or Interests in each Impaired Class will receive at least as much under the Plan as they would if the Debtors were liquidated under Chapter 7.

This Liquidation Analysis was prepared for the sole purposes of providing a good-faith estimate of the proceeds that would be generated if the Debtors were liquidated under Chapter 7, and it is not intended and should not be used for any other purpose.

B.      Methodology

The first step in determining whether the "best interests test" has been satisfied is to estimate the proceeds that a trustee appointed pursuant to Chapter 7 (the "Chapter 7 Trustee") would be likely to generate if the Chapter 7 Trustee liquidated the Debtors' estates in a Chapter 7 liquidation.  The second step in the analysis is to reduce this total hypothetical value by the estimated costs of the Chapter 7 liquidation, which may including: (i) the fees and expenses of the Chapter 7 Trustee; (ii) administrative expenses; and (iii) priority claims that may exist or may result from the termination of the Debtors' businesses and use of Chapter 7 for the purpose of liquidation.  In the third step of the analysis, the remaining hypothetical value is reduced by the carve-out, and any claims secured by enforceable security interests and liens against the the Debtors' assets and their estates.  Fourth, any Cash remaining from the hypothetical liquidation is allocated to Holders of Allowed Claims and Interests in strict priority in accordance with Section 726 of the Bankruptcy Code.  Finally, each Holder's liquidation distribution is compared to the distribution that such Holder would likely receive if the Plan is confirmed and consummated.  The "best interest test" has been satisfied if the probable distribution to such Holder in a Chapter 7 liquidation has a value that is less than the value of the probable distribution under the Plan.

---

[1]For purposes of the Liquidation Analysis, the proceeds, wind down costs, and claims of the Debtors include the assets and liabilities of the non-debtor subsidiaries.

C.    Liquidation Analysis

The Liquidation Analysis is based on a number of estimates and assumptions that are inherently subject to significant economic, competitive and operational uncertainties and contingencies that are beyond the control of the Debtors or a Chapter 7 Trustee.  Further, the actual amounts of Claims against the Debtors' estates could vary materially from the estimates set forth in the Liquidation Analysis, depending on, among other things, the Claims asserted during a Chapter 7 Liquidation.  Accordingly, the Debtors cannot assure you that the values assumed would be realized or the Claims estimates assumed would not change if the Debtors were in fact liquidated, nor can assurances be made that the Bankruptcy Court would accept this analysis or concur with these assumptions in making its determination under Section 1129(a) of the Bankruptcy Code.

The Liquidation Analysis has been prepared assuming that the Chapter 11 Cases convert to Chapter 7 cases on or about February 1, 2020 (the "Liquidation Date"), and an expedited marketing sale process would be initiated on the Liquidation Date, and immediately after the Liquidation Date, the Debtors' assets would be marketed for sale as a going concern entity during a sixty-day period (the "Sale Process").  It is assumed that the Debtors' assets will be sold to a single buyer.  It is presumed that the Chapter 7 Trustee would resolve all Claims and other matters involving the Debtors' estates and make distributions.

The Liquidation Analysis assumes that the Chapter 7 Trustee sells or otherwise monetizes the the Debtors' assets as a going concern enterprise within a sixty-day window. Any discounts reflect the potential practical and pragmatic difficulties imposed by, among other things:  (i) the constraints on the Chapter 7 Trustee of operating the Debtors' businesses in Chapter 7 (ii) the "as is" nature of the sale including potential reduction in value from the Chapter 7 Trustee's limited ability to provide representations and warranties as well as indemnification provisions in connection with any sale.

The Liquidation Analysis is based on unaudited book values as of October 31, 2019, with adjustments to assume a hypothetical balance as of the Liquidation Date, unless otherwise stated (the "Estimated Book Value"). These Estimated Book Values are assumed to be representative of the Debtors' assets and liabilities as of the Liquidation Date. The Liquidation Analysis presents the liquidation of the Debtors on a consolidated basis. Proceeds realized from each Debtor are aggregated in a common distribution source. Clover Technologies Group, LLC, et al., and its direct and indirect subsidiaries (the "Operating Entities") are reflected as a consolidated group because (i) substantially all of the Debtors' assets are owned by the Operating Entities, and (ii) the Term Loan Secured Claims are secured by substantially all assets of each of the Operating Entities. There are no known material unencumbered assets owned by any of the Debtors.

In preparing the Liquidation Analysis, A&M reviewed the Debtors' books and records, conferred with management and the Debtors' restructuring counsel, and relied on its own professional judgments, from all of which A&M estimated an amount of Claims that will ultimately become Allowed Claims. Such Claims have not been evaluated by the Debtors or Allowed by the Bankruptcy Court and, accordingly, the final amount of Allowed Claims against the Debtors may differ from the Claim amounts used to complete this Liquidation Analysis.

The liquidation may also prompt certain other events to occur, including the rejection and probable breach of Executory Contracts, Unexpired Leases and other agreements that have not been rejected as of the date thereof. Such events would create additional General Unsecured Claims. The

Liquidation Analysis does not include estimates for the tax consequences that may be triggered upon a Chapter 7 liquidation and any related asset sales in the manner described above. Such tax consequences may be material. In addition, the Liquidation Analysis does not include recoveries resulting from any potential preference, fraudulent transfer, or other litigation or Avoidance Actions, which are assumed to have zero value for purposes of the Liquidation Analysis.

D.    <u>Disclaimer</u>

**THE LIQUIDATION ANALYSIS WAS PREPARED SOLELY AS A GOOD-FAITH ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF A HYPOTHETICAL CHAPTER 7 LIQUIDATION OF THE DEBTORS' ASSETS.    THE LIQUIDATION ANALYSIS RELIES ON A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT LEGAL, ECONOMIC, COMPETITIVE, AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE DEBTORS' AND THEIR RESTRUCTURING ADVISORS' CONTROL.    ADDITIONALLY, VARIOUS DECISIONS UPON WHICH CERTAIN ASSUMPTIONS ARE BASED ARE SUBJECT TO CHANGE.**

**THERE CAN BE NO GUARANTEE THAT THE ASSUMPTIONS AND ESTIMATES EMPLOYED IN DETERMINING THE HYPOTHETICAL LIQUIDATION VALUES OF THE DEBTORS' ASSETS REFLECT THE ACTUAL VALUES THAT WOULD BE REALIZED IF THE DEBTORS WERE TO UNDERGO AN ACTUAL LIQUIDATION, AND SUCH ACTUAL VALUES COULD VARY MATERIALLY FROM THOSE SHOWN HEREIN.  NEITHER THE DEBTORS NOR THEIR RESTRUCTURING ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE WOULD OR WOULD NOT APPROXIMATE EITHER THE ASSUMPTIONS ON WHICH THIS LIQUIDATION ANALYSIS IS BASED OR THE RESULTS OF THE LIQUIDATION ANALYSIS REFLECTED HEREIN.**

**THIS ANALYSIS HAS NOT BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS AND HAS NOT BEEN PRODUCED IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.**

**NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM OR INTEREST BY THE DEBTORS.    THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS OR INTERESTS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS.    THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE LIQUIDATION ANALYSIS SET FORTH HEREIN.**

E.    Liquidation Analysis

## CLOVER TECHNOLOGIES GROUP, LLC, et al.
### Chapter 7 Liquidation Analysis
(USD in '000s)

| | Note References | Estimated Book Value | Estimated Recovery Rate Low | Estimated Recovery Rate High | Estimated Liquidation Value Low | Estimated Liquidation Value High | Midpoint Est. Liquidation Value |
|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | |
| **Current Assets:** | | | | | | | |
| Unrestricted Cash | A | $ 15,860 | 100.0% | 100.0% | $ 15,860 | $ 15,860 | $ 15,860 |
| Accounts Receivable, net | B | 45,572 | 90.0% | 100.0% | 41,015 | 45,572 | 43,293 |
| Inventory | C | 37,001 | 80.0% | 90.0% | 29,601 | 33,301 | 31,451 |
| Prepaid Expenses & Other Current Assets | D | 2,721 | 50.0% | 70.0% | 1,360 | 1,905 | 1,633 |
| **Total Current Assets** | | $ 101,154 | | | $ 87,836 | $ 96,637 | $ 92,237 |
| **Long Term Assets:** | | | | | | | |
| Includes (Property, Plant & Equipment, Other LT Assets & Goodwill) | | | | | | | |
| **Total Long Term Assets** | E | $ 98,609 | 45.0% | 60.0% | $ 44,208 | $ 58,708 | $ 51,458 |
| **Total Estimated Proceeds from Liquidation of Clover Technologies Group LLC et al. and Non-Debtor Group[1]** | | | | | $ 132,044 | $ 155,345 | $ 143,694 |
| **Chapter 7 Liquidation Adjustments:** | | | | | | | |
| **Post Conversion Cash Flow** | F | | | | $ 10,200 | $ 10,200 | $ 10,200 |
| **Wind Down Costs** | G | | | | | | |
| Operational Costs Associated with Wind Down | | | | | $ (2,287) | $ (1,715) | $ (2,001) |
| Professional Fees | | | | | (3,441) | (3,907) | (3,674) |
| **Total Wind Down Costs** | | | | | $ (5,728) | $ (5,622) | $ (5,675) |
| Chapter 7 Trustee Fees | H | | | | (3,931) | (4,630) | (4,281) |
| **Total Chapter 7 Liquidation Adjustments** | | | | | $ 541 | $ (53) | $ 244 |
| **Net Estimated Proceeds from Liquidation Available for Distribution by class** | | | | | $ 132,584 | $ 155,293 | $ 143,939 |
| Net Estimated Proceeds Allocable to Credit Agreement Claims | | | | | | | $ 143,939 |
| **Net Estimated Proceeds from Liquidation Available for Distribution** | | | | | | | $ 143,939 |

| | | | Total Est. Claim | Total Dist. % | Total Est. Distribution |
|---|---|---|---|---|---|
| **Distributions from Secured Proceeds** | | | | | |
| **Beginning Distributable Value** | | | | | $ 143,939 |
| Superpriority Carveout Claims | I | | $ 2,333 | 100.0% | 2,333 |
| **Net Remaining Distributable Value** | | | | | $ 141,606 |
| **Remaining Distributable Value** | | | | | $ 141,606 |
| Term Loan Secured Claims | J | | $ 444,700 | 31.8% | 141,606 |
| **Total Credit Agreement Claims** | | | $ 444,700 | 0.0% | $ - |
| **Remaining Distributable Value** | | | | | $ - |
| Chapter 11 Administrative Claims | K | | $ 11,078 | 0.0% | |
| **Net Remaining Distributable Value** | | | | | $ - |
| **General Unsecured Claims** | | | | | |
| Credit Agreement Deficiency Claims | L | | 303,094 | 0.0% | - |
| General Unsecured Claims & Accrued Expenses | L | | 4,416 | 0.0% | - |
| **Total General Unsecured Claims** | | | $ 307,510 | 0.0% | $ - |
| **Residual Value Available for Equity Holders** | | | | | $ - |

**Note:**

1 - Hypothetical Liquidation value assumed for Clover Technologies LLC et al. inclusive of the Non-Debtor group consisting of foreign Clover Wireless entities and Teleplan N.V.

**Notes to the Liquidation Analysis**

The following notes describe key assumptions that were made with respect to assets, wind-down expenses, and claims.

<u>**Asset Recovery**</u>

**Note A – Unrestricted Cash**

The Debtors' unrestricted cash balance as of the Liquidation Date is estimated to be $15.9 million. It is assumed that cash and cash equivalents of the Debtors would be 100% collectible and available. Cash held by third parties as security is not considered recoverable for purposes of this analysis. The projected cash balances as of the Liquidation Date are consistent with the Debtors' business plan and financial projections.

**Note B – Accounts Receivable (net)**

The accounts receivable balance as of the Liquidation Date has been estimated based on projected revenue and collection estimates. In all, the accounts receivable balance available for collection as of the Liquidation Date has been estimated at approximately $45.6 million.

The analysis of accounts receivable assumes that the Chapter 7 Trustee would retain certain existing staff of the Debtors to handle a collection effort of outstanding trade accounts receivables from customers. Collections during a liquidation of the Debtors would likely be significantly compromised as customers may attempt to offset outstanding amounts owed to the Debtors against alleged damage and breach of contract Claims. The liquidation value of accounts receivable was estimated by applying a recovery factor consistent with the Debtors' experience in collecting accounts receivable, comparable assumptions of Chapter 7 recovery rates in similar cases, and the expectation of additional attempts to offset. The estimates also consider the inevitable difficulty a liquidating company has in collecting its receivables and any concessions that might be required to facilitate the collection of certain accounts. Recoveries of this account are estimated to be between approximately 90% and 100% of the outstanding balance.

**Note C – Inventory**

Inventory consists of materials, parts, WIP, and finished goods. The Debtors' inventory includes component parts, consumable products, packaging, and refurbished devices; including, but not limited to, cellular phones, LCDs, wearables, iPads & tablets, PCs, and servers. A portion of the Debtors' inventory is expected to be in-transit on the Liquidation Date. As such, it is assumed a portion of this inventory will be clawed back by suppliers due to product recall upon conversion to Chapter 7. In total, inventory is estimated to be recoverable at 80% to 90% of the Estimated Book Value after Sale Process adjustments.

**Note D – Prepaid Expenses & Other Current Assets**

Prepaid expenses and other current assets include prepaid expenses, prepaid insurance, prepaid rent, and miscellaneous other current assets, in total estimated to be recoverable at 50% to 70% of the Estimated Book Value for such category after adjusting certain accounts that would expect to be utilized during the Sale Process.

WEIL:\96874613\1\57682.0003

**Note E – Long Term Assets**

Recovery from the sale of Clover Technologies, LLC et al. and related non-debtor subsidiaries is expected to be low relative to book value due to several factors, including but not limited to, an expedited sales process, acquisition by a single buyer, and the unique type of business and corresponding limited number of suitors for the assets.

Typically, upon filing Chapter 7, a business is shut down and ceases all operations. For purposes of this Liquidation Analysis; however, the Debtors assets are assumed to be marketed for sale as a going concern and assumed recovery for Long Term Assets has been estimated based upon the enterprise valuation reflected by Exhibit E to the Disclosure Statement which is in part based on an expected EBITDA multiple applied to the projected EBITDA for the Debtors.  Such EBITDA has been adjusted to reflect the operational impact of a liquidation scenario. Similarly, the multiples utilized in determining this recovery percentage have been discounted in relation to current market multiples to reflect the distressed nature of the transaction as well as the other factors previously described in this and prior notes.

Long term assets include: fixed assets representing land, buildings, fixtures, vehicles, furniture and other miscellaneous fixed assets, as well as intangibles and goodwill, owned by the Debtors.  An estimated $98.6 million in net book value of long term assets are valued on an estimated discounted basis.  Long term assets are assumed to have a consolidated recovery in the approximate range of 45-60%, of net book value.  Due to the potential difficulty and timing in liquidating long term assets, recoveries on these assets could be materially lower.

**Chapter 7 Liquidation Adjustments**

**Note F – Post-Conversion Cash Flow**

Based on the Debtors and their advisors' financial projections, this adjustment approximates cash flow generated by operating Debtor entities for the period from the Liquidation Date to the end of the sixty-day marketing period.

**Note G - Wind-Down Costs**

The Liquidation Analysis assumes the Debtors' assets are marketed for sale as a going concern during a sixty-day period. The estimated costs associated with the liquidation of the Debtors include operating expenses and other costs associated with liquidation activities including, but not limited to: (i) collection of accounts receivable, (ii) communication and coordination with personnel to continue operations during asset sales, (iii) negotiation of the sale of other tangible and intangible assets, and (iv) certain employee-related expenses. These costs include salaries, occupancy costs, certain general and administrative costs, and professional fees. If the aforementioned activities or other activities associated with the liquidation of the assets take longer than the assumed liquidation period, actual administrative costs may exceed the estimate included in the Liquidation Analysis.

1. Operational Costs: Minimal staff and shared services of the Debtors operations are assumed to be utilized by the Chapter 7 Trustee post closing of a sale, in order to maximize the value of the estate. Such resources would include, but are not limited to, access to finance, accounting, and legal personnel, books and records, and other miscellaneous administrative functions.

These estimated expenses are based on an analysis of the run rate of the Debtors' actual corporate general and administrative detailed expenses incurred in recent historical periods. No provision has been made within the operational budget for a formal severance plan, which, if implemented, could increase the wind-down expenses.

2. <u>Professional Fees:</u> Chapter 7 professional fees include legal, investment banking, appraisal, and accounting fees expected to be incurred during the liquidation period that are not already deducted from liquidation values. Professional fees are estimated between $3.4 and $3.9 million during the Sale Process.

## Note H – Trustee Fees

Estimated trustee fees and related fees associated with the liquidation of the Debtors' assets are assumed to be 3% of total sale proceeds.

## Estimated Claim Amounts

In preparing the Liquidation Analysis, the Debtors have estimated an amount of Allowed Claims for each Class based upon a review of the Debtors' projected balance sheets as of the Liquidation Date, adjusted as discussed herein. The Debtors currently expect the amount of Allowed Claims to generally correspond to the amounts set forth on the Debtors' balance sheets, but there can be no assurances that this will occur. Subject to the following paragraphs, the estimate of all Allowed Claims in the Liquidation Analysis is based on the par value of those Claims on the Debtors' balance sheets.

Depending on the outcome, a liquidation also may trigger certain Claims that otherwise would not exist. Examples of these kinds of Claims include various potential employee Claims (*e.g.*, for such items as potential WARN Act Claims), Claims related to the rejection of unexpired leases and executory contracts, and other potential Allowed Claims. These additional Claims could be significant, and some may be entitled to priority in payment over holders of general unsecured claims. Certain estimates for these Claims have been included but due to their uncertainty may realize material variances to actual Claims asserted.

In sum, the actual amount of Allowed Claims could be materially different from the amount of Allowed Claims estimated in the Liquidation Analysis. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied upon for any other purpose, including, any determination of the value of any distribution to be made on account of allowed claims under the Plan. Nothing contained in this Liquidation Analysis is intended to be, or constitutes, a concession, admission, or allowance of any claim by the Debtors. The Debtors reserve all rights to supplement, modify, or amend the analysis set forth herein.

## Distributions

## Note I – Super-priority Carve-out Claims

Includes fees paid to the U.S. Trustee and Clerk of the Bankruptcy Court, and certain Allowed professional fees claims under the Final Cash Collateral Order, excluding investment banker success fees contingent on the consummation of certain transactions. The estimates are consistent with the Debtors' Cash Collateral Budget.

## Note J – Term Loan Secured Claims

Term Loan Secured Claims are assumed to approximate $444.7 million.

**Note K – Chapter 11 Administrative and Priority Claims**

Chapter 11 Administrative Claims include estimated post-petition accounts payable and accruals outstanding upon conversion to a Chapter 7, the assumed rejection Claims relating to any post-petition agreements or assumed contracts, and certain projected accrued and unpaid bonus obligations. These assumed Claims are assumed to approximate $11 million.

**Note L – General Unsecured Claims**

> For purposes of the Liquidation Analysis, the Debtors have assumed that Allowed General Unsecured Claims will consist of prepetition unpaid and accrued unsecured obligations owed to deficiency Claims on account of less than full satisfaction of the Allowed Term Loan Secured Claims (the "Term Loan Deficiency Claims"), vendors, certain employees, as well as Claims for damages arising from the rejection of certain Executory Contracts and Unexpired Leases. The Liquidation Analysis does not attempt to estimate any additional General Unsecured Claims that would arise as a result of the rejection of additional Executory Contracts (including talent and programming contracts) and Unexpired Leases that would otherwise be assumed under the Plan, the failure of the Debtors to perform under existing contracts, or any potential litigation Claims. The amount of such additional Claims would likely be substantial in amount. Additionally, this Liquidation Analysis does not include any estimates for recovery by the Chapter 7 Trustee on account of certain potential Avoidance Actions and other Causes of Action.

## CONCLUSION

**BASED ON THIS HYPOTHETICAL LIQUIDATION ANALYSIS VERSUS THE IMPLIED REORGANIZATION VALUE AND ANTICIPATED DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS AND INTERESTS UNDER THE PLAN, THE PLAN SATISFIES THE REQUIREMENTS OF 1129(A)(7) OF THE BANKRUPTCY CODE.**

In addition, the Debtors believe that the present value of distributions from the liquidation proceeds, to the extent available, may be further reduced because such distributions in a Chapter 7 may not occur until significantly after the period assumed in the analysis.  Moreover, in the event that litigation becomes necessary to resolve claims asserted in the Chapter 7, distributions to creditors could be further delayed, which both decreases the present value of those distributions and increases administrative expenses that could diminish the liquidation proceeds available to prepetition creditors. THE EFFECTS OF THIS DELAY ON THE VALUE OF DISTRIBUTIONS UNDER THE HYPOTHETICAL LIQUIDATION HAVE NOT BEEN CONSIDERED IN THIS LIQUIDATION ANALYSIS.